1        UNITED STATES BANKRUPTCY COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3            (SAN FRANCISCO DIVISION)

4

5   In re:

6   SIMA GEREVICH and          Case No. 13-31018
    MICHAEL GEREVICH,
7
                               Chapter 13
8
                               San Francisco,California
9                              June 10, 2015
                               10:19 a.m.
10          Debtors.
    _____/
11
    MICHAEL GEREVICH and
12  SIMA GEREVICH,

13          Plaintiffs,

14     v.                      A.P. No. 14-3056

15  ANNIE Li SUN, as Trustee
    of the ANNIE Li SUN
16  REVOCABLE TRUST,

17          Defendant.
    _____/
18

19          TRANSCRIPT OF TRIAL PROCEEDINGS

20

        BEFORE THE HONORABLE HANNAH L. BLUMENSTIEL
21            UNITED STATES BANKRUPTCY JUDGE

22

23

24

25

1  APPEARANCES:

2  For the Plaintiffs:        VOLKOV LAW FIRM
                              BY: ALEKSANDR A. VOLKOV, ESQ.
3                             211 Gough Street #211
                              San Francisco, California 94102
4

5  For the Defendant:         MORANGA AND MORGENSTERN
                              BY: PHILLIP T.S. TUKIA, ESQ.
6                                  CHRISTOPHER F. JOHNSON, ESQ.
                              350 Sansome Street #350
7                             San Francisco, California 94104

8
   Bankruptcy Counsel for     LAW OFFICES OF OXANA KOZLOV
9  Debtors:                   BY: OXANA KOZLOV, ESQ.
                              649 Dunholme Way
10                            Sunnyvalie, California 94087

11
   Also Present:              SVETLANA SHIRINOVA
12                            Certified Court Interpreter

13
   Court Recorder:            BEN GAPUZ
14                            UNITED STATES BANKRUPTCY COURT
                              235 Pine Street
15                            San Francisco, California 94104

16

17 Transcription Service:     Jo McCall
                              Electronic Court
18                            Recording/Transcribing
                              2868 E. Clifton Court
19                            Gilbert, Arizona 85295
                              Telephone: (480)361-3790
20

21

22

23

24

25

1                          I N D E X

2   Opening Statements:                                  Page

3   By Mr. Volkov                                          11

4   By Mr. Tukia                                           12

5   Plaintiffs' Witnesses:   Direct Cross Redirect Recross

6   Casey, John

7       By Mr. Volkov          65              101

8       By Mr. Tukia                 98

9   Myers, David Barry

10      By Mr. Volkov         106

11      By Mr. Tukia                113

12  Sun, Annie Li

13      By Mr. Volkov         116              146

14      By Mr. Johnson              141

15  Gerevich, Sima

16      By Mr. Volkov         156              195

17      By Mr. Tukia                172

18  Defense Witnesses:

19  Casey, John

20      By Mr. Tukia           14               61

21      By Mr. Volkov                34                      63

22  Closing Arguments:                                   Page

23  By Mr. Volkov                                         208

24  By Mr. Tukia                                          223

25

E X H I B I T S

Plaintiffs' Exhibits:                                    Evid.

32 - e-mail letter from John Casey - April 9, 2013      76

18 - e-mail letter from John Casey - February 7, 2013  79

37 - Copies of Disaster Relief payment checks           87

 6 - Supplemental Declaration of Annie Lu Sung         123

 4 - Defendants' Amended Claim No. 19-2                131

15 - Letter from Mr. Volkov dated December 23, 2013    133

19 - Invoice from Cindy Lee dated January 28, 2013     138

33 - Escrow Instructions re Assignment of Lease        160
       to Plaintiffs


Defense Exhibits:

D - Lease                                               37

E - Assignment of Lease                                 37

F and G - Letters written by Mr. Casey to Plaintiffs 41

I - Letter written by Mr. Casey to Plaintiffs          42

N - Fautline Plumbing Invoice dated April 13, 2013    114

H, J, K                                                195

P R O C E E D I N G S

June 10, 2015                                    10:19 a.m.

---—oOo—-

COURTROOM DEPUTY: All rise.  This is the United States Bankruptcy Court for the Northern District of California.  Court is now in session.

THE COURT: Please take your seats.

COURTROOM DEPUTY: This is the Court's 10:00 o'clock calendar in regards to Gerevich, et al. versus Sun, et al.

THE COURT: Appearances, please.

MR. VOLKOV: Good morning, Your Honor, Aleksandr Volkov on behalf of the Plaintiffs and the Debtors in the case, Sima and Michael Gerevich.

MR. TUKIA: Good morning, Your Honor, Phillip Tukia for Defendants and creditors.

THE COURT: Good morning.

MR. JOHNSON: Good morning, Your Honor, Chris Johnson also for Defendants and creditors.

THE COURT: Good morning.

MS. KOZLOV: Good morning, Your Honor, Oxana Kozlov, bankruptcy attorney for the Debtors.

MS. SHIRINOVA: Your Honor, the Debtors are assisted by certified court interpreter, Svetlana Shirinova.

1        THE COURT: And that's you?

2        MS. SHIRINOVA: Yes, Your Honor.

3        THE COURT: And why were you late?

4        MS. SHIRINOVA: I got lost.  I'm sorry.

5        THE COURT: Yeah.  We started -- we were supposed

6   to start at 10:00 o'clock, and that's when you're supposed

7   to be here.  Do not be late again.  Do you understand?

8        MS. SHIRINOVA: Yes, Your Honor.  I've learned my

9   lesson.  Thank you.

10       THE COURT: What's your last name?

11       MS. SHIRINOVA: Mine?

12       THE COURT: Yes.

13       MS. SHIRINOVA: S-h-i-r-i-n-o-v-a.

14       THE COURT: S-h-i-r-i-n-o --

15       MS. SHIRINOVA: v-a.

16       THE COURT: Thank you.  All right.  We'll first

17  address the motions in limine that were filed.  I will rule

18  on those without argument, having read them and evaluated

19  them yesterday.  We'll start with Defendants' motion in

20  limine No. 1 to exclude evidence of post-fire restoration

21  activities.  The Defendants' motion in limine seeks to

22  exclude all evidence relating to post-fire restoration

23  activities.

24       The Plaintiffs' opposition -- or the Debtors'

25  opposition contends that the motion in limine is so vague

1  that they cannot tell exactly what the creditors actually

2  intend to exclude, but beyond that, the Debtors allege that

3  some portions of the creditor's claim indisputably occurred

4  post-fire, in other words after March 23rd, 2013.  These

5  items are a $895 plumbing charge and a $2,244.94 Advanced

6  Restoration charge.  The Court will grant in part and deny

7  in part the creditor's motion.  The Advanced Restoration

8  charge is properly excluded because it is not specifically

9  pled in the complaint, and the creditors would be unduly

10 prejudiced by allowing the Debtors to challenge this

11 portion of the creditors' claim now.

12        The Court will deny the motion in limine as to

13 the $895 plumbing repair charge.  The Debtors clearly

14 challenge this component of the creditors' claim in their

15 complaint, so even though this charge occurred after the

16 March 23rd, 2013 fire, the creditors are not prejudiced by

17 trial of this issue, having always been on notice that it

18 was in issue.

19        As to Plaintiffs' motion in limine No. 1, this

20 motion in limine seeks relief to challenge the $2,244.94

21 Advanced Restoration charge included in the creditor's

22 Proof of Claim.  The Debtors contend that even though this

23 component of the creditor's claim was not clearly

24 challenged in their complaint, the creditors would not be

25 prejudiced by trial of this issue because it was raised

1 during discovery. The creditors contend that they would be

2 ambushed and prejudiced if forced to try this element of

3 their claim, and the Court agrees. The Debtors' complaint

4 does not take issue with this element of the creditor's

5 claim, and Plaintiffs chose not to amend their complaint to

6 properly place the creditors and the Court on notice of

7 this issue. So the Debtors' motion in limine No. 1 will be

8 denied.

9 Plaintiffs/Debtors' motion in limine No. 2 seeks

10 to exclude witness Cindy Lee whose testimony is allegedly

11 relevant to the component of the creditors' claim

12 consisting of $2,000 for attorney's fees on the grounds

13 that she was not disclosed in the creditors' Rule 26

14 disclosures. The motion also seeks to limit the testimony

15 of Defendant's witness, David Myers, to be subjects upon

16 which the Plaintiffs deem him competent, namely the

17 plumbing invoice of $895 and the Advance Restoration charge

18 of $2,244.94.

19 Finally, the motion seeks to limit the

20 Defendants' examination of Mr. and Mrs. Gerevich to cross

21 on the grounds that the Defendants did not compel their

22 appearance at trial. It further seeks an order requiring

23 the Defendants to pay half the cost of the interpreter

24 necessary to facilitate Mr. and Mrs. Gerevich's testimony.

25 The Defendants contend that their failure to identify Ms.

1  Lee as a witness was harmless, although they don't explain
2  that failure in any meaningful way.  Absent a reasonable
3  explanation of Defendants' failure to identify Ms. Lee as a
4  potential witness when they clearly possessed relevant
5  discoverable information concerning an element of their
6  claim that was challenged in the complaint, the Court will
7  grant the Plaintiffs' motion as to Ms. Lee and exclude her
8  testimony.

9         As to Mr. Myers, the Defendants argue that he
10 should be allowed to testify as to the $895 plumbing
11 charge, but as to the $2,244.94 Advanced Restoration
12 charge, Defendants contend that this portion of their claim
13 is not at issue and that therefore the Court should not
14 entertain any evidence relating to that amount.  The
15 Defendants' opposition to Plaintiffs' motion in limine No.
16 2 is silent as to the Plaintiffs' argument regarding Mr.
17 and Mrs. Gerevich's testimony.

18        The Court notes that the Defendants previously
19 stipulated to -- stipulated and agreed to pay half of the
20 translator's fee, and the Court fully expects the
21 Defendants to honor that agreement.  As to Mr. and Mrs.
22 Gerevich's testimony, the Court notes that the Plaintiffs
23 cite no authority requiring it to limit their testimony as
24 the Debtors demand, and while it may have been very core
25 practice for the Defendants to neglect to compel Mr. and

1  Mrs. Gerevich's appearance at trial, they are here, and the

2  Court sees no reason to limit Defendants' examination to

3  cross.

4        The Court will also deny Plaintiffs' motion in

5  limine No. 2 as to Mr. Myers.  The motion is moot as to the

6  Advanced Restoration component of Defendants' claim, given

7  that the Court has granted in part Defendants' motion in

8  limine and excluded that issue from trial.  Mr. Myers may

9  testify as to the $895 plumbing charge.  So Plaintiffs'

10 motion in limine No. 2 will be granted in part and denied

11 in part.

12       Finally, Plaintiffs' motion in limine No. 3, this

13 motion seeks to exclude so-called cumulative evidence to

14 prohibit the Court –- and to prohibit the Court from

15 reviewing trial exhibits submitted prematurely as exhibits

16 to the Defendants' trial brief.  The Defendants apologize

17 for submitting some of their exhibits prematurely and

18 suggest that whether any exhibits are cumulative can be

19 addressed as they're introduced.  The Court agrees that

20 Plaintiffs' motion in limine is not well taken.

21       First and foremost, the Court knows better than

22 to review exhibits before trial, even exhibits as to which

23 the Plaintiffs have stated they have no objection.  Second,

24 the Court agrees that whether any exhibit is cumulative is

25 an issue best addressed at the time its proponent seeks its

1　admission.  So Plaintiffs' motion in limine No. 3 is denied

2　as pointless and therefore moot.

3　　　　Okay.  Any other housekeeping matters that we

4　need to address before we get started?

5　　　　MR. VOLKOV: Your Honor previously addressed

6　stipulation of the Defendants' witness, John Casey was

7　supposed to go first, and I don't see him in the courtroom.

8　　　　MR. TUKIA: Your Honor, Mr. Casey is outside.

9　　　　THE COURT: Okay.  Well, please fetch him if

10　that's what we're going to do.

11　　　　MR. TUKIA: Okay.

12　　(Pause.)

13　　　　THE COURT: Well, sir, are we going to have

14　opening statements?

15　　　　MR. TUKIA: Oh, I'm sorry.

16　　　　THE COURT: I have read the trial briefs and I'm

17　prepared to proceed without them, but it's up to counsel.

18　Mr. Volkov?

19　　　　　　　　OPENING STATEMENT

20　　　　MR. VOLKOV: Your Honor, I'll be very brief for

21　judicial economy of time.  This appears to be as stated in

22　the brief already a claim basic objection to the Proof of

23　Claim, and we will proceed first to demonstrating into

24　evidence as to the items allowed to be objected to, after

25　which we will make a summary argument of what the evidence

1    shows.  It is our position that the items objected to

2    should be disallowed as of the claim.

3                THE COURT: Okay.  Thank you.  Mr. Tukia?

4                          OPENING STATEMENT

5                MR. TUKIA: Your Honor, Defendants stand on their

6    trial brief.  Briefly, in response to some of the arguments

7    in the Plaintiffs' trial brief, for example, the accounting

8    of the taxes and insurance, and that will be brought up in

9    witness testimony, that was never brought up in the

10   complaint, in discovery.  Again, we're being sandbagged.

11   They've waited because they've already paid part of the

12   taxes based on the figures and demand that we provided.  So

13   that argument by the Plaintiffs is untimely, was waived,

14   and is incorrect anyway, and we'll prove that as well.

15   Thank you.

16               THE COURT: Okay.  Thank you.  All right.  So

17   we're going to call Mr. Casey out of order first, and

18   you'll be conducting your direct of him first; is that what

19   I understand?

20               MR. TUKIA: Well, it's my understanding that --

21   yeah, I can do that.  My understanding is that he was being

22   called out of order.  We thank the Court and opposing

23   counsel for allowing that so he can attend a graduation.

24   That's fine.

25               THE COURT: Mr. Casey is your witness, right?

1          MR. TUKIA: Yes, he is.

2          THE COURT: Okay.  So you'll conduct your direct.

3  Mr. Volkov, then you can cross and we can redirect and if

4  necessary recross.  So let's –- Mr. Casey, if you'd now

5  please come forward.  Just stand directly behind that table

6  there to my left, and you'll be sworn in.  Come around,

7  please.  You need to sit down eventually.

8              JOHN CASEY, DEFENSE WITNESS, SWORN

9          COURTROOM DEPUTY: Please raise your right hand.

10  Do you hereby affirm under penalty of perjury that the

11  testimony you are about to give in the matter now pending

12  before this Court shall be the truth, the whole truth, and

13  nothing but the truth?

14          THE WITNESS: I do.

15          COURTROOM DEPUTY: Please state your full name and

16  spell it for the record.

17          THE WITNESS: Yes.  John Casey, J-o-h-n,

18  C-a-s-e-y.

19          THE COURT: Okay.  Mr. Casey before we get

20  started, a couple of ground rules.  Take a seat.  First of

21  all, I need you to speak directly into that microphone

22  that's on the table there.  You can move it around wherever

23  it's convenient for you.  We record all proceedings

24  electronically in here, and unless you're speaking directly

25  into that microphone, it's hard for that electronic

1 recording system to pick up everything that you say.  Do

2 you understand?

3          THE WITNESS: I do.

4          THE COURT: Okay.  The second thing is, when

5 you're responding to a question, you need to answer

6 audibly.  That means you can't nod your head or shake your

7 head in response to a question.  If it calls for an answer,

8 you have to open your mouth and speak.  Okay?

9          THE WITNESS: Understood.  Okay.

10          THE COURT: Do you understand?

11          THE WITNESS: Understood.

12          THE COURT: All right.  Thank you.  Mr. Tukia, go

13 ahead, please.

14          MR. TUKIA: Your Honor, with the Court's

15 permission, I'm still recovering from back surgery.  May

16 I --

17          THE COURT: Yes, please.  You're always welcome to

18 ask your questions or give your presentations from the

19 chairs; that's fine here.

20          MR. TUKIA: Thank you, Your Honor.

21          THE COURT: Uh-huh.

22                    DIRECT EXAMINATION

23 BY MR. TUKIA:

24 Q    Good morning, Mr. Casey.  Just to start off, what is

25 your name?

1    A    My name is John Casey.

2    Q    And are you employed?

3    A    I am.

4    Q    Where do you work?

5    A    I work for C & C Property Management.

6    Q    What do you do for C & C Property Management?

7    A    I manage multi-unit properties, tenant point of

8    contact.

9    Q    Just real briefly, could you explain to us -- provide

10   for us your educational background.

11   A    Four-year college degree.  I've been in the property

12   management business now for about 20 years, hold the

13   certification for the last ten years, and I currently

14   manage, you know, six or seven multiple -- multi-unit

15   buildings.

16   Q    Where are those properties located?

17   A    San Francisco and also in the East Bay as well.

18   Q    Do you know Miss Annie Sun?

19   A    I do.

20   Q    How do you know her?

21   A    Through managing her property.

22   Q    Which property is that?

23   A    554-556 Commercial Street.

24   Q    When did you start managing 554 and 556 Commercial

25   Street?

1  A    2010.

2  Q    Could you describe for us those properties.

3  A    They are two different leases, two different

4  properties.  The lower level is a restaurant; the upper

5  level is an office space.

6  Q    And when you started in 2010, managing those

7  properties, who were the tenants, starting with the 554

8  Commercial Street.

9  A    So 554 Commercial Street was Seven Pleasures, and 556

10  Commercial Street was a prior tenant, and I don't remember

11  the exact name.

12  Q    Who are the owners of Seven Pleasures?

13  A    Michael and Sima Gerevich.

14  Q    What do you do in managing the 554 Commercial Street

15  address?

16  A    Anything encompassing the property, the tenant would

17  need to reach out to the management in regard to --

18  Q    Do you collect rents?

19  A    Yeah, collect rents, pay bills, essentially tenant

20  point of contact for any issues.

21  Q    Aside from rents, what else do you collect, as part of

22  your property management for 554.

23  A    Right.  So property tax, insurance payments.

24  Q    Are you familiar with the applicable lease for 554

25  Commercial Street?

1  A    Yes.

2  Q    Let me direct your attention to a copy of the lease,

3  and that's -- there are two books in front of you, sir.

4  Part of it is for the Plaintiffs; and part of it is for the

5  Defendants.  The Defendants' trial book at Exhibit D, do

6  you recognize what's depicted in Exhibit D?

7  A    I do.

8  Q    What is it?

9  A    It's page 1 of the 554 Commercial Street lease.

10 Q    And who are the parties in that 554 Commercial lease?

11 A    Annie Sun and a tenant by the name of Vena

12 Shotiveyaratana.

13 Q    That's listed on the first page of that commercial

14 lease under Exhibit D; is that correct?

15 A    Correct.

16 Q    Were you involved in the negotiations for this lease?

17 A    No.

18 Q    Do you have any understanding as to whether that lease

19 was in force when you started managing the 554 Commercial

20 Street address?

21 A    Yes, it was.

22 Q    Okay.  How do you know that?

23 A    There was an assignment of lease in 2006.

24 Q    And let me direct your attention to Exhibit E of the

25 Defendants' exhibits.  Do you recognize what's depicted in

1  Exhibit E?

2  A    I do.

3  Q    What is it?

4  A    It's the assignment of lease for 554 Commercial

5  Street.

6  Q    And who are the parties in the assignment of lease?

7  A    Vena Shotiveyaratana and Michael and Sima Gerevich in

8  addition to Annie Sun.

9  Q    And do you understand what -- do you have an

10  understanding as to what that assignment did, or what was

11  the effect of that assignment?

12  A    I do.

13  Q    What's your understanding?

14  A    It's essentially transitioning of the responsibility

15  of the lease from the assignor to the assignee.

16  Q    Are you familiar with the terms of the lease, again,

17  going back to Exhibit D.

18  A    Yes.

19  Q    Is there a provision in there about payments by the

20  tenants?

21  A    Yes.

22       MR. VOLKOV: Objection.  The question was

23  (Inaudible).

24       THE COURT: The witness answered the question

25  already.  So you need to interpose your question before the

1  witness answers.

2  BY MR. TUKIA:

3  Q    Let me direct your attention to Section 6 of the

4  lease, page 8.  There's a number circled on the bottom of

5  Exhibit D, the lease, and if you would go to page 8.

6  A    Okay.

7  Q    Do you see that?

8  A    I do.

9  Q    Are you familiar with that provision of the lease?

10             THE COURT: Can you wait until I get there,

11  please?

12             MR. TUKIA: Sorry.

13             THE COURT: Okay.  Go ahead.  Thank you.

14  BY MR. TUKIA:

15  Q    Are you familiar with Section 6 of the lease?

16  A    Yes.

17  Q    What is your understanding of what Section 6 requires?

18  A    The tenant is responsible for one-third of property

19  taxes and insurance for the 554 and 556 Commercial Street

20  property.

21  Q    When you started in 2010 managing the 554 Commercial

22  Street property, did you ever address this requirement with

23  the tenants at that time?

24  A    Not that I recall.

25  Q    At any time after you started your property management

1  of that address?

2  A    Yes.

3  Q    In general, in what regard?

4  A    Written communication from C & C Property Management

5  to the tenants of Seven Pleasures requesting payment for

6  the term of the lease.

7  Q    Why did you request payment for the term of the lease?

8  A    Because it was a lease requirement.

9  Q    Were payments being made?

10 A    At that time, no.

11 Q    Approximately how many times, if you know,

12 approximately how many times did the tenant fail to make

13 payment?

14 A    Payments were essentially never received when

15 requested.

16 Q    And these are payments for what?

17 A    Payments for the property tax and insurance.

18 Q    In 2010, what is your understanding as to whether

19 property taxes and insurance were paid by the tenant?

20 A    The only knowledge that I have is just from documents

21 from the prior management indicating that the property

22 taxes or insurance may have been waived in the past, but

23 nothing more than that.

24 Q    For what year?

25 A    Possibly 2008.

1  Q    How about for 2009, what is your knowledge as to

2  whether property taxes and insurance were paid by the

3  tenant?

4  A    I do not know.

5  Q    How about 2010, for the year 2010?

6  A    No, not paid.

7  Q    How about for the year 2011?

8  A    No.

9         THE COURT: What do you mean by "no"?  No what?

10        THE WITNESS: Not paid.

11        THE COURT: Okay, thank you.

12 BY MR. TUKIA:

13 Q    And for 2012, were taxes -- were the portions of the

14 taxes that were required to be paid by the tenants of 554

15 Commercial Street paid?

16 A    In a given year, by then 2012, partial payments did

17 begin and ceased shortly thereafter by the 554 tenant.

18 Q    And we'll go to that later in your testimony, sir.

19 Did you ever write to the Plaintiffs requesting them for

20 outstanding taxes and insurance?

21 A    Yes.

22 Q    Let me direct your attention to Exhibit F of the

23 Defendants' exhibit book.  Do you see that in front of you?

24 A    I do.

25 Q    At the bottom of that first page, there's a signature

1  there; do you see that?

2  A     I do.

3  Q     Is that your signature, sir?

4  A     It is.

5  Q     Is that a letter that you wrote?

6  A     Yes.

7  Q     And you wrote this to Michael and Sima Gerevich?

8  A     Yes.

9  Q     The address is the 554 Commercial Street in San

10 Francisco?  Do you see that?

11 A     I do.

12 Q     Did you have any other addresses for Michael or Sima

13 at that time to correspond with them?

14 A     No.

15 Q     At any time, any correspondence that you made to Mr.

16 or Mrs. Gerevich, did you ever send to any other address?

17 A     Not to my knowledge, no.

18 Q     And what does this letter say?

19 A     Would you like for me to read it verbatim, or --

20 Q     No.  In general.  This is your letter; is that

21 correct?

22 A     Correct.

23 Q     And in general, what were you trying to convey with

24 this letter?

25 A     It was a request to pay for property taxes and

1  insurance, that the tenant was responsible for.

2  Q    It looks like for the years 2008 through 2010.

3  A    Correct.

4  Q    And do you know if -- it doesn't say -- well, strike

5  that.  Let me start again.

6         Do you know when Annie Sun first assumed

7  ownership of 554 Commercial Street?

8  A    No.

9  Q    Do you know when the Gereviches first started as

10 tenants at 554 Commercial Street?

11 A    Approximately, yes.

12 Q    What's your knowledge, approximately?

13 A    I believe it was June of 2006.

14 Q    Do you know if the Gereviches paid taxes and insurance

15 pursuant to the lease in 2006?

16 A    I do not know.

17 Q    Do you know if they paid taxes and insurance pursuant

18 to the lease in 2007?

19 A    I do not know.

20         THE COURT: Do you know about 2011, same question?

21         THE WITNESS: To my knowledge, no, from what I

22 recall.

23 BY MR. TUKIA:

24 Q    Did you ever receive a response from the Plaintiffs,

25 that is Mr. and Mrs. Gerevich, to your letter of November

1  18, 2010?

2  A    No.

3  Q    And there are attachments to that letter, Exhibit F,

4  and they're pages 2 through 12.  Do you see numbers on the

5  bottom in circles?  Is that correct?

6  A    I see those, yes.

7  Q    What are those attachments for?

8  A    It's documentation to support the payment request.

9  Q    And again it's for the years 2008 through 2010.

10  A    Correct.

11  Q    Let me direct your attention to Exhibit G of

12  Defendants' exhibit book.  Do you see that exhibit in front

13  of you, sir?

14  A    I do.

15  Q    What is that?

16  A    That is a request from the management to the tenant

17  requesting their share and payment for the 2011 property

18  taxes and insurance.

19  Q    Is that your signature at the bottom?

20  A    It is.

21  Q    I think you've already explained it, but let me ask

22  you, why did you write this letter to the Gereviches?

23  A    It was a term of the lease.

24  Q    Payments for property and insurance were due?

25  A    Correct.

1  Q    Did you ever discuss this letter, or did you ever get

2  a response to this letter from the Plaintiffs?

3  A    Not to my knowledge, no.

4  Q    Did you ever get a response to this letter from any

5  representatives or attorneys for the Plaintiffs about this

6  letter?

7  A    Not to my knowledge, no.

8  Q    Let me direct your attention to Exhibit I of

9  Defendants' exhibit book.  Do you recognize what's depicted

10 in that exhibit?

11 A    I do.

12 Q    What is that?

13 A    This is confirmation of partial payments towards the

14 outstanding balance for the property tax and insurance

15 payment due by the tenant.

16 Q    That's your signature at the bottom?

17 A    Correct.

18 Q    And what is your understanding of what this -- what

19 were you saying in this letter?

20 A    Conveying and confirming the payment that had been

21 received.

22 Q    Payments for what?

23 A    Towards property tax, past property tax, and

24 insurance.

25 Q    Do you know for what year?

1   A    If going in numerical order, it would have been for

2   2009.

3   Q    And pursuant to this letter -- well, strike that.

4         Was this letter pursuant to discussions you had

5   with the Gereviches and hence their payment?

6   A    No.

7   Q    Do you know why they sent you these two checks?

8   A    Yes.

9   Q    What is your understanding?

10  A    My understanding is that Annie Sun's attorney, Cindy

11  Lee, had verbal and written conversations with the 554

12  tenant and there was some type of verbal agreement to begin

13  making a good faith payment towards the outstanding

14  balance.

15  Q    Now this outstanding balance, these are figures and

16  amounts that you had provided to the Gereviches; is that

17  correct?

18  A    Correct.

19  Q    This is based on your accounting of the taxes and

20  insurance that were paid?

21  A    Right, based off the documentation that was provided

22  to me.

23  Q    Did the Gereviches ever object to your accounting?

24  A    No.

25  Q    Did they ever tell you that it was incorrect?

1  A    No.

2  Q    And again, what is your understanding as to these two

3  $1,000 checks that are referred to in this letter of March

4  7, 2012?

5  A    It conveys that two partial payments had been paid and

6  received.

7  Q    Who are the current tenants at 554 Commercial Street?

8  A    That would be Seven Pleasures.

9  Q    Who are the owners of Seven Pleasures?

10  A    Michael and Sima Gerevich.

11  Q    And is their current tenancy based on or pursuant to a

12  lease?

13  A    Yes.

14  Q    Which lease?

15  A    The 554 Commercial Street lease that we discussed

16  earlier.

17  Q    What was the period for that lease?  How long was that

18  lease?

19  A    Ten years.

20  Q    Let's go back to that lease, sir, and could you tell

21  me when that lease first started or commenced?

22  A    It states July 1st, 2004.

23  Q    So after ten years, that lease ends when, according to

24  that lease, if you know.

25  A    Yeah.  According to the lease, the last day would be

1  June 30, 2014.

2  Q    Okay.  But the Gereviches are still tenants now in

3  2015.

4  A    Because of ongoing litigation.

5  Q    What do you mean by that?

6  A    The parties haven't resolved their issues.

7  Q    No.  I'll let you go through this lease, but are you

8  aware of a provision in the lease for an extension of the

9  lease beyond June 30, 2014?

10  A    Yes.

11  Q    What's your understanding of that?

12  A    My understanding is that the tenant has the option to

13  submit a request to extend the lease beyond the current

14  term.

15  Q    And were you involved in -- well, strike that.  Let me

16  ask you this.

17         Do you know if the tenants made a request to

18  extend or to exercise the five-year option?

19  A    I do.

20  Q    What's your understanding of that?

21  A    My understanding is the management had received a

22  written request to initiate that five-year extension.

23  Q    Were you involved in those circumstances for the

24  initiation of the five-year extension?

25  A    Only in receiving the communication.

1  Q    Communication from whom?

2  A    From the 554 tenant, Seven Pleasures.

3  Q    Okay.  In your correspondence -- how did you

4  correspond with Mr. and Mrs. Gerevich in writing?

5  A    Via the U.S. mail.

6  Q    And where would you send your U.S. mail

7  correspondence?

8  A    To 554 Commercial Street.

9  Q    Any other place?

10 A    No.

11 Q    And would you get responses to your correspondence

12 that you send them?

13 A    Sometimes.

14 Q    Would you also -- how about e-mail?

15 A    Rarely.

16 Q    Were you ever told by the Gereviches that they were

17 not receiving correspondence or mail?

18 A    No.

19 Q    How much was the rent that the Gereviches were paying

20 as of June 30, 2014, if you know?

21 A    Roughly sixty-one hundred, I believe, per month.

22 Q    And was that pursuant to the lease?

23 A    Correct.

24 Q    As of July 1, 2014, what was the rent?

25 A    It increased by a few hundred dollars, I believe, per

1   month.

2   Q     And did the Gereviches pay that increased amount?

3   A     I believe so.

4   Q     When did they start making payments in that increased

5   amount?

6   A     Per the lease, it would have been July 1 of each year.

7   Q     And did they in fact start on July 1, 2014?

8   A     I don't recall to be honest.

9   Q     What are they currently paying?

10  A     Nine thousand five hundred per month.

11  Q     When was that rate supposed to have started?

12  A     That would have started at the termination of the

13  existing lease.

14  Q     When was that again?

15  A     The termination of the existing lease would have been

16  June 30 of 2014.

17  Q     So starting July 1, 2014, the Gereviches were supposed

18  to pay ninety-five hundred dollars?

19  A     That was my understanding.

20  Q     Did they in fact pay ninety-five hundred dollars a

21  month starting July 1, 2014?

22  A     No.

23  Q     Currently they're paying ninety-five hundred; is that

24  correct?

25  A     Correct.

1  Q    When did they start paying ninety-five hundred?

2  A    I believe that was over the last few months.

3  Q    Of 2015?

4  A    Correct.

5  Q    So for a period of time from July 1, 2014 to some time

6  in 2015, they were not paying the required ninety-five

7  hundred dollar rent.  Is that correct?

8  A    That's my understanding, yes.

9  Q    And prior to April 29, 2013, were -- did the

10  Gereviches pay their rent on time?

11         MR. VOLKOV: Objection (inaudible and

12  unintelligible.)

13         THE COURT: Are you saying that the fact that they

14  weren't paying their rent on time is irrelevant?

15         MR. VOLKOV: Payments of rent are not part of a

16  claim or the objections to the claim and it goes under Rule

17  404 into the character reference.

18         THE COURT: Okay, thank you.  What's your

19  response, Mr. Tukia?

20         MR. TUKIA: This goes to the issue of the lease

21  expiring on June 30, 2014 and not paying the rent prior to

22  that was grounds for eviction.

23         THE COURT: Okay.

24         MR. VOLKOV: There is no eviction.  Paying or not

25  paying is not part of --

1          THE COURT: I'm going to overrule the objection.

2     The lease states that the option to extend the lease for

3     one five-year term can only be exercised if there's no

4     default, and payment of rent constitutes -- or lack of

5     payment of rent constitutes a default under the lease.  So

6     I'm going to overrule --

7          MR. VOLKOV: Your Honor, the --

8          THE COURT: I will overrule the objection.  Go

9     ahead.  Thanks.

10    BY MR. TUKIA:

11    Q    So prior to April 29 of 2013, are you aware of any

12    times that the Gereviches failed to pay rent on time?

13         MR. VOLKOV: Your Honor, a slightly different

14    objection.

15         THE COURT: Okay.

16         MR. VOLKOV: The exercise of the option was done

17    in December of 2013, and that's when the requirement of no

18    defaults had been done and for reasons that

19    (unintelligible), this line of questioning is going beyond

20    and after the timing of exercise of the option.

21         THE COURT: Understood.  Mr. Tukia?

22    BY MR. TUKIA:

23    Q    Prior to December 2013 --

24         THE COURT: I guess the question was withdrawn.

25    Go ahead.

1   BY MR. TUKIA:

2   Q    Prior to December 2013, sir, are you aware of any

3   rents not paid by the Gereviches on time for 554 Commercial

4   Street?

5   A    Yes.

6   Q    How many times?

7   A    Multiple.

8   Q    Please describe for us some or all of those multiple

9   times that they failed to pay rent on time?

10  A    From memory, it's, you know, five plus.  Could be

11  more.

12  Q    And please describe for us why, if you know, why their

13  rents were not paid on time?

14  A    I have no idea.

15  Q    They were just late.

16  A    Correct.  And that was from the beginning when C & C

17  Property Management first took over.  That's how far back

18  it started.

19  Q    Aside from the Plaintiffs not paying rent on time and

20  not paying the taxes and insurance, are you aware of other

21  payments that the Gereviches failed to make pursuant to the

22  lease?

23  A    Not to my knowledge.

24  Q    That's it.  Thank you, sir.  I have no further

25  questions.

1         THE COURT: Okay.  Mr. Volkov, cross?

2         MR. VOLKOV: Thank you, Your Honor.

3                   CROSS-EXAMINATION

4    BY MR. VOLKOV:

5    Q    Good morning, Mr. Casey.

6    A    Good morning.

7    Q    Your current office address is 195 - 31st Street in

8    Oakland?

9    A    That's the mailing address.

10   Q    And you also have a P.O. Box mailing address?

11   A    Correct.

12   Q    Is that P.O. Box 11314, Oakland, California 94611?

13   A    Yes.

14         THE COURT: Mr. Volkov, I'm going to ask you to

15   pull that microphone a little closer to you.  I'd

16   appreciate it.

17         MR. VOLKOV: Thank you, Your Honor.

18         THE COURT: Thank you.

19   BY MR. VOLKOV:

20   Q    Do you recall on your signature on the letters, there

21   are four letters saying CCRM?

22   A    I do.

23   Q    What do those letters stand for?

24   A    It's California Certified Residential Manager.

25   Q    Residential manager.  You also testified at the direct

```
 1  that you handle several multi-unit buildings?
 2  A    Correct.
 3  Q    Are those residential units?
 4  A    Mixed use.
 5  Q    How many commercial units?
 6  A    Currently now we manage three leases, commercial
 7  leases.
 8  Q    Do you have any certification as to the commercial
 9  leases?
10  A    No.
11  Q    Are you a licensed real estate broker?
12  A    No.
13  Q    Are you a licensed real estate professional?
14  A    No.
15  Q    Are you a licensed accountant?
16  A    No.
17  Q    Are you a licensed bookkeeper?
18  A    No.
19  Q    Are you a licensed attorney?
20  A    No.
21  Q    And finally, are you a licensed California contractor?
22  A    No.
23  Q    I will read the e-mail of this and tell me if that's
24  yours, ccpropertymgmt@(unintelligible).  Is that your e-
25  mail address?
```

1  A    Correct.

2  Q    Do you use any other e-mail address?

3  A    No.

4  Q    Does anyone else beside you use this e-mail address?

5  A    No.

6  Q    You testified earlier that you became a manager in

7  2010.  So is it fair to say that you were not in any

8  representative capacity around when the lease was formed in

9  2004?

10  A    Correct.

11  Q    And you were not around in any capacity when the lease

12  was assigned in 2006.

13  A    Correct.

14  Q    But it is your understanding that the lease, which was

15  the Defendants' Exhibit D is currently enforced?

16  A    Correct.

17  Q    That's the black binder, Exhibit D.  And it is your

18  understanding that the assignment of the lease, Defendants'

19  Exhibit E, is currently enforced?

20  A    Correct.

21  Q    Are you aware of any terms or provisions of either of

22  those two documents not being enforced?

23  A    Not to my knowledge.

24         MR. VOLKOV: We would move to admit into evidence

25  Defendants' Exhibit D and E.

1          THE COURT: Any opposition?

2          MR. TUKIA: No opposition, Your Honor.

3          THE COURT: Okay.  Those exhibits, Defendants'

4  Exhibits D and E will be admitted.

5                              (Whereupon, Defendant's Exhibits

6                              D and E., Lease and Assignment of

7                              Lease, are admitted into

8                              evidence.)

9  BY MR. VOLKOV:

10  Q    Are you aware of the accident of the fire that

11  happened on the property?

12  A    Yes.

13  Q    Is it fair to say and establish today that the fire

14  happened on March 23rd, 2013?

15  A    Correct.

16  Q    You previously testified that as a manager for Ms.

17  Sun, you pay bills which include property tax and insurance

18  bills?

19  A    Correct.

20  Q    And you receive payments and deposit those?  You

21  receive payments from the tenants?

22  A    Oh, rent payments?

23  Q    Rent -- any payments from the tenants.

24  A    Yeah, anything that they submit and we receive,

25  correct.

1  Q    Are you aware of discussions with the tenants over

2  installing a mailbox?

3  A    Yes.

4  Q    Is it fair to say that these discussions happened in

5  the fall of 2014?

6  A    Could have been.

7  Q    Is it true to say that the landlord allowed to install

8  a mailbox in 2014?

9  A    Yes.

10 Q    Are you aware of any mailbox installed on the property

11 prior to 2014?

12 A    Repeat that again, please?

13 Q    Are you aware of any mailbox installed on the property

14 prior to 2014?

15 A    Not to my knowledge.

16 Q    You were previously addressed in the black binder on

17 Exhibit D, paragraph 6, that's page 8 of the exhibit.

18 A    Okay.

19        THE COURT: I'm sorry, Mr. Volkov, what exhibit,

20 please?

21        MR. VOLKOV: It's Defendants' Exhibit D.

22        THE COURT: Okay.  Page 8?

23        MR. VOLKOV: Page 8.

24        THE COURT: Okay.

25        MR. VOLKOV: Paragraph 6.

1           THE COURT: Thank you.

2           THE WITNESS: Which page again?

3           MR. VOLKOV: 8.

4           THE WITNESS: Page 8.

5           MR. VOLKOV: Paragraph 6.

6           THE WITNESS: Okay.

7    BY MR. VOLKOV:

8    Q    Is that your understanding that the payment of tax and

9    insurance has to happen upon written demand by the

10   landlord?

11   A    Correct.

12   Q    And you previously said that you make written demands

13   by U.S. mail?

14   A    Correct.

15   Q    Are you aware of the property tax and insurance being

16   waived -- the portion of the property tax and insurance

17   being waived against the Defendants for the year 2008 to

18   2009?

19   A    There's documentation from the prior management that

20   indicated as of such.  Other than that, I don't know.

21   Q    Defendants' Exhibit F, previously discussed --

22   A    Yes.

23   Q    -- that letter was also sent by U.S. mail?

24   A    Correct.

25   Q    It was not sent by certified mail.

1   A       No.

2   Q       And it was not personally served?

3   A       No.

4   Q       And you previously said that you heard nothing from

5   the tenants in connection with this letter.

6   A       Correct.

7   Q       Is there any –- are any pages missing from this

8   letter?

9   A       No.

10  Q       As it is in the copy on Exhibit F.

11  A       Well, the supporting documentation behind it came with

12  it as well.

13  Q       Just as exhibits?

14  A       Correct.

15  Q       And you were previously addressed to Exhibit G in the

16  same binder.

17  A       Okay.

18  Q       That's your letter from January 11, 2012?

19  A       Correct.

20  Q       The exhibit shows only one page.  Are you aware of any

21  contents not shown on the exhibit?

22  A       Yeah, there would be missing documentation here in

23  this binder.

24  Q       Has this missing documentation ever been produced?

25  A       On January 11th of 2012, yes.

1  Q    (Unintelligible)

2  A    No.

3         MR. VOLKOV: We'll move to submit into evidence

4  Defendants' Exhibits F and G.

5         THE COURT: Any opposition?

6         MR. TUKIA: No.

7         THE COURT: Is that no?

8         MR. TUKIA: No, Your Honor.  Sorry.

9         THE COURT: Okay.  Thank you.  Defendants'

10 Exhibits F and G will be admitted.

11                        (Whereupon, Defendants' Exhibit F

12                        and G, Letters written by Mr.

13                        Casey to the Plaintiffs, admitted

14                        into evidence.)

15 BY MR. VOLKOV:

16 Q    Directing your attention to Defendants' Exhibit I.

17 A    Okay.

18 Q    And that's your letter?

19 A    Correct.

20 Q    It starts "hello" –- I'm sorry, the language under

21 "hello" says "To Confirm."  Do you recall what this is

22 confirming?

23 A    Confirming partial payments towards property tax and

24 insurance.

25 Q    Well, is it confirming some kind of a communication

1  about the partial payments?

2  A    Apparently so, yes.

3  Q    What's your knowledge of that communication?

4  A    As I stated before, it was communication between Annie

5  Sun's attorney, Cindy Lee, and the Gereviches to make a

6  good faith payment towards the outstanding balance.

7  Q    Was it in connection with your January letter of the

8  same year?

9  A    Yes, anything to do with property tax and insurance,

10 yes.

11          MR. VOLKOV: We move to admit this letter,

12 Defendants' Exhibit I into evidence.

13          MR. TUKIA: No objection, Your Honor.

14          THE COURT: All right.  Defendants' Exhibit I will

15 be admitted.

16                         (Whereupon, Defendant's Exhibit I,

17                         Letter written by Mr. Casey to the

18                         Gereviches, is admitted into

19                         evidence.)

20 BY MR. VOLKOV:

21 Q    Returning back to your letter, Defendants' Exhibit G.

22 A    Okay.

23 Q    It provides certain amounts, basically two lines.  One

24 is 2011 property tax, and one is 2011 insurance.  Is this

25 year, 2011, does it refer to the calendar year?

1   A   Correct.

2   Q   On both property tax and insurance?

3   A   Repeat that again?

4   Q   I'll go line by line.  The line which has 2011

5   property tax, that starts with 2011 property tax.

6   A   Correct.

7   Q   Does it refer to the calendar year?

8   A   Correct.

9   Q   The second line says 2011 insurance.  Does it refer to

10  the 2011 calendar year?

11  A   Correct.

12  Q   Is there any reason why the 2011 calendar year is

13  demanded in 2012?

14  A   Yes.

15  Q   What's the reason?

16  A   2011 was done.

17  Q   By "done," you mean it was paid?

18  A   No.  That year passed.

19  Q   The calendar year of 2011 passed.

20  A   Right.

21  Q   And then it's your understanding that after the

22  calendar year passes, then you as the manager issued the

23  demand?

24  A   Correct.

25  Q   You previously confirmed that you were the one who

1  makes payments on behalf of Ms. Sun for tax and insurance.

2  Is that correct?

3  A    Correct.

4  Q    How do you make payments for property tax?

5  A    Via the U.S. mail.

6  Q    How do you arrive to the amount due?

7  A    Based on the documentation that's submitted.

8  Q    Is that the bill from the tax assessor you receive for

9  the property?

10  A    Correct.

11  Q    How do you arrive to the number due for insurance?

12  A    Same way.

13  Q    Will it be the bills from David Klein (Phonetic)

14  Agency?

15  A    Correct.

16  Q    Are you aware that the property taxes are due by

17  fiscal year?

18  A    Not per the lease terms that I needed to follow.

19  Q    Explain that, please.

20  A    Not per the lease term.  It doesn't stipulate that.

21  Q    I'm right now talking about the dues -- you're the

22  property manager.  You're making the payments for the

23  entire property tax bill; is that correct?

24  A    Correct.

25  Q    On behalf of the property as a whole.

1  A    Correct.

2  Q    You receive the property tax bill each year.

3  A    Correct.

4  Q    Does the property tax bill go by fiscal year or by

5  calendar year?

6  A    I believe it begins in June of each year.

7  Q    Yes.  That matches my understanding, and the bill for

8  the insurance for the entire building, what periods does it

9  go by?

10  A    I believe the billing comes out September of each

11  year.

12  Q    So the period goes from September to September.

13  A    Correct.

14  Q    So is there any reason why the tenants in 2012 were

15  billed for the 2011 calendar year on both amounts?

16  A    Because those are the payments made by the owner for

17  that year.

18  Q    I would like to address your attention to the white

19  binder, that's Plaintiffs' Exhibit 6, and addressing the

20  Court here, I would like to admit this into evidence on the

21  grounds of taking request for judicial notice, and that

22  it's part of the record of this case, and it's a

23  declaration for the -- made by the opposing party.  And I

24  apologize, Your Honor, it's a declaration made in the

25  underlying bankruptcy case, but it's part of the record of

1  the --

2         THE COURT: I'm sorry, Mr. Volkov.  What exhibit

3  are we looking at, please?

4         MR. VOLKOV: We're looking at Exhibit 6 of the

5  Plaintiffs' binder.

6         THE COURT: Okay.  I can take judicial notice of

7  the fact that this document was filed in the main case.  I

8  am not going to accept as truthful the testimony set forth

9  therein.

10         MR. VOLKOV: I understand.

11         THE COURT: Okay?  Any objection to my taking

12  judicial notice of Ms. Sun's supplemental declaration?

13         MR. TUKIA: No objection, Your Honor.

14         THE COURT: Okay.  I will take judicial notice of

15  this document.

16  BY MR. VOLKOV:

17  Q    So on that exhibit, Mr. Casey, if you can refer to

18  page 4.

19  A    So at the bottom of the page, it says page 2 of -- and

20  then it isn't followed by any number.  So I don't know

21  exactly what page.

22  Q    It's in the bottom.  The typed says page 2 of 24.

23  A    Oh, yes, I do see that.

24  Q    That's the court's marking.  It's just the fourth page

25  and number under the exhibit, but it is page 2 of 24 of the

1  document 17-1.  Is that true that this letter was –- just

2  by date –- was issued prior to you becoming the manager of

3  the property?

4  A    Correct.

5  Q    And the next page, if you turn, this appears to be

6  dated April 3rd, 2010, but you previous said you became the

7  manager in 2010, but this was also done before you became

8  the manager.

9  A    Correct.

10 Q    And as we're at it, what month of 2010, if you recall,

11 you became the manager?

12 A    I believe it was July.

13 Q    So the next page, which is page 4 of 24, Document

14 1781, that appears to be a face page of the same document

15 we previously discussed, November 18, 2010.

16 A    Okay.

17 Q    Next page, going immediately after it, appears to be a

18 billing statement from Golden Eagle Insurance.

19 A    Okay.

20 Q    Is that the billing by which you pay insurance

21 for the property?

22 A    Correct.

23 Q    It has a hand mark, pd. 8-24-10 in full.  Does that

24 mean paid in full?

25 A    Correct.

1  Q     Is that your writing?

2  A     Correct.

3         THE COURT: And what did you mean by that?  Who

4  paid it in full?

5         THE WITNESS: C & C Property Management did on

6  behalf of the owner.

7         THE COURT: Thank you.

8  BY MR. VOLKOV:

9  Q     If you scroll down to -- and we're in the same

10 exhibit - page 8 of 24.

11 A     Okay.

12 Q     Are you at the page which says "David E. Klein Agency"

13 Invoice for date of September 21, 2011?

14 A     Correct.

15 Q     And there is a hand mark, paid 9-21-2011?

16 A     Correct.

17 Q     And that's your mark?

18 A     Correct.

19 Q     Does that indicate that you on behalf of Ms. Sun made

20 the payment for the insurance on that date?

21 A     Correct.

22        MR. TUKIA: I'm sorry, what page?  Sorry, Your

23 Honor.

24        MR. VOLKOV: On the footer, it's page 8 of 24.

25        I'm skipping the next page, and then after it,

1  there is a page which appears to be a website printout from

2  the Office of the Treasurer and Tax Collector.

3          THE WITNESS: What page number?

4          MR. VOLKOV: It's -- bates stamp is page 10 of 24.

5          THE WITNESS: Okay.

6  BY MR. VOLKOV:

7  Q    Is this the page you printed from the website of the

8  San Francisco Tax Collector?

9  A    Yes, that appears to be the case.

10 Q    Does that indicate payments made for the property tax

11 on the subject property?

12 A    Yes, that appears to be the case.

13 Q    And the next page, which is similar to it, does this

14 indicate the payments made, only that this page appears to

15 be the next period 2009-2010?

16 A    Correct.

17 Q    And is it fair to say that both of these pages were

18 printed as dated in November 9, 2010?

19 A    That's what it says at the bottom of the page, yes.

20 Q    Is it your recollection that you printed it prior to

21 making your November 18, 2010 letter?

22 A    Not to my knowledge.

23 Q    But do you remember making those printouts?

24 A    I believe so, yes.

25 Q    Is there any reason not to believe that they were made

1  in November 10, 2010 –- November 9, 2010, as it's dated?

2  A    No.  They would have been printed at the time stamp at

3  the bottom.

4  Q    Thank you.  And the next page, page 12 of 24, do you

5  recognize this document?

6  A    I do.

7  Q    Is this your handwriting?

8  A    It is.

9  Q    So is it fair to say that the handwriting shows that

10  the installment was due on April 4, 2011 and paid on April

11  7, 2011?

12  A    Yes.  Payments were made on those dates as written.

13  Q    And on the very top, the fourth line from the header

14  of the page, it says "For fiscal year July 1, 2010 through

15  July (sic) 30, 2011."

16  A    Okay.

17  Q    Is there any reason not to believe that the tax

18  periods for that period were counted from July 1, 2010

19  through June 30, 2011?

20  A    Correct.

21  Q    Next page, page 13 of 24, this is your handwriting for

22  pd. and due?

23  A    Correct.

24  Q    Does it fairly represent that the payment for the

25  first installment was due December 10, 2011 and paid

1  December 8, 2011?

2  A    Correct.

3  Q    And this was for the fiscal year period from July 1,

4  2011 through June 30, 2012?

5  A    Correct.

6  Q    Next page.

7         THE COURT: Mr. Volkov, can you just give me a

8  chance to catch up?

9         MR. VOLKOV: Yes.

10        THE COURT: Thank you.  Thank you, I apologize.

11        MR. VOLKOV: No problem, Your Honor.  May I

12  proceed?

13        THE COURT: Yes, please.

14  BY MR. VOLKOV:

15  Q    So the next page is bates stamped page 14 of 24.

16  A    Okay.

17  Q    Do you recognize this letter?

18  A    I do.

19  Q    Is it fair to say you issued it on January 2nd, 2013?

20  A    Correct.

21  Q    It reflects five $1,000 payments made.  Is this a

22  reference to the payments made by the tenants?

23  A    Correct.

24  Q    Above this, it says "Initial balance due $22,860.77."

25  A    Okay.

1  Q    In your understanding, what is this amount meant to

2 indicate?

3  A    The past due property taxes and insurance.

4  Q    For what years?

5  A    For any and all prior years that were never paid.

6  Q    Do you have any exact understanding for what years it

7 was?

8  A    Per the letter, it states 2009, '10 and '11, at that

9 time.

10  Q    Apart from that letter, do you have any separate

11 understanding?

12  A    No.

13  Q    You became a manager in July of 2010.

14  A    Correct.

15  Q    When you assumed your role, how did you arrive to the

16 knowledge of what amounts are due as of the date you became

17 the manager?

18  A    Based on the billings that were received.

19  Q    So there was some kind of a file for the property?

20  A    Correct.

21  Q    Or -- because billings are received; I understand that

22 new bills were coming in, but as far as of any preexisting

23 balance on your day one as the manager, how you obtained

24 the knowledge of what was due as of that date?

25  A    Based on the communication from the prior management

1  and knowing that there were no payments received.

2  Q    Was that communication in writing?

3  A    I'm sorry?

4  Q    Was that communication in writing?

5  A    Correct.

6  Q    Have you produced a copy of that writing?

7  A    I believe we've already touched on it, yes.

8  Q    The next page, bates stamp 15 of 25.

9  A    Okay.

10  Q    Same question, whether it's your writing, "pd and

11  due" dates?

12  A    It is.

13  Q    So it's fair to say that it demonstrates the payments

14  made for first and second installment of the period of

15  starting July 1st, 2011 through June 30, 2012, one paid on

16  December 8, 2011 and one paid on April 4, 2012?

17  A    Correct.

18  Q    The next page, page 16 of 24.  Do you recognize this

19  document?

20  A    I do.

21  Q    Is that your handwriting saying "Pd. 12-7-12"?

22  A    Correct.

23  Q    Does it represent that the payment for the first

24  installment was made on December 7, 2012?

25  A    Correct.

1  Q    When was the second installment made?

2  A    Prior to the due date.

3  Q    Approximately how prior?

4  A    I don't know.

5  Q    Would it be fair to say based on the previous conduct

6  of payment that it was within the week of the due date?

7  A    That's fair to say.

8  Q    Next page, 17 of 24, does this fairly represent the

9  invoice for the insurance on the property for the period

10  from September 29, 2012 to September 29, 2013?

11  A    Correct.

12  Q    It states here that the due date was September 17,

13  2012.  It's the second line on the right column above the

14  actual invoice body.  Do you see that line?

15  A    I don't follow you, no.

16         MR. VOLKOV: May I approach the witness to point

17  the line?

18         THE COURT: Sure.

19         THE WITNESS: Okay, thank you.

20  BY MR. VOLKOV:

21  Q    Do you have a recollection of when the payment was

22  made?

23  A    Exact date, no.

24  Q    Approximately?

25  A    Prior to the due date.

1  Q    Within the week?  Is it fair to estimate?

2  A    Yes.

3  Q    Next page, page 18 of 24.  Is this your letter?

4  A    It is.

5  Q    Is it fair to say that it was issued in January 11,

6  2012?

7  A    Correct.

8  Q    Next page after I believe is a copy of one of the

9  pages we addressed, and so is the next, and page 21 of

10  24 --

11  A    Okay.

12  Q    -- is that your handwriting in the bottom?

13  A    Yes.

14  Q    Does that indicate that this insurance invoice for the

15  period September 29, 2011 to September 29, 2012 was paid on

16  September 21, 2011?

17  A    Correct.

18  Q    On the prior examination, there was a subject attached

19  on the extension of the lease.  Will it be fair if I refer

20  to it as option?

21  A    Sure.

22  Q    Are you aware that it's a five-year option?

23  A    Correct.

24  Q    You testified that the current payment is $9,500 a

25  month?

1  A    That's the current payment we receive today, yes.

2  Q    Do you recall how did the parties arrive to that

3  amount?

4  A    I do.

5  Q    What's your recollection?

6  A    Two brokers came to that agreement.

7  Q    Is it fair to say it was done in early 2014?

8  A    I don't recall exactly when that occurred.

9  Q    Well, do you recognize it was made in 2014?

10  A    It could have been.

11  Q    Do you recall when the tenants made their request for

12  the option?

13  A    The exact time, date, no.

14  Q    I would refer you to Plaintiffs' Exhibit 15.

15  A    Okay.

16  Q    And particularly on that exhibit, I'll refer you to

17  page 3 of that exhibit.

18  A    And this is Section 18 you're referring to?

19  Q    The Exhibit 15 of the white folder.

20  A    15.  Okay, and what page?

21  Q    Page 3.  It's a three-page document, so page 3, the

22  last page of this exhibit.

23  A    Is that it?

24  Q    Yes.

25  A    Okay.

1  Q     Do you recall depositing this check?

2  A     Do we know what it's for?

3  Q     Well, do you recall that when the tenants exercised

4  their option, they made the payment for the established

5  amounts of tax and insurance.

6  A     I don't.  Off the top of my head, I don't recall what

7  this payment is for.

8  Q     Well, do you recall making -- accepting this check and

9  depositing it, and the reason I ask you is because you

10 testified that you were the one who deposits the payments.

11 A     Sure.  Sure.  Understood.  But this is some time ago.

12 Q     Do you recall the tenants making any payment in

13 connection with their exercise of option?

14 A     No.  To my knowledge, the option never occurred.

15 Q     How did you arrive to that conclusion?

16 A     There's nothing in writing that stipulates that.

17 Q     Is that your understanding that it has to be in

18 writing?

19 A     Yes.

20 Q     I would refer you back to Defendants' Exhibit D,

21 Exhibit D in the black binder.

22 A     Okay.

23 Q     Page 3.

24 A     Okay.

25 Q     Do you see paragraph 1.2?

1  A    I do.

2  Q    Is there any point, to your knowledge, which requires

3  that the execution of option has to be in writing?

4  A    That's my understanding.

5  Q    You don't have any particular provision of the lease

6  to base your understanding on?

7  A    I mean I would have to read through it in its entirety

8  to answer.

9  Q    As you sit right now, you don't.  It is your

10  understanding that it has to be in writing, but you don't

11  have any particular citation to support your understanding.

12  A    I would have nothing else to refer to if it wasn't in

13  writing.

14  Q    You also on direct testified that the rent increases

15  every year on July 1st?

16  A    Correct.

17  Q    Is it your understanding that it automatically

18  increases?

19  A    Per the lease, it does stipulate that.

20  Q    Are you aware that the landlord has to make a written

21  notice of the rent increase?

22  A    Correct.

23  Q    Are you aware of you making a written notice of rent

24  increase?

25  A    Yes.

1  Q    For what years?

2  A    Each year.

3  Q    Are you able to point us to any documents to that

4  extent?

5  A    Not that I have in my possession, no.

6  Q    You also testified that the tenants were late on their

7  rent at least five times as of the time of making their

8  exercise of option.  For the time line, is it fair to say

9  that they exercised their option in December of 2013?

10  A    That sounds about correct, yes.

11  Q    For those five times you're aware they were late,

12  first of all, in your understanding, how late were they?

13  A    Past the due date.

14  Q    And the due date is what date?

15  A    I'm sorry?

16  Q    What's the due date?

17  A    The due date is the first of every month.

18  Q    Are you aware of any non-default period when the

19  payment received after the first is not considered late?

20  A    Yes.

21  Q    How deep is the period?

22  A    Five days.

23  Q    So out of those five times, were they more late than

24  five days?

25  A    Yes.

1  Q    Out of those five times, how many of those times were

2  after April 29, 2013?

3  A    I don't recall off the top of my head.

4  Q    Is it fair to say that all five instances were before

5  April 29, 2013?

6  A    Late payments did occur prior to that time frame, yes.

7  Q    Out of those five times, is it fair to say that some

8  of the instances were before you became the manager?

9  A    I can't speak to that.

10 Q    So all five instances happened on you being the

11 manager since July 2010?

12 A    Correct.

13 Q    And when they were more than five days late, how many

14 days were they typically late?

15 A    Whenever they finally submitted the payment.  It could

16 have been the 20th of the month.  It could have been sooner.

17        MR. VOLKOV:  Your Honor, I do have questions to

18 ask on the direct, but for housekeeping, I have to indicate

19 that I'm done with the cross.

20        THE COURT: Okay.

21        MR. VOLKOV: And then I have my own questions for

22 the direct examination.

23        THE COURT: For him on direct -- as if on direct,

24 right?  Do you want to —-

25        MR. VOLKOV: I think I need to give an opportunity

1  for redirect first.

2          THE COURT: For him to redirect, yeah.  I agree.

3                    REDIRECT EXAMINATION

4  BY MR. TUKIA:

5  Q    Just real briefly, sir, Mr. Casey, let me direct your

6  attention back to Plaintiffs' Exhibit 15 and that check of

7  $5,488.

8  A    Okay.

9  Q    If you look -- it looks like this check is attached to

10 a two-page letter of December 23, 2013, and you see that

11 letter under Exhibit 15?

12 A    Is this the letter dated December 23rd, 2013 from Cindy

13 Lee -- or to Cindy Lee?

14 Q    That's correct.

15 A    From Aleksandr Volkov?

16 Q    Yes.

17 A    Okay.

18 Q    And starting at page 1 and going into page 2, there's

19 a paragraph there that refers to that check.  Look at that

20 paragraph and see if that refreshes your recollection as to

21 what that check was for.

22 A    Okay.  So it says -- going into detail confirming the

23 receipt of notice of exercise of five-year option.

24 Q    What was that check for, if you know?

25 A    This looks like it's -- it could be in regard to the

1  bankruptcy proceedings possibly.  I recognize the name

2  Cathy Moran, and I know she was a part of the bankruptcy

3  part of it.  That's why I say that.

4  Q    Concerning property tax and insurance?

5  A    I'll just read through it here.

6       (Pause.)

7  Correct.

8  Q    Apparently it looks like these are numbers based on --

9  well, strike that.

10       Are you aware of any objections to that figure of

11  $5,488.34 with a resulting check made therein?

12  A    Not to my knowledge, no.

13  Q    In fact, this is a letter from Mr. Volkov who just

14  asked you questions about -- just asked you questions in

15  this trial; is that correct?

16  A    Correct.

17  Q    Are you aware of any objections made by Mr. Volkov

18  regarding this amount?

19  A    Not to my knowledge.

20  Q    Just real quickly, Mr. Casey, did you ever receive any

21  mail back from the Gereviches that stated that they were --

22       MR. TUKIA: Sorry, Your Honor, let me ask a better

23  question.

24       THE COURT: That's okay.

25  ///

1  BY MR. TUKIA:

2  Q    You testified earlier that any written correspondence

3  you sent to the Gereviches was always to 554 Commercial

4  Street; is that correct?

5  A    Correct.

6  Q    And sometimes they would respond?

7  A    Correct.

8  Q    Did you ever receive any of your letters that you sent

9  to the Gereviches as, you know, returning to you as

10 undeliverable?

11 A    Never.

12       MR. TUKIA: That's it.  Thank you, Your Honor.

13 Thank you, sir.

14       THE COURT: Okay.  So Mr. Volkov, you want --

15       MR. VOLKOV: One question on recross.

16                    RECROSS EXAMINATION

17 BY MR. VOLKOV:

18 Q    Regarding the same check, you testified you were not

19 aware of any objections made by the tenants.  Are you aware

20 of any objections made by the landlord?  We're talking

21 about the third page, bates stamped 286 of Plaintiffs'

22 Exhibit 15.

23 A    Is he referencing this check again?

24 Q    Yes.

25 A    Yeah.

1          MR. TUKIA: That's vague and ambiguous.  Objection

2     in that regard.

3          THE COURT: I'm going to sustain the objection.

4     Why don't you ask a clear question, Mr. Volkov, please.

5     BY MR. VOLKOV:

6     Q    Referring your attention to the check which is the

7     third page in the Plaintiffs' Exhibit 15.  You just

8     testified that you're not aware of any objections made by

9     the tenants to that check.  Are you aware of any objections

10    made by the landlord to that check?

11         MR. TUKIA: Again, that's vague and ambiguous.

12         MR. VOLKOV: I'm allowed to explore --

13         THE COURT: I disagree, so I'm going to overrule

14    the objection.  If you can answer the question.

15         THE WITNESS: The best I can say, this is

16    communication between two other parties that doesn't

17    involve C & C Property Management.

18    BY MR. VOLKOV:

19    Q    But that's not my question.  My question is, you said

20    that you were not aware of any objections to making this

21    payment by the tenants; is that correct?

22    A    To my knowledge, yes.

23    Q    Is that to your knowledge, there are no objection by

24    the landlord?

25    A    Not to my knowledge.

1  Q    So that means you are not knowing of any objections by

2  the landlord?

3  A    Correct.

4          MR. VOLKOV: Your Honor, I would -- with the

5  Court's permission, be ready to proceed on direct, but if

6  you need a break --

7          THE COURT: No, I'm fine.  Okay.  Go ahead, Mr.

8  Volkov.

9                    DIRECT EXAMINATION

10  BY MR. VOLKOV:

11  Q    Mr. Casey, on the night of the fire, at some point you

12  arrived to the scene on March 23rd, 2013; is that correct?

13  A    The morning of.

14  Q    Do you recall an issue with the fire sprinklers?

15          MR. TUKIA: Objection, Your Honor, this is outside

16  the scope of this trial and the issue involved.

17          MR. VOLKOV: Your Honor, this goes as to the proof

18  of $895 plumbing invoice.

19          THE COURT: I'll let you go ahead, but you're

20  going to be on a short leash.

21          MR. VOLKOV: Thank you, Your Honor.

22          THE WITNESS: Repeat the question.

23  BY MR. VOLKOV:

24  Q    Are you aware -- do you recall the problem with the

25  fire sprinklers at that night?

1   A     No.

2   Q     Do you recall that one of the fire sprinklers was

3 leaking?

4   A     At that time, no.

5   Q     Are you familiar with the company called Faultline

6 Plumbing?

7   A     Yes.

8   Q     One of the items in the claim is their invoice, so

9 I'll refer your attention to Exhibit -- it's Plaintiffs'

10 Exhibit 1, but because the exhibit is the complaint, it's

11 in Exhibit I.

12           MR. VOLKOV:   May I approach the witness to point

13 to what page it is?

14           THE COURT: Sure.

15 BY MR. VOLKOV:

16   Q     Does this appear to be an invoice from Faultline

17 Plumbing?

18   A     Correct.

19   Q     Is that a two-page document?

20   A     Yes.

21   Q     And the total is $895?

22   A     Correct.

23   Q     Are you aware of this invoice?

24   A     Yes.

25   Q     What's your recollection about this invoice?

1  A     Plumbing repair.

2  Q     Is it fair to say that this reflects services by

3  Faultline Plumbing?  I'm going by definitions made -- the

4  descriptions made in the body -- actual description, and I

5  have to apologize but when I made the complaint, I flipped

6  the pages so page 1 of the invoice is page 2 of my exhibit,

7  and page 2 is page 1.

8  A     Oh, okay.  M-hm.  Okay.

9             MR. TUKIA: Your Honor, before -- I'm going to

10  object to this.  This is not pertaining to the actual

11  claim.  It's the wrong invoice.

12             MR. VLOKOV: Your Honor, this is the first time I

13  hear any objection to this invoice, and it's the invoice

14  proposed by the defense into evidence and actually filed

15  with the court, a similar copy.

16             MR. TUKIA: Actually it's not.

17             THE COURT: Mr. Tukia, you're going to have to

18  make an offer of proof.  I'm not following you.  It's an

19  $895 invoice from a plumbing vendor.  That's the element of

20  the claim that's at issue, so --

21             MR. TUKIA: Should we do it in front of the

22  witness or -- there's another invoice for $895 regarding

23  other -- different work.

24             THE COURT: Different services.

25             MR. TUKIA: That's correct.

1          THE COURT: Okay.  Mr. Casey, we're going to

2    excuse you a moment while I hear further argument on this

3    objection.  I just want you to go out in the hallway, stay

4    put.  We will call you back to the stand when we resolve

5    this objection.  Okay?

6          THE WITNESS: Okay.

7          MR. TUKIA: Your Honor, could we use this as a

8    bathroom break just real quick.

9          THE COURT: Sure.  Let's just break until noon.

10          COURTROOM DEPUTY: All rise.

11      (Whereupon, a recess is taken at 11:47 a.m., and the

12    court is reconvened at 12:08 p.m.)

13          COURTROOM DEPUTY: All rise.  Court is now in

14    session.

15          THE COURT: Please be seated.  Mr. Tukia, you are

16    officially exempt from the "all rise" requirement today.

17          MR. TUKIA: Thank you.

18          THE COURT: Have we reached any conclusion as to

19    the exhibit?

20          MR. TUKIA: I apologize.  It is the same exhibit.

21    Because the pages were mixed up, I just saw it wrong and --

22          THE COURT: Okay.  Okay.  So we're okay.

23          MR. VOLKOV: Your Honor, the mixup was mine.  I

24    mixed the first and the second.

25          THE COURT: Yeah, I heard you say that when you

 1  were talking with the witness about the exhibit.  So all

 2  right.  Can someone go and get Mr. Casey.

 3      (Pause.)

 4          Okay, Mr. Casey, you remain under oath and under

 5  an obligation to tell the truth.  Do you understand?

 6          THE WITNESS: I do.

 7          THE COURT: Okay.  Mr. Volkov?  Before we get

 8  started, let's talk about when we might break for lunch.  I

 9  would like to do that at about 1:00 o'clock.  Does that

10  makes sense to everybody?

11          MR. VOLKOV: No objection, Your Honor.

12          THE COURT: Mr. Tukia?

13          MR. TUKIA: When would we come back, Your Honor?

14          THE COURT: Probably 2:00 o'clock.

15          MR. TUKIA: Yeah, I called a witness, and I told

16  him to show up at 1:30, and I guess he can just wait --

17  it's better than having you wait.

18          THE COURT: Okay.  Or we can take a shorter break.

19  I don't plan on going anywhere.  The extended break is more

20  for your convenience than mine, so --

21          MR. VOLKOV: Your Honor, as a housekeeping matter,

22  in terms of the time, would the initial order be hours per

23  side, but with John Casey accommodated, I assume the Court

24  will have leniency towards the Plaintiffs' case in chief to

25  proceed because the time got actually mixed.

1          THE COURT: Yeah.  Well, I'm allocating the time

2   between the parties.  You know, your examination is coming

3   out of your allotted three hours, and Mr. Tukia's

4   examination is coming out of his allotted three hours.  So

5   far, I think we have 40 minutes for one side and 35 for

6   another, although Mr. Gapuz can confirm that.

7          COURTROOM DEPUTY: It's 40 minutes for the

8   Plaintiff, 35 for the Defendant.

9          THE COURT: Okay.  So you've got two hours and 20

10  minutes left and you have two hours and 35 minutes left.

11         MR. VOLKOV: Thank you, Your Honor.

12         THE COURT: So what's the concern?

13         MR. VOLKOV: No concern, Your Honor.

14         THE COURT: Okay.  So are we breaking at 1:00

15  o'clock?

16         MR. TUKIA: That's fine, Your Honor.

17         THE COURT: Okay, and for how long?

18         MR. VOLKOV: If it can be a shorter break.

19         THE COURT: Okay, so let's break for half an hour

20  at 1:00 o'clock.  Okay?

21         MR. TUKIA: Okay, Your Honor.  Thank you.

22         THE COURT: All right.  Mr. Volkov, you can

23  proceed.

24  BY MR. VOLKOV:

25  Q    Mr. Casey, I believe the issue with the exhibit, the

1  invoice that results, so we do attend your attention to

2  this invoice.

3  A    Okay.

4  Q    Have you made the payment on that invoice?

5  A    Yes.

6  Q    And that payment was made on behalf of Ms. Sun?

7  A    Yes.

8  Q    To Faultline Plumbing directly?

9  A    Yes.

10 Q    Are you familiar with the company called Advanced

11 Restoration?

12 A    Yes.

13 Q    Is it fair to say that that company is the

14 contractor's company which undertook emergency work and

15 restoration of the property?

16 A    Yes.

17 Q    Do you recall -- referring back to this invoice, do

18 you recall an issue with different sizes of fittings of the

19 pipes, the piping issue?

20 A    I don't have any knowledge about that.

21 Q    So it is your testimony you have no knowledge of that

22 issue with the diameter of the pipes?

23 A    Correct.

24 Q    I will refer your attention to Plaintiffs' Exhibit 32.

25 A    Page 32?

1  Q    Yes.  Sorry, it's not page 32; it's Exhibit 32, I

2  apologize.

3  A    So it goes to 25?

4         THE COURT: No, there are more tabs behind there.

5         MR. VOLKOV: May I approach?

6         THE COURT: Yes, Mr. Volkov, you may.

7         THE WITNESS: Okay.  32, you said?

8         MR. VOLKOV: Yes.

9         THE WITNESS: Okay.

10  BY MR. VOLKOV:

11  Q    You previously testified that C & C Property

12  Management, that Pac Bell does your e-mail?

13  A    Correct.

14  Q    Do you recognize an e-mail in the middle of this page

15  starting with the words: "Hi Richard"?

16  A    Yes, I see that's from myself.

17  Q    Thank you.  Do you recognize the contents of the main

18  paragraph of that letter?

19  A    Give me a moment to read through it here.

20  Q    Please.

21     (Pause.)

22  A    Okay.

23  Q    Has your recollection changed after you reviewed this

24  e-mail?

25  A    Now that I know what we're talking about, yes.

1    Q    What's your recollection now?

2    A    It's just indicating the pipe sizes.

3    Q    And what was wrong with the pipe sizes?

4    A    It just notates the size differential.

5    Q    So the size was larger than normal?

6    A    That's not for me to say.  I'm not a professional in

7    that area.

8    Q    I understand, but you authenticated this e-mail;

9    that's your e-mail, correct?

10   A    Correct.

11   Q    Doesn't it say that the plumbing line size is larger

12   than normal, two inches as opposed to three and a quarter

13   inches, something to that effect?

14   A    That's what it says.

15   Q    Does it also say about a leak, also notes an

16   aggressive leak?

17   A    Correct.

18   Q    And that e-mail was sent on April 9, 2013?

19   A    Correct.

20   Q    Approximately within the time frame when the plumbing

21   invoice was issued?

22   A    Repeat that again?

23   Q    Approximately within the same time when the plumbing

24   invoice was issued?

25   A    I don't know.  I'd have to --

1  Q    You're welcome to refer back.

2  A    Where is that?

3  Q    It was Exhibit 1 on the same binder and the sub

4  exhibit I --

5  A    9-I?

6         THE COURT: One.

7         THE WITNESS: 1-I.

8  BY MR. VOLKOV:

9  Q    So if I can approach, I'll point you back to that --

10         MR. TUKIA: If I could help on that, Your Honor.

11  It's also Exhibit N to the Defendants --

12         THE COURT: Let's just work with the exhibit that

13  Mr. Volkov has been addressing.  Have you found it, Mr.

14  Casey?

15         THE WITNESS: No.

16         THE COURT: Okay.  So go to Exhibit 1 in that

17  binder.  Mr. Volkov, you can approach.

18         MR. VOLKOV: Your Honor, I'll take their offer

19  because then the witness can have two binders open, so

20  Defendants' Exhibit N will be the invoice.

21         THE COURT: Okay.

22         THE WITNESS: Okay.  So I have Section N, The

23  Faultline Plumbing invoice.

24  BY MR. VOLKOV:

25  Q    Yes.  Reviewing that invoice, do you now recall the

1  approximate time when the events happened as stated on that

2  invoice?

3  A    Yes.  The invoice is dated April 15, 2013.

4  Q    And your e-mail is dated April 9, 2013, same year?

5  A    Correct.

6        MR. VOLKOV: Your Honor, we move to admit into

7  evidence Plaintiffs' Exhibit 32.

8        THE COURT: Just a moment.  Any opposition, Mr.

9  Tukia?

10        MR. TUKIA: I would object to hearsay within that

11  e-mail referring to a David and so on, within that e-mail.

12  And it also refers to another e-mail there, so my objection

13  is hearsay.

14        MR. VOLKOV: Your Honor, I can examine further as

15  to confirm who is David because the e-mail says David

16  Myers, so it's a statement of the opposing party and I

17  represent that it's your capacity to establish that David

18  Myers was the contractor.

19        THE COURT: But that doesn't solve the hearsay

20  problem.

21        MR. VOLKOV: Well, the manager of the opposing

22  party has authenticated the e-mail adopting the statement

23  made by the contractor working for the same opposing party.

24        THE COURT: I see what you're saying.  Okay.

25  Would you care to respond to that?

1          MR. TUKIA: I disagree, Your Honor.  It was used

2     to refresh his reflection as to the invoice.

3          MR. VOLKOV: Your Honor, it was just to --

4          THE COURT: Don't interrupt him, Mr. Volkov.

5          MR. TUKIA: I don't think he was trying to adopt

6     anything.  It was just to refresh his recollection, so my

7     objection stands.

8          THE COURT: Okay.

9          MR. VOLKOV: Your Honor, it was also used for the

10    impeachment.  It was a prior inconsistent -- prior

11    testimony that the witness does not recall any issues with

12    the piping size, and after that, he was referred to this

13    exhibit.

14         THE COURT: I disagree that it was for purposes of

15    impeachment.  The witness just said he didn't remember, so

16    you showed him the document to refresh his recollection.

17    That's a different thing.

18         MR. VOLKOV: And it was authenticataed.

19         THE COURT: I'm going to overrule the objection.

20    And Exhibit 32 can come into evidence.

21                         (Whereupon, Plaintiffs' Exhibit 32, e-

22                         mail letter from John Casey dated April

23                         9, 2013, is admitted into evidence.)

24    BY MR. VOLKOV:

25    Q   Mr. Casey, do you recall the accounting arrangement

1 that when Ms. Sun pays directly to subcontractors, she

2 avoids a 20 percent markup on the invoices rather than

3 paying Advanced Restoration.

4 A     That didn't involve me.

5 Q     Referring back to the Defendants' Exhibit N; that's

6 in the black binder.  Do you recall asking tenants to pay

7 this invoice?

8 A     Yes, I believe so.

9 Q     Do you have any writing which refers -- reflects you

10 asking them to pay this invoice?

11 A     Not in my possession.

12 Q     In your memory, when would you make that request?

13 A     After the billing.

14 Q     But you don't recall when exactly?

15 A     I don't have that paperwork in front of me, no.

16 Q     Do you recall informing tenants -- and by "tenants," I

17 mean Mr. and Mrs. Gerevich, the Plaintiffs -- do you recall

18 informing tenants about 2,000 owed to be paid to Cindy Lee?

19 A     Yes.

20 Q     And by Cindy Lee, is it fair to say that it's one of

21 Ms. Sun's attorneys?

22 A     Correct.

23 Q     Do you recall what this $2,000 was for?

24 A     Cindy Lee's services.

25 Q     Do you recall what kind of services?

1  A    That was in regard to -- from my recollection -- past

2  work done by Cindy Lee in review of potential replacement

3  tenants for 554 Commercial Street.

4  Q    Is it fair to say that roughly in 2012, there was an

5  anticipated sale of the restaurant and there was a

6  potential buyer?

7  A    That, I do not know.

8  Q    But you do recall that there was a -- do you recall

9  that there was a potential new assignment or new transfer,

10 a new tenant, in 2012 as to which this $2,000 charge

11 pertains?

12 A    All I know is that nothing of that nature occurred.

13 Q    But it was anticipated.

14 A    It didn't occur.

15 Q    Referring your attention to Plaintiffs' Exhibit No.

16 18.

17 A    Okay.

18 Q    Is this your e-mail?

19 A    It is.

20 Q    Do you recall asking $2,000 payable to C & C Property

21 Management as stated in this e-mail?

22 A    Correct.

23        MR. VOLKOV: Your Honor, we would move this letter

24 into evidence, Exhibit 18 of the Plaintiffs.

25        THE COURT: Any opposition?

1          MR. TUKIA: No objection, Your Honor.

2          THE COURT: Okay.  Exhibit 18 will be admitted.

3                    (Whereupon, Plaintiffs' Exhibit 18, e-

4                    mail letter from John Casey, dated

5                    February 7, 2013, is admitted into

6                    evidence.)

7    BY MR. VOLKOV:

8    Q    On the second page of this exhibit, is this your

9    letter?

10   A    It is.

11   Q    Will it be fair to say that the second page letter is

12   roughly the statement of the same language made in the e-

13   mail on the first page?

14   A    Correct.

15   Q    And it also refers to $2,000 to become payable to

16   C & C Property Management.

17   A    Correct.

18   Q    Next two pages of the same exhibit, do you recognize

19   this letter as the letter of Ms. Cindy Lee?

20   A    Yes.

21   Q    Is it fair to suggest that this was attached to your

22   letter?

23   A    It could have been.

24   Q    On the second page of this letter, do you see a

25   paragraph No. 3 saying "Attorney's Fees and Costs"?

1   A     Yes.

2   Q     Do you see in the last few lines of that paragraph

3   that it refers to "$2,000 incurred thus far in regard to

4   the apparent unsuccessful lease transfer to date?"

5   A     The last sentence you're referring to in Item 3?

6   Q     It's in paragraph 3, last two lines, refers to "Owner

7   incurred attorney's fees 2,000 (In brackets) incurred thus

8   far in regard to the apparent unsuccessful lease transfer

9   to date."

10  A     Yes.

11  Q     Is that your recollection that that's the 2,000 which

12  was demanded by you in the letters on the first and second

13  page of that exhibit?

14  A     Yes.

15  Q     Referring your attention to Exhibit 19 of the

16  Plaintiffs.

17  A     Okay.

18  Q     Does this appear to be an invoice from Ms. Cindy Lee?

19          MR. TUKIA: Objection.  Calls for speculation, and

20  it's hearsay.

21          THE COURT: I think you just need to lay a

22  foundation that the witness knows what this document is,

23  and that he's seen it before.

24          MR. VOLKOV: Thank you, Your Honor.  I'll

25  rephrase.

1  BY MR. VOLKOV:

2  Q    Are you familiar with this document?

3  A    Yes, I believe I have seen this before.

4  Q    Is it fair to say that this is an invoice from Ms.

5  Cindy Lee?

6  A    Yes, that appears to be the case.

7  Q    As manager for Ms. Sun, you make payments on invoices

8  like this?

9  A    If it's billed to C & C Property Management, yes.

10  Q    So do you recall making payment on this invoice?

11  A    It could have been done by C & C or the owner

12  directly.

13  Q    But it's fair to suggest that it was paid?

14  A    I can't suggest anything.

15  Q    Well, is there anything indicating on this invoice or

16  anywhere else that it was not paid?

17  A    Not that I have here in front of me, no.

18  Q    At the second page of this invoice, there is some

19  writing --

20  A    I'm sorry, what's the question?

21  Q    At the second page of this invoice, there is some

22  writing.  Do you see some handwriting on the second page?

23  A    Yes.

24  Q    Is this your writing?

25  A    No.

1  Q    Is it fair to suggest it's Ms. Cindy Lee's writing?

2            MR. TUKIA: Calls for speculation, lacks

3  foundation.

4  BY MR. VOLKOV:

5  Q    Do you have any personal knowledge whose writing this

6  is?

7  A    No.

8  Q    Was this invoice presented to the tenants?

9  A    More than likely.

10           MR. VOLKOV: Your Honor, we move to submit into

11 evidence Plaintiffs' Exhibit 19.

12           MR. TUKIA: Again, Your Honor, it's hearsay, and

13 I'm not sure if it's relevant because it hasn't been

14 established what this bill is related to.

15           MR. VOLKOV: Your Honor, this is first of all a

16 statement by a party opponent and I represent that it's a

17 capacity adopted by another representative recognized by

18 that representative.  It appears to be a part of a business

19 record without no challenge to its custodian part.  And it

20 refers to the already-admitted Exhibit 18 where it requests

21 the $2,000 and states the details of that $2,000 charge.

22           MR. TUKIA: And I'll submit, Your Honor, it has

23 not been established that this $2,000 on a bill is related

24 to the correspondence in Exhibit 18.  Again, as a business

25 record exception to hearsay, Ms. Lee is not here.  If

1    counsel is opening the door to allow Ms. Lee to testify

2    concerning her billing, I'll bring her back.

3         MR. VOLKOV: Your Honor, it's not -- if that

4    becomes a cornerstone, we'll have Ms. Lee coming back, but

5    this is a statement authenticated by the manager and

6    adopted by the manager.

7         THE COURT: All he said is that he's seen it.  He

8    doesn't -- he did not testify that this related to the

9    prior exhibit, so I'm going to sustain the objection and

10   exclude Exhibit 19.

11   BY MR. VOLKOV:

12   Q    Mr. Casey, are you in possession of any other invoice

13   of Ms. Lee for $2,000?

14   A    No, not to my knowledge.

15   Q    Back to Exhibit 18, where you ask for $2,000 for

16   "owner attorney fee invoice."  That's the second from the

17   bottom line on the main paragraph of your e-mail.

18   A    Okay.

19   Q    It says "Attached are hard copies of this

20   communication and owner attorney fee invoice totaling

21   $2,000 now due."

22   A    Okay.

23   Q    "Has been U.S. mailed."  Is it fair to say that that's

24   the invoice in Exhibit 19 which was attached?

25        MR. TUKIA: Lacks foundation.  Calls for

1 speculation. Asked and answered.

2        MR. VOLKOV: Your Honor, this question was not

3 asked and answered. I'm answering the Court's concern with

4 establishing a foundation.

5        THE COURT: And I've already ruled and excluded

6 the exhibit. So you need to move on, Mr. Volkov.

7 BY MR. VOLKOV:

8 Q   Mr. Casey, do you recall Ms. Sun in 2013 applying for

9 tax relief?

10        MR. TUKIA: I'm going to object to this as

11 irrelevant, Your Honor.

12        MR. VOLKOV: Your Honor, it's directly relevant to

13 the amounts of the claim as to the claim for the tax due.

14        THE COURT: Okay. I'm going to overrule the

15 objection. You can continue.

16        THE WITNESS: Okay. Go ahead; repeat the

17 question.

18 BY MR. VOLKOV:

19 Q   Are you aware in 2013 of Ms. Sun applying for tax

20 relief?

21 A   I believe so, yes.

22 Q   Do you recall communications with the City officials

23 in that regard?

24 A   I recall it was paperwork received by C & C Property

25 Management, which I informed the owner about.

1  Q    What kind of paperwork?

2  A    Forms to fill out.

3  Q    Do you recall whether that tax relief forms -- was the

4  tax relief forms some kind of an application for tax

5  relief?

6  A    Yes.

7  Q    Was that application submitted to the City?

8  A    Yes.

9  Q    Do you recall whether the City granted the

10  application?

11  A    That, I do not know.

12  Q    Referring your attention to Exhibit -- Plaintiffs'

13  Exhibit 36.  You have previously testified that the

14  address, P.O. Box 11314, Oakland, California 94611 is your

15  mailing address?

16  A    Correct.

17  Q    Is there any reason not to believe that you received

18  this letter?

19  A    No.

20  Q    After seeing this letter, do you agree that you

21  received it?

22  A    Yes.

23  Q    And referring you to Exhibit 37.  Do you recognize the

24  address of P.O. Box 11314 in Oakland, California, 94611

25  printed on this document?

1  A    Yes.

2  Q    Is this a copy of the check for the amount of

3  $3,125.48?

4  A    Okay.

5  Q    Does this depict the check for the tax relief?

6  A    The description doesn't depict much to ascertain that,

7  but it could have been.

8            MR. TUKIA: Objection, calls for speculation.

9            THE COURT: You need to interpose the objection

10 before the question is answered.

11 BY MR. VOLKOV:

12 Q    Do you recall depositing this check?

13 A    In 2015, no.

14 Q    The date on the check says November 13, 2014.  Do you

15 agree with that?

16 A    That's correct.

17 Q    Is there any reason to believe you did not receive

18 this check?

19 A    Not to my knowledge.

20 Q    Is there any reason to believe you did not deposit

21 this check?

22 A    Not to my knowledge.

23 Q    Referring your attention to page 2 on this exhibit.

24 A    Okay.

25 Q    Does this appear to be also a check sent to the same

1   mailing address of yours?

2   A     Correct.

3   Q     Does that appear to be a check for $69.74?

4   A     Yes.

5   Q     Issued on the same day of November 13, 2014?

6   A     Yes.

7   Q     Is there any reason to believe you did not receive

8   this check?

9   A     No, not to my knowledge.

10  Q     Is there any reason to believe you did not deposit

11  this check?

12  A     No.

13  Q     And by "deposit," I mean the account pertaining to Ms.

14  Sun's property.

15  A     Correct.

16          MR. VOLKOV: Your Honor, I move to admit

17  Plaintiffs' Exhibit 37 into evidence.

18          THE COURT: Any opposition?

19          MR. TUKIA: No objections, Your Honor.

20          THE COURT: All right.  Exhibit 36 will be

21  admitted -- excuse me, 37.

22          MR. VOLKOV: 37.

23                  (Whereupon, Plaintiffs' Exhibit 37,

24                  copies of Disaster Relief payment

25                  checks, is admitted into evidence.)

1  BY MR. VOLKOV:

2  Q    Referring your attention to the last line of the

3  middle portion of the first page.

4            MR. VOLKOV: May I approach, Your Honor.

5            THE COURT: Yes.

6            MR. VOLKOV: It's easier to point out, but I also

7  need to show it to counsel.

8            THE WITNESS: Is that the last line?

9            MR. VOLKOV: Yes.

10           THE WITNESS: Uh-huh.

11 BY MR. VOLKOV:

12 Q    It reads: "FY..."

13           THE COURT: Where are we please?

14           MR. VOLKOV: Your Honor, may I approach the bench

15 to point you to the --

16           THE COURT: Just tell me the exhibit.  I'll find

17 it.

18           MR. VOLKOV: It's Exhibit 37.  I'm asking about

19 this line.

20           THE COURT: Okay, got it.

21 BY MR. VOLKOV:

22 Q    It reads: "FY 2013 secured real estate."

23 A    I see that.

24 Q    Will it be fair to say that it means financial year

25 2013?

1  A    That, I don't know.

2  Q    On the documents and communications in writing

3  received by your office in connection with Ms. Sun's

4  property, do you keep a copy of them?

5  A    Yes.

6  Q    Do you keep copies of insurance policies --

7  A    Yes.

8  Q    -- for Ms. Sun's properties?

9  A    Yes.

10  Q    Do you send a copy to Ms. Sun of those insurance

11  policies?

12  A    No.

13  Q    So Ms. Sun trusts you to keep the insurance, but she

14  does not request a copy of the policies.

15  A    Correct.

16  Q    Referring your attention to Exhibit -- Plaintiffs'

17  Exhibit 35.

18  A    Okay.

19  Q    The first page of that exhibit, does it appear to be

20  a communication from Golden Eagle Insurance?

21  A    Correct.

22  Q    It says: "Notice of Cancellation."  Do you recall a

23  cancellation of insurance as of May 3, 2012?

24  A    No.

25  Q    Do you have any recollection of the payment of

1   $3,176.85 not made as of April 5th, 2012?

2   A    I don't have any knowledge of those.

3   Q    Is there any reason to believe this is not a correct

4   statement?

5   A    Not for me to say.  It's not my paperwork.

6   Q    Who else would have insurance paperwork for Ms. Sun?

7   A    No one else to my knowledge.

8   Q    No one else besides you?

9   A    Correct.

10  Q    The second page of the same exhibit.  Do you recognize

11  the page?

12  A    I haven't seen this before.

13  Q    The third page, do you recognize this page?

14  A    I have not seen it, no.

15  Q    But if somebody will be holding the insurance policy

16  papers, that would be you.

17  A    Right.  But if you notice the address in the beginning

18  of the document is not for C & C Property Management.

19  Q    Is that the document of David Klein Agency?

20  A    That's what it says at the top, yes.

21  Q    But didn't you just testify that you received copies

22  of the insurance policies?

23  A    Right, but the document you're referring to is not

24  addressed to C & C Property Management.

25  Q    Well, besides to whom it is addressed, don't you have

1   the copy?

2   A    If it's sent to us, yes.

3   Q    And even if it's sent first to David Klein Agency and

4   then sent to you, you still have a copy; is that correct?

5   A    If that was to occur.

6   Q    But it could be that some of the policies for some

7   years were not sent to you?

8            MR. TUKIA: Lacks foundation.

9            THE COURT: Sustained.  You don't need to answer

10  the question.  He has to ask another question.

11  BY MR. VOLKOV:

12  Q    Referring to page 5 of this exhibit, also bates

13  stamped as AS2247.

14  A    Okay.

15           THE COURT: Wait a minute, 2247, okay.

16  BY MR. VOLKOV:

17  Q    Do you recognize this page?

18  A    Not off the top of my head, no.

19  Q    You manage the subject property, the 554-556

20  Commercial, and how often do you visit the property?

21  A    Weekly.

22  Q    Are you aware of the homeless problems with the

23  property?

24  A    Not on the property, no.

25  Q    Well, are you aware of the homelesses around the

1    property?

2    A     Yes.

3    Q     If you look on the Exhibit 39 of the Plaintiffs'

4    binder, there are three photographs.  Does this fairly

5    depict the issue with the homeless around the property?

6    A     Repeat that again?

7    Q     Do these pictures fairly depict the common issue with

8    the homeless around the property?

9              MR. TUKIA: Lacks foundation.  It's speculative,

10   and it's vague and ambiguous.

11             THE COURT: Sustained.

12             MR. VOLKOV: Your Honor, those are the pictures

13   made for the fair depiction of the homeless --

14             THE COURT: I have no idea what these pictures

15   are.

16             MR. VOLKOV: Well, I can approach the bench and

17   tell you, offer the proof.  The pictures are --

18             THE COURT: You need to witness to authenticate

19   these things.  I can't just take judicial notice.  I don't

20   even -- I've never been to the property.  I don't know what

21   these pictures are of.

22             MR. VOLKOV: Granted.

23   BY MR. VOLKOV:

24   Q     Mr. Casey --

25             MR. VOLKOV: May I ask the witness on this

1  exhibit?

2          THE COURT: You can ask him another question --

3          MR. VOLKOV: The exhibit is not excluded.

4          THE COURT: -- but I've sustained that objection.

5          MR. VOLKOV: Thank you, Your Honor.

6  BY MR. VOLKOV:

7  Q    On the first page of the Exhibit 39, do you recognize

8  the facade of the subject property?

9  A    I do.

10  Q    On the second page of the exhibit, do you recognize

11  the facade of the subject property?

12  A    Yes.

13  Q    On the third page of these pictures, do you recognize

14  the facade of the subject property?

15  A    Yes.

16  Q    Will it be fair to say that those pictures are made

17  depicting the area immediately adjacent and the sidewalk to

18  the subject property?

19  A    Yes.

20  Q    And that would be Commercial Street.

21  A    Correct.

22  Q    So do these pictures now with the established

23  foundation fairly depict the issue with the homeless around

24  the subject property?

25          MR. TUKIA: Same objections, Your Honor, lacks

1  foundation, vague and ambiguous, calls for speculation.

2          MR. VOLKOV: Your Honor, we now have established

3  that those pictures are depicting the property as far as

4  its facade.  I'm only trying to develop the witness's

5  understanding as to the homeless --

6          THE COURT: No, you're trying to get him to

7  confirm what your position is of what these pictures are.

8  That's different.  You haven't asked him for what his

9  understanding is.  So I'm going to sustain that objection

10 as well.

11 BY MR. VOLKOV:

12 Q    Mr. Casey, are you aware -- do you recall that the

13 tenants complained to you about the homeless problem on the

14 property?

15         MR. TUKIA: I'm going to object now, Your Honor,

16 as beyond the scope of the --

17         MR. VOLKOV: I'm on direct --

18         THE COURT: Let him finish, Mr. Volkov.

19         MR. TUKIA: I apologize.  I realize he's on

20 direct.  But I will object as irrelevant.

21         MR. VOLKOV: Your Honor, it's direct, relevant as

22 to the execution of the terms of the lease, which I will

23 tie up in the argument, but I'm almost done with this line

24 of questioning.  I mean I can --

25         THE COURT: Well, if you're almost done, you know,

1   that doesn't -- I'm having a hard time understanding how

2   this is relevant.  So I'm going to sustain the objection.

3             MR. VOLKOV: Your Honor, if I can offer --

4             THE COURT: I've sustained the objection.  You

5   need to move on, please.

6   BY MR. VOLKOV:

7   Q   As to the previously --

8             MR. VOLKOV:  I just need to understand at what

9   point the objection was sustained.  Was the question --

10  there was a question asked and answered whether Mr. Casey

11  recalls tenants complaining about homeless problems.  So

12  may I impeach or at least refresh the recollection of the

13  witness as to that statement?

14            THE COURT: I find this line of questioning

15  irrelevant, so you need to move on to a different area of

16  questioning, okay?

17            MR. VOLKOV: Thank you, Your Honor.

18  BY MR. VOLKOV:

19  Q   Mr. Casey, I will refer you to Plaintiffs' Exhibit 4.

20  A   Okay.

21  Q   And on that exhibit, I'll refer you to page 4.

22  A   Okay.

23  Q   Have you seen this document before?

24  A   I believe so, yes.

25  Q   Is it fair to say that it summarizes the claims that

1   we're at the trial today, the claims of the landlord to

2   the tenants as due?

3   A    Correct.

4   Q    Referring to actually page 5 of this because it runs

5   on two pages.  Do you see the line saying: "Property Taxes

6   and Insurance - January 1, 2013 - April 28, 2013"?

7   A    I do.

8   Q    Do you have any knowledge as to why this number is

9   due, why -- how the --

10          THE COURT: Hold on, Mr. Volkov.  We're here to

11  try the following issues.

12          MR. VOLKOV: Anticipating your question, Your

13  Honor, this item --

14          THE COURT: Don't anticipate my question.  Let me

15  finish, please.  Just a moment.

16      (Pause.)

17          You did not take issue with this element of the

18  Defendants' claim in your complaint.

19          MR. VOLKOV: Your Honor, it's paragraph 63(b)

20  directly allowed on the March 5th, 2015 hearing.  It's the

21  $2,519 for tax and insurance.  It's pre-Petition portion of

22  property tax and insurance that were made part of the claim

23  in the amount of 23,482.80, 7,202.33, and 2,598.36, which

24  is exactly this number.  That's page 13 of the adversary

25  complaint, paragraph 63(b).  And I apologize, Your Honor,

1  if I haven't made it more clear.

2      THE COURT: Okay.  I stand corrected.  Go ahead,

3  please.

4  BY MR. VOLKOV:

5  Q    Do you have any knowledge as to this amount being

6  claimed?

7  A    Based on what it says, property tax and insurance,

8  January 1-2013 through April 28, 2013.

9  Q    So in your understanding, that depicts the summary of

10  property tax and insurance due for the period from January

11  1st, 2013 through April 28, 2013?

12  A    That appears to be the case.

13  Q    Referring you back to page 4 of the same document.

14  A    Okay.

15  Q    You see there are two items on the top, each

16  having five years in it, so from 2008 through 2012, and

17  again, from 2008 to 2012, one for property tax and one for

18  the insurance.

19  A    Okay.

20  Q    In your understanding, are these calendar years?

21  A    Correct.

22      MR. VOLKOV: Your Honor, I have no more questions

23  on direct.

24      THE COURT: Okay.

25      MR. TUKIA: Just a few questions, Your Honor.

1       THE COURT: Sure.

2                    CROSS-EXAMINATION

3  BY MR. TUKIA:

4  Q    Staying at Exhibit 4 of the Plaintiffs, that second --

5  page 5 of 5, I'd like to go with the page numbers that

6  counsel was kind enough to just write in and circle.  I

7  think that's easiest for all of us, so just page 5 of

8  Exhibit 4, and that refers to property taxes and insurance

9  for 2013 in the amount of $2,598.36.  Has that amount been

10 paid, as far as you know?

11 A    No.

12 Q    And I apologize, I'm jumping around with just a few

13 follow-up questions, sir.  Going -- let me turn your

14 attention back to Plaintiffs' Exhibit 18.  Those are two e-

15 mails with a two-page attachment to it.

16 A    Okay.

17 Q    Okay.  The two-page attachment, it looks like a

18 February 5, 2013 letter from Cindy Lee to Michael and Sima

19 Gerevich.  Mr. Volkov asked you some questions about that,

20 and it refers to unpaid taxes and insurance.  Do you see

21 that, sir, on page 1 of that letter?

22 A    I do.

23 Q    Did you ever get back any objections to those figures,

24 to those numbers that were provided to Mr. and Mrs.

25 Gerevich?

1   A    None.

2   Q    Did they ever tell you that these unpaid taxes and

3   insurance were incorrectly accounted using a calendar year

4   instead of a fiscal year?

5   A    Never.

6   Q    And in fact, they made payments to you to repay that

7   outstanding balance; is that correct?

8   A    Correct.

9           MR. VOLKOV: Objection, Your Honor, the payment --

10          THE COURT: The question has already been

11  answered, Mr. Volkov.  You need to interpose your

12  objections before the question is answered.

13  BY MR. TUKIA:

14  Q    And they were monthly payments starting approximately

15  when, if you know?

16  A    There's a document in here that I just saw that

17  referenced it.  We could refer to that.  I don't know the

18  exact time frame.  It could have been 2012.

19  Q    That was in response to your correspondence and Ms.

20  Lee's correspondence to Ms. Gerevich?

21  A    That was in response to confirm receipt of partial

22  payments towards tax and insurance by the 554 tenant to C &

23  C Property Management.

24  Q    That's correct, and Ms. Gerevich in fact sent you

25  back -- strike that; I'm sorry.

1        Ms. Gerevich or Mr. Gerevich and Mrs. Gerevich

2    sent you payments some time in 2013 -- well, strike that.

3    I already asked that.  I apologize.

4        Let me direct your attention, sir, to Exhibit 37.

5    Those are the two checks.

6    A    Okay.

7    Q    And I apologize if this was asked; I'm not sure if it

8    was, but do you know what that first check is for in the

9    amount of $2,125.48?

10   A    The description on the page doesn't give enough

11   backing to convey that to me right now, but I can make an

12   assumption.

13   Q    I'm not asking for an assumption, whatever you know,

14   sir.

15   A    Right.  I guess based on the information here, it

16   doesn't give me enough description to accurately answer it.

17   Q    And how about the second check on Exhibit 37 for

18   $69.74?  Do you know what that was for?

19   A    No, same response.  I don't -- not enough description

20   to accurately answer.

21        MR. TUKIA: Okay.  Thank you, sir.

22        THE COURT: Are you finished?

23        MR. TUKIA: Yes, thank you.

24        THE COURT: Okay.  Anything further, Mr. Volkov?

25        MR. VOLKOV: Yes, please, very quickly.

REDIRECT EXAMINATION

BY MR. VOLKOV:

Q    Staying on the same exhibit just confirming your prior testimony, there is nothing to suggest that you haven't deposited those checks into Ms. Sun's account.

A    Correct.

Q    Going back to Exhibit 18 you were just asked about?

THE COURT: Is it -- say it again, please?

MR. VOLKOV: 18, Plaintiffs' Exhibit 18.

THE COURT: Thank you.

THE WITNESS: Okay.

BY MR. VOLKOV:

Q    The last two pages, is it fair to say that this letter was dated February 5, 2013?

A    Repeat that again?

Q    The letter says it's dated February 5, 2013.  Is there any reason to suggest this letter was issued prior than that date?

A    Again, this communication is not from C & C Property Management, so I don't know.

Q    Well, in your recollection, is that 2013 communication?

A    Repeat that again?

Q    Is it your understanding -- is it your understanding that this is 2013 communication?

1  A    That's what it says at the top.

2  Q    The five payments of $1,000 each which was discussed

3  previously, were they done in 2012?

4  A    It could have been, but there's documentation here to

5  support that that we looked at already.

6  Q    And in this letter, it appears to have no reference to

7  the $2,598.36 we discussed as the last line on the claim in

8  Exhibit 4; is that correct?

9  A    Correct.

10 Q    Also this letter consists of two pages?

11 A    Correct.

12 Q    And it doesn't appear to have any attachments.

13 A    Nothing behind it.

14 Q    Going back to Exhibit 4, you were just asked whether

15 Plaintiffs paid the amount of $2,598.36 and you said no; is

16 that correct?

17 A    Correct.

18 Q    Do you recall that this amount was ever asked to be

19 paid by the Plaintiffs?

20 A    It appears to be the case.  It's in that written

21 documentation that you referred to.

22 Q    What documentation?

23 A    Whatever prior exhibit that was that notated that

24 number.

25 Q    And what exhibit number are you referring to?

1  A    I don't know.  These are your exhibits.  You tell me.

2  Q    Are you referring to Exhibit 4 or are you referring to

3  Exhibit 18?

4  A    Neither.  It would be the one that referenced that

5  twenty-five hundred dollar number, page 5 of 5.

6  Q    So that's Exhibit 4, page 5 of 5.

7  A    Correct.

8  Q    Except and aside of this, are you aware of any other

9  requests made by the landlord for this amount?

10 A    Other than the initial requests at the beginning of

11 each year, no.

12 Q    Well, are you in possession of the initial request at

13 the beginning of the year for the amount of $2,598.36?

14 A    Not to my knowledge.

15        MR. VOLKOV: No further questions, Your Honor.

16        THE COURT: Okay.  All right.

17        MR. TUKIA: No questions.

18        THE COURT: Mr. Casey, you're off the hot seat,

19 and you're excused.

20        THE WITNESS: Thank you.

21        THE COURT: Thank you very much.

22        It probably makes sense to take our break now.

23 Yes?

24        MR. TUKIA: Yes, Your Honor.

25        THE COURT: Okay.  Mr. Volkov, do you agree with

1  that?

2          MR. VOLKOV: Yes, Your Honor.

3          THE COURT: Okay.  So we will be back on the

4  record at 1:30 p.m.

5          COURTROOM DEPUTY: All rise.

6      (Whereupon, the luncheon recess is taken at 12:58

7  p.m., and the court is reconvened at 1:35 p.m.)

8          COURTROOM DEPUTY: All rise.  Court is now in

9  session.

10          THE COURT: Please be seated.  Okay.  Before we

11  get started, I want to let the parties know where the times

12  allotted for trial stands.  So Mr. Gapuz?

13          COURTROOM DEPUTY: Plaintiff is at one hour and 21

14  minutes.  Defendant is at 40 minutes.

15          THE COURT: Thank you.  Okay.  So Mr. Volkov, do

16  you want to call your next witness, please?

17          MR. VOLKOV: Thank you, Your Honor.  The Plaintiff

18  will call Mr. Myers, which my understanding is he's

19  outside.

20          THE COURT: Is Mr. Myers here?

21          MR. TUKIA: I saw him here, Your Honor.

22          THE COURT: Okay.  Somebody should get him,

23  please.

24      (Pause.)

25          Mr. Myers, you're being called as a witness.

Please put your belongings down and come forward.  Stand

just behind this table over here to my left, please.

DAVID MYERS, PLAINTIFFS' WITNESS, SWORN

COURTROOM DEPUTY: Please raise your right hand.

Do you hereby affirm under penalty of perjury that the

testimony you are about to give in the matter now pending

before this Court shall be the truth, the whole truth, and

nothing but the truth?

THE WITNESS: I do.

COURTROOM DEPUTY: Please state your full name and

spell it for the record, please.

THE WITNESS: David Barry Myers, D-a-v-i-d,

B-a-r-r-y, M-y-e-r-s.

THE COURT: Okay.  Before we get started, Mr.

Myers, a couple of ground rules.  The microphone in front

of you obviously amplifies your voice but it also feeds

into an electronic recording system.  So in order for that

system to capture everything that you say, you need to

speak pretty directly into the microphone.  Do you

understand?

THE WITNESS: Yes, I do.

THE COURT: Okay.  And when you're responding to a

question, you need to answer audibly and not nod your head

or shake your head or shrug or otherwise physically gesture

in response to a question.  Do you understand?

```
 1              THE WITNESS: Yes, I do.
 2              THE COURT: Okay.  Thank you, go ahead, Mr.
 3    Volkov.
 4              MR. VOLKOV: Thank you, Your Honor.
 5                        DIRECT EXAMINATION
 6    BY MR. VOLKOV:
 7    Q    Good afternoon, Mr. Myers.
 8    A    Good afternoon.
 9    Q    Before you, you see two binders, one is a black
10    binder; one is a white binder.  The white binder is
11    Plaintiffs' binder of exhibits, and the black binder is
12    Defendants' binder of exhibits.  So I will be referring
13    your attention to certain documents.  For instance, we'll
14    start with and referring your attention to, in the black
15    binder, to Defendants' Exhibit N, like Nancy.
16    A    Okay.  I think we're already there.
17    Q    Please tell if you recognize this document.
18    A    I have seen this, yes.
19              MR. TUKIA: Is this N as in Nancy?
20              THE COURT: Yes.
21              MR. VOLKOV: Yes, that's --
22              MR. TUKIA: Sorry, I was on M.
23    BY MR. VOLKOV:
24    Q    Are you familiar with the company called Faultline
25    Plumbing?
```

1  A    It's been some time, but, yes.

2  Q    Do you recall them doing plumbing services for a scope

3  of $895 on the subject property?

4  A    I don't recall the amount, but I do remember they did

5  the work, yes.

6  Q    And just for establishing the basics, you are with a

7  company called Advanced Restoration?

8  A    Correct.

9  Q    Is that true that your company did a restoration and

10 emergency projects on the property located at 554-556

11 Commercial Street?

12 A    Yes, as well as cleaning and some manipulation of

13 furniture.

14 Q    Is it fair to say that it followed the event of a fire

15 that happened on the property?

16 A    Correct.

17 Q    Do you recall the date of the fire?

18 A    Not off the top of my head, no.

19 Q    Do you recall the date when the property was returned

20 to possession to the tenants?

21 A    No.

22 Q    Will it be fair to say it was in 2014?

23 A    Yes.

24 Q    Will it be fair to say that the fire happened in 2013?

25 A    I believe so.

1  Q    Do you recall the initial response –- the scope of the

2  initial response of your company to the property?

3           MR. TUKIA: Objection, it's irrelevant, outside

4  the scope of the issues at trial in this case.

5           MR. VOLKOV: Your Honor, I'm establishing time

6  line of possession and use of the property.  It goes toward

7  the timing, and I basically –-

8           THE COURT: How does the scope of his work–- how

9  is that relevant to the timing of when your clients were or

10 were not in possession?

11          MR. VOLKOV: My clients, the fire event is

12 incompatible with the use of the property by my clients, so

13 the possession of the clients and work of Mr. Myers'

14 company were two consecutive events but not parallel

15 events.

16          THE COURT: All right.  I'm going to sustain the

17 objection.  I don't think this is the witness for that.

18 BY MR. VOLKOV:

19 Q    Mr. Myers, on the document in Exhibit N, if you read

20 it, does it refresh your recollection of the services done

21 by this company?

22 A    Let me peruse it if I may?

23 Q    Please.

24      (Pause.)

25 A    This is the document I remember, and it's for the most

1 part accurate.  I may not have actually read this document

2 because a lot of the communication between Faultline was

3 going directly to Annie in a way to save them paying us the

4 20 percent.  So these documents at the time, I may have

5 just gone over.  Most of my memory of that is from being on

6 the site.

7 Q    But is there any reason to suggest that the statements

8 on this invoice are not accurate?

9 A    I believe the technician believes these to be

10 accurate.  Some things I might have a slightly different

11 version of.

12 Q    What is your version?

13            THE COURT: A version of what?

14            MR. VOLKOV: He said he had -- Your Honor, he had

15 a slightly different version, and I apologize for the

16 question.

17 BY MR. VOLKOV:

18 Q    What kind of different version of what --

19 A    Better explanation.

20            MR. TUKIA: It's still vague and ambiguous.

21            THE COURT: I'll let him answer if he can.

22            THE WITNESS: Basically I remember three different

23 issues, the back flow, the sump pump, and the clogged

24 drain.  None were related to each other.  To the best of my

25 knowledge, none were related to the fire.  The drain was

1  approximately 25 feet from the sump pump or the back flow.

2  It was just a kitchen drain where the water was supposed to

3  drain, and it wasn't draining, which I assumed was

4  preexisting.  The sump pump was not in the best of shape

5  and from my knowledge of plumbing as a general contractor,

6  it looked like it was not working as well.  Those units

7  usually only work when activated, and unless they had

8  regular floods down there, it probably wasn't working

9  prior.

10        The back flow though, I know that it was dripping

11  and it had a minor issue, to me, from my opinion.  Now, of

12  course, this gentleman is the plumber and the expert, so

13  I'd have to defer to anything technical he was saying, a

14  little better than what my opinion would be.

15  BY MR. VOLKOV:

16  Q    And in responding to this question, you referred about

17  the 20 percent.  Is that their accounting issue that if Ms.

18  Sun pays subcontractors directly, she saves 20 percent on

19  the deal; is that correct?

20        MR. TUKIA: Lacks foundation.

21        MR. VOLKOV: Well, the witness mentioned 20

22  percent in his response.  I'm exploring the testimony.

23        THE COURT: I'm going to overrule the objection.

24  You can answer if you understand the question.

25        THE WITNESS: In the insurance industry, our

1  standard markup by California law is ten percent overhead,

2  ten percent profit for a total of 20 percent.  I did this

3  because I told Annie if you go direct, it would save the

4  cost of money ultimately to the tenants because I believed

5  it to be their cost, and the insurance company, and Annie,

6  all parties.  For me just to manage it and look at the bill

7  and pay it and then collect money seemed ridiculous, and at

8  this point, I was trying to help everything move along.

9           MR. VOLKOV: Understood.

10  BY MR. VOLKOV:

11  Q    Do you recall that following the fire, the property

12  was flooded with the water?

13  A    There was, which is very normal, a lot of water from

14  extinguishing the fire, yes.

15  Q    Do you recall that your company did the cleanup

16  immediately following the fire?

17           MR. TUKIA: Objection.  It's vague and ambiguous,

18  outside the scope of the issues at trial here.

19           MR. VOLKOV: Your Honor, it goes to the issue of

20  the plumbing.

21           THE COURT: I'll allow it.  It's a preliminary

22  question.  He's not going to get too far down this road.

23           THE WITNESS: We started the water mitigation, but

24  we could not effectively do our work.

25  ///

BY MR. VOLKOV:

Q    So you shared your opinion on two of those three issues on the invoice.  What is your opinion on the back flow preventer?

A    Well, the only reason I don't have an opinion is, I saw it dripping.  I did not look at it personally any further than that, and as I mentioned, I passed that on to Annie, meaning she would have to talk directly to them.  I was kind of out of that.  I did see this, but I really didn't give it much thought.

Q    Do you recall an issue with different pitching on the pipes?

MR. TUKIA: Irrelevant.  Lacks foundation and vague and ambiguous.

MR. VOLKOV: The issue is stated on the invoices, I believe.  I'm checking myself.

THE COURT: Okay.

MR. VOLKOV: It's -- the piping is on page 2 of the Defendants' proposed Exhibit N.

THE COURT: I'll allow the question and overrule the objection.

THE WITNESS: A moment to read page 2, please.

(Pause.)

Actually I do not recall this.  I wasn't involved with this process.

1  BY MR. VOLKOV:

2  Q    Is it fair to say that your e-mail is dated at

3  advancedrestor.com.

4  A    Correct.

5  Q    You're the only one who uses this e-mail?

6  A    Yes, without an "e" at the end of restore, just to be

7  specific.

8  Q    Yes.  r-e-s-t-o-r.com.

9  A    Correct.

10 Q    Do you recall being deposed by me back in February of

11 this year?

12 A    Clearly.

13 Q    Have you received the transcript?

14 A    I did not.

15 Q    Were you offered the transcript?

16 A    I believe so.

17          MR. VOLKOV: No further questions.

18          MR. TUKIA: Just a few follow-ups, sir.

19          THE WITNESS: Sure.

20                    CROSS-EXAMINATION

21 BY MR. TUKIA:

22 Q    Good afternoon, Mr. Myers.

23 A    Good afternoon.

24 Q    This Faultline invoice marked as Exhibit N as in

25 Nancy to Defendants' trial exhibits, this is addressed to

1  you at Advanced Restoration; is that correct?

2  A    Correct.

3  Q    Is it fair to say that you would have received this

4  at some point?

5  A    Yes.

6  Q    Is it fair to say that you would have kept a copy of

7  this invoice in your records?

8  A    Possibly not, because again, I knew that this was

9  going to Annie.  I may have had a record, and I'm known for

10  keeping pretty much everything, so there might be a record

11  of it.  I haven't seen it recently, but then again, I

12  haven't gone through every piece of paper.

13  Q    Okay.  Thank you, sir.

14  A    M-hm.

15        THE COURT: Is that all?

16        MR. VOLKOV: Your Honor, first of all, I would

17  like to submit into evidence Defendants' proposed Exhibit

18  N, the plumbing invoice.

19        THE COURT: Any opposition?

20        MR. TUKIA: No opposition, Your Honor.

21        THE COURT: Okay.  Exhibit N will be admitted.

22                      (Whereupon, Defendants' Exhibit N,

23                      Faultline Plumbing invoice dated

24                      April 13, 2013, is admitted into

25                      evidence.)

1          MR. VOLKOV: No further questions.

2          THE COURT: All right.  Mr. Myers, thank you for

3   your testimony.  You're excused.

4          THE WITNESS: For the day?

5          THE COURT: Yes.

6          THE WITNESS: Okay.  Thank you.

7          THE COURT: Your next witness, Mr. Volkov?

8          MR. VOLKOV: We're calling Ms. Annie Sun.

9          THE COURT: Okay.  Hi, Ms. Sun.  If you could just

10  take a -- you know, stand up next to this table over here

11  to my left and raise your right hand, please.

12          ANNIE SUN, PLAINTIFFS' WITNESS, SWORN

13          COURTROOM DEPUTY: Do you affirm under penalty of

14  perjury that the testimony you are about to give in the

15  matter now pending before this Court shall be the truth,

16  the whole truth, and nothing but the truth?

17          THE WITNESS: (Inaudible response.)

18          COURTROOM DEPUTY: Please state your full name and

19  spell it for the record.

20          THE WITNESS: Annie Li Sun, A-n-n-i-e, L-i, S-u-n.

21          THE COURT: Thank you, Ms. Sun.  You've heard me

22  tell a couple of the witnesses now the ground rules for

23  testifying.  I do need you to speak pretty directly into

24  that microphone so that the court's electronic recording

25  system can pick up everything that you say.  Do you

1  understand?

2          THE WITNESS: Yes, I do.

3          THE COURT: Okay.  And I also need you to answer

4  questions audibly.  You can't physically gesture; don't nod

5  your head or shake your head or shrug or anything like that

6  in response to a question.  Do you understand?

7          THE WITNESS: Yes, I do.

8          THE COURT: Okay, thank you.  Go ahead, Volkov.

9          MR. VOLKOV: Thank you, Your Honor.

10                    DIRECT EXAMINATION

11 BY MR. VOLKOV:

12 Q    Good afternoon, Ms. Sun.

13 A    Good afternoon.

14 Q    First, to establish the basic -- in this case, as you

15 may know, we have two Defendants.  One is Annie Li Sun;

16 that's you; is that correct?

17 A    Yes.

18 Q    And another is Annie Li Sun as trustee of the Annie Li

19 Sun Revocable Trust.  Are you still the trustee of the

20 Annie Li Sun Revocable Trust.

21 A    Yes, I am.

22 Q    Do you recall the event of the fire on the subject

23 property, 554-556 Commercial Street?

24 A    Yes, in 2013, some time in --

25 Q    Yes, in 2013.

1 A    Yes.    March.

2 Q    Is it fair to say it took place on March 23rd, 2013?

3 A    Yes.

4 Q    You've heard Mr. Casey testify today, John Casey.

5 A    Yes.

6 Q    Is it fair to say that he's your property manager?

7 A    Yes.

8 Q    And currently is.

9 A    Yes.

10 Q   Prior to Mr. John Casey, your manager was Mr. Steve

11 Clark?

12 A    Yes.

13 Q    And prior to Mr. Clark, there was Mr. Szeto,

14 S-z-e-t-o?

15 A    Yes.

16 Q    Is it true that the property managers communicate with

17 the tenants of the subject property on your behalf?

18 A    Yes.

19 Q    Is it true that the managers inspect the subject

20 property on your behalf?

21 A    Yes.

22 Q    Ms. Cindy Lee, is she your attorney?

23 A    Not now.

24 Q    Was she your attorney in 2013?

25 A    Yes.

1  Q    Was she your attorney for any part of 2014?

2  A    Part of 2014.

3  Q    When did her representation stop?

4  A    I don't remember the exact date.

5  Q    Rough estimate.

6  A    I can't guess.  I really don't remember.

7  Q    Would it be in the summer?

8  A    I should think so.

9  Q    And your current attorney, is it Ms. Phoebe Zen

10 (Phonetic)?

11 A    Yes.

12 Q    And your attorneys, prior Ms. Cindy Lee, and currently

13 Ms. Phoebe Zen, are authorized by you to communicate with

14 the tenants on your behalf?

15 A    Can you please repeat the question?

16 A    Do your attorneys, such as in the past, Ms. Cindy Lee,

17 and currently Ms. Phoebe Zen, are they authorize to

18 communicate with the tenants on your behalf?

19 A    Yes.

20 Q    Do you recognize the name Ms. Cathleen Moran?

21 A    Yes.

22 Q    Spelled M-o-r-a-n.

23 A    Yes.

24 Q    Is she your attorney representing you in the

25 bankruptcy case?

1   A      Not now.

2   Q      Was she representing you in this bankruptcy case in

3   the past?

4   A      Yes.

5   Q      Was it in 2013?

6   A      Yes.

7   Q      We just heard Mr. David Myers who is with Advances

8   Restoration.  Is it fair to say that the company Advanced

9   Restoration was the company which undertook the restoration

10  project on the subject property?

11  A      Yes.

12  Q      Do you recall paying the company -- well, strike that.

13  Do you recall a company called Faultline Plumbing?

14  A      Yes.

15  Q      If you would refer your attention to Defendants'

16  Exhibit N, which is probably open.

17  A      Yes.

18  Q      Do you recognize this document?  It's a two-page

19  document.

20  A      Yes.

21  Q      Is it fair to say that this is a Faultline Company --

22  Faultline Plumbing Company invoice?

23  A      Yes.

24  Q      Do you remember paying $895?

25  A      I don't remember paying it myself, because all the

1  dues are referred to John Casey, my manager.

2  Q    Now, will it be your understanding that the bill was

3  paid on your behalf?

4  A    Yes.

5  Q    Do you recall -- was there anyone on your behalf who

6  requested tenants to pay this invoice?

7  A    I'm sorry, I don't understand the question.

8  Q    Do you have any knowledge -- was there anyone on your

9  behalf or you personally requested this invoice to be paid

10  by the tenants?

11  A    I don't know.

12  Q    May I refer your attention to Plaintiffs' -- that's

13  the white binder -- Exhibit 5.  And I should say that the

14  first two pages -- it appears to be the declaration of Ms.

15  Cathleen Cooper Moran, following which, entitled as Exhibit

16  A, is what appears to be a lease agreement.

17  A    Which page is this, 32?

18  Q    Well, the pages are 32 because they're all 32, but you

19  can see on the stamp it says page 1 of 32, page 2 of 32 and

20  so on.

21  A    Yes, I have it.

22  Q    Referring your attention to page -- I strike this

23  question because I realized we have already admitted into

24  evidence the Defendants' copy of it.

25        MR. VOLKOV: Your Honor, we will ask for request

1   for judicial notice of this filed document that we will

2   refer to the copy admitted, the Defendants', which appears

3   to be identical.

4         THE COURT: Any opposition to me taking judicial

5   notice of the declaration?

6         MR. TUKIA: Yeah, I'm not quite clear on how you

7   take judicial notice of the existence of a declaration.

8         THE COURT: All I can -- what that would mean is

9   that I can recognize that it was filed.  It says what it

10   says.  I am not accepting as true its contents, but it's

11   part of the record in the action.

12         MR. TUKIA: No objection.

13         THE COURT: Okay.  So I will take judicial notice

14   of Plaintiffs' Exhibit 5.

15   BY MR. VOLKOV:

16   Q    Ms. Sun, on Plaintiffs' Exhibit 6, I refer your

17   attention to this document, which is entitled "Supplemental

18   Declaration of Annie Li Sun in Support of Motion for Relief

19   from Stay."

20   A    Yes, I'm looking at it.

21   Q    Is this your declaration?

22   A    Can you give me some time to read it?

23   Q    Please do.

24         (Pause.)

25   A    Yes.

1  Q     And the paragraph 2 of this declaration on the first

2  page of it, refers to "attached copies of the letters."

3  Do you see that?  It says "attached letters"?  Is that the

4  Exhibit A of this declaration, which immediately follows

5  within the same exhibit?

6  A     Notice of tax and insurance payment due on page 24?

7  Q     Well, it starts with Exhibit A, which looks like this.

8  A     Yes.

9  Q     And then the letters, so this is part of the -- that's

10 the attachment to the declaration.

11 A     Right.

12 Q     Do you recognize that attachment?

13 A     I recognize that attachment, but I do not recall that

14 I waived any of the insurance and property tax of April

15 2009.

16 Q     So in other words, this is not your writing?

17 A     It's not my writing.

18 Q     You're pointing to page 2 of 24?

19 A     Yes.  It's not my writing.

20 Q     Very good.  But the question of waiver will come next.

21 But as of now, we're moving to admit into evidence Exhibit

22 6, which was previously requested for judicial notice, but

23 now -- that's the declaration of the witness and it's part

24 of the record.

25          THE COURT: Okay.

1       MR. VOLKOV: Your Honor, we're moving to admit it

2  into evidence.

3       THE COURT: Do you have any opposition to the

4  admission of Ms. Sun's declaration?

5       MR. TUKIA: No.

6       THE COURT: All right.

7                 (Whereupon, Plaintiffs' Exhibit 6,

8                 Supplemental Declaration of Annie

9                 Li Sun with attachments, is admitted

10                 into evidence.)

11 BY MR. VOLKOV:

12 Q    Now since we touched on the question of the waiver,

13 you do not recall making a waiver?

14 A    No.

15 Q    Do you recall me taking your deposition in October of

16 2014?

17 A    Yes.

18 Q    Do you recall me taking your deposition in February of

19 2015?

20 A    Yes.

21 Q    I will refer your attention to Plaintiffs' Exhibit 8,

22 page 13 of this document, starting with line 19.  Actually

23 19, the reporter asks me again, so the question is on line

24 23 about waiver by owner.  Does that refresh your

25 recollection as far as the waiver in 2008?

1  A    Yes.

2  Q    And what's your current testimony as far as the

3  payment for 2008?

4  A    At that time, I said, because the market was bad, I

5  did that to help them out.  This is my recollection from

6  the note that was on that statement from Steve Clark.

7  Q    So your recollection is that the taxes in 2008 were

8  waived?

9  A    I don't remember exactly, whether I waived it or not.

10 Q    Is there any reason to believe that this statement

11 that you made at your deposition is wrong?

12          MR. JOHNSON: Lacks Foundation, vague and

13 ambiguous, speculation.

14          THE COURT: I'm going to overrule the objection.

15 If you understand the question, you can answer it.

16          THE WITNESS: Please state that question again.

17 BY MR. VOLKOV:

18 Q    Is there any reason to believe that the statement made

19 at that deposition confirming the waiver is wrong?

20 A    At that time, I thought I was saying what I believed

21 was true.  But I only have the note to compare with because

22 there's no written -- any written document to confirm that.

23 Q    Well, your deposition was taken under oath.

24 A    Yes.

25 Q    And we do have a document with which we started which

1    also refers to the waiver.  That's Exhibit 6 we just

2    talked -- which is submitted under your declaration again,

3    your personal declaration, and that writing is in the

4    submitted exhibit.

5            MR. JOHNSON: Object to the form of the question.

6    It's argumentative.

7            MR. VOLKOV: I haven't even made the question.

8    I'm establishing the question.

9            THE WITNESS: Which page is that?

10           MR. VOLKOV: That would be page 4 of Exhibit 6, or

11   if you go by typed numbers, that's page 2 of 24.

12           THE WITNESS: Exhibit 6?

13           MR. VOLKOV: Exhibit 6.

14           THE WITNESS: Page?

15           MR. VOLKOV: 4 if you go by written numbers, page

16   2 of 24 if you go by typed numbers.

17           THE WITNESS: 24?  Right.  That's the notice of

18   tax and insurance payment due.

19           MR. VOLKOV: Yes.

20   BY MR. VOLKOV:

21   Q    Do you see the writing?

22   A    Yes.

23   Q    And you're not agreeing with this writing?

24   A    I do not --

25           MR. JOHNSON: That misstates her testimony.

1          THE COURT: The question simply was, if she's --

2    whether the witness is confirming that she does not agree

3    with whoever's handwritten note this is.  I'd like her to

4    answer that question, please.

5          THE WITNESS: I don't remember, Your Honor.

6          THE COURT: Okay.  Thank you.

7    BY MR. VOLKOV:

8    Q    Going back to page 13 on the Exhibit 8 of your

9    deposition and turning over to page -- referring you

10   actually to page 80 of the same exhibit.

11         THE COURT: Eight-zero?

12         MR. VOLKOV: Eight-zero.

13         THE WITNESS: Eight-zero on --

14         MR. VOLKOV: The same exhibit, yes, Exhibit 8,

15   lines 15 through 17.  Page 18, lines 15 through 17.

16         THE WITNESS: Allegation as stated in Attachment

17   15, is that what I'm supposed to be looking at?

18         MR. VOLKOV: Your Honor, may I approach?

19         THE COURT: You may.  He's just going to show you

20   where to look in the document.

21         THE WITNESS: Thank you.

22   BY MR. VOLKOV:

23   Q    So the lines I'm referring to are 15 through 17.

24   A    Yes.

25   Q    Does this refresh your recollection as to the waiver

1  of property tax and insurance in 2009?

2  A    Based on the note from Steve Clark, yes.

3  Q    So do you agree that the tax and insurance in 2009

4  were waived?

5  A    Based on what's written on the handwritten note from

6  Steve Clark, yes.

7  Q    And as of the previous note, you agree that the

8  property tax and insurance in 2008 were waived?

9  A    According to the note, yes.

10  Q    Do you recall Mr. Myers testifying about the way that

11  the plumbing deal is paid directly, it saves you 20

12  percent.  Do you agree with his testimony?

13  A    Not save me, save the insurance company.

14  Q    And by that you mean that otherwise the insurance

15  company would pay 20 percent more?

16  A    Well, it's by request from the insurance company

17  adjusted at that time, that certain bills should be sent to

18  me and paid by my manager.

19  Q    Do you recall receiving a refund for the property tax

20  in 2013?

21  A    2013.  I received two checks that Cindy Lee sent me.

22  I have no idea what is the check for.

23  Q    Let me point your attention to Exhibit 37 in the white

24  binder.

25  A    Yes.

1  Q    There are two pages here, and is it fair to say that

2  those two pages reflect those checks?

3  A    I deposited those checks, yes.

4  Q    Do you recall tenants asking you for permission to

5  install a mailbox?

6  A    Yes.

7  Q    Is it fair to say it happened in the fall of 2014?

8  A    Yes.

9  Q    Are you aware of the issue with the homeless people

10  surrounding the subject property?

11            MR. JOHNSON: Vague.

12            THE COURT: Sustained.  Don't answer the question.

13  It's been objected to successfully.

14  BY MR. VOLKOV:

15  Q    Do you recall writing to the mayor of San Francisco?

16            MR. JOHNSON: Relevance.

17            MR. VOLKOV: I'll establish my relevance, Your

18  Honor, once I present the document.

19            THE COURT: You need to ask a more specific

20  question.  I mean you need to tie it to the case.

21            MR. VOLKOV: Well, the tie will be in the next

22  question, but may we establish a general recollection

23  whether Ms. Sun wrote a letter to the mayor of San

24  Francisco?

25            THE COURT: About what?

1          MR. VOLKOV: About the homeless people.  I need to
2  explain my issue with the homeless people.

3          THE COURT: I've already found that that issue is
4  not relevant, sir.  So move on.

5  BY MR. VOLKOV:

6  Q    Ms. Sun, do you recall your prior testimony regarding
7  an intention to recover every penny from the tenants, to
8  recover every penny you spent on the restoration?

9          MS. JOHNSON: Foundation.

10          MR. VOLKOV: The item for $895.

11          MS. JOHNSON: Vague.

12          THE COURT: I didn't hear your response.  I'm
13  sorry.

14          MR. VOLKOV: The item for $895 is apparently paid
15  out of pocket by Ms. Sun, and that's the reason it's
16  included in the claim.

17          THE COURT: Okay.  Well then ask that question,
18  not one that's so loaded with -- I mean the question that
19  you asked, asked her to confirm that her intention to get
20  every penny out of your clients, that's a different
21  question.

22          MR. VOLKOV: Well, that's the exact working of the
23  testimony, Your Honor, so --

24          THE COURT: Okay.  Well --

25          MR. VOLKOV: I'll move on.

1          THE COURT: Why don't we -- if you want to ask a

2     question about that $895 invoice, you're free to do that.

3     Otherwise, I sustain the objection.

4     BY MR. VOLKOV:

5     Q     Ms. Sun, I'm referring you to Plaintiffs' white

6     binder, Exhibit 4.

7     A     Exhibit 4?

8     Q     Yes.

9     A     Can I ask what page?

10    Q     Well, I'll start with the front page.  First I will

11    ask you whether you recognize this document.

12    A     Yes.

13    Q     Do you recognize that this is a document entitled

14    Proof of Claim?

15    A     Yes.

16    Q     Do you recognize that it was filed on your behalf?

17    A     Yes.

18    Q     Against the tenants, Mr. and Mrs. Gerevich?

19    A     Yes.

20    Q     Referring you to page 4 and before referring, I would

21    move to admit this one into evidence, Exhibit 4 of the

22    Plaintiffs.

23          THE COURT: Any opposition?

24          MR. TUKIA: No opposition.

25          THE COURT: All right.  Exhibit 4 is admitted.

1          (Whereupon, Plaintiffs' Exhibit 4,

2          Defendants' Amended Claim No. 19-

3          2, is admitted into evidence.)

4     BY MR. VOLKOV:

5     Q     So on page 4 of this Exhibit 4, do you see the line

6     and it's the third item from the bottom called "April 5,

7     2013, Faultline Plumbing Sump Pump Clean/Repair ... $895."

8     A     Yes.

9     Q     What's your understanding -- why is it included in

10    your claim?

11    A     Including in what claim?

12    Q     Why is it here?  Why is it included in the account?

13    We just established that this is the document of your

14    claims against the tenants.  So the question is, why do you

15    claim $895 for this charge from the defendants -- from the

16    tenants, the Plaintiffs?

17    A     This is something that you have to refer to John Casey

18    because I do not manage -- you know, he manages the

19    property, and when the bill comes to me, I have him pay for

20    it.

21    Q     So you don't have any independent knowledge outside of

22    what Mr. Casey can do with it?

23    A     Well, he's allowed to -- I don't remember exactly --

24    one thousand or two thousand dollar payment without asking

25    me when he receives any bills.

1  Q    Do you recall that this claim was filed by Ms. Moran?

2  A    Yes.

3  Q    And you authorized her to file this claim?

4  A    Yes.

5  Q    Referring back on the front -- the first page of this

6  document, Exhibit 4, Item 2, do you see three lease

7  arrears?

8  A    Yes.

9  Q    Is that your understanding that the items claimed on

10 this claim are due for paying in the lease agreement

11 between you and the Plaintiffs?

12 A    What exactly does arrears mean?

13 Q    Well, Ms. Sun, it's not my claim.  That's the question

14 to explore.  What's your understanding what lease arrears

15 mean?

16 A    According to the lease, my understanding.

17 Q    Do you recall my clients, the tenants, exercising

18 their right for extending the lease?

19 A    I remember them asking for extension.

20 Q    When did this happen, if you remember?

21 A    I don't remember.

22 Q    Would it be fair to say it happened in December 2013?

23 A    I really don't remember the date.

24 Q    If I refer you to Plaintiffs' Exhibit 15, I will ask

25 you if you recognize this letter, and I should say that the

1  letter itself, the first two pages, and the third page

2  appears to be a copy of the check.

3  A    Yes.

4          MR. VOLKOV: Your Honor, I ask to move this

5  exhibit into evidence.

6          THE COURT: Any opposition?

7          MR. JOHNDON: May I have a moment, please.

8          THE COURT: Sure.

9      (Pause.)

10          MR. JOHNDON: No objection.

11          THE COURT: All right.  Exhibit 15 will be

12  admitted.

13                          (Whereupon, Plaintiffs' Exhibit

14                          15, Letter from Mr. Volkov, dated

15                          December 23, 2013 is admitted into

16                          evidence.)

17  BY MR. VOLKOV:

18  Q    Ms. Sun, if you refer to page 3 of this exhibit, do

19  you recognize this check?

20  A    Yes.

21  Q    Is it fair to say that it was deposited on your

22  behalf?

23  A    Yes, but I have no idea what the check is for.

24  Q    In your understanding, do you think the agreement

25  about the option was made?

1          MR. JOHNSON: Vague, speculation.

2          THE WITNESS: I don't know.

3          THE COURT: I'll overrule the objection.  We've

4    gotten an answer to the question.

5    BY MR. VOLKOV:

6    Q    What do the tenants -- do you know what's the current

7    monthly rent payment the tenants make on the property?

8    A    Sorry, would you repeat that.

9    Q    Do you know what amount the tenants pay -- the rent

10   amount the tenants pay currently on the property?

11   A    Well, the last two months, it's $9,500.

12   Q    Do you recall where the number of $9,500 arrived from?

13   A    Both my real estate agent representing me and their

14   real estate agent representing them come up with that

15   amount, and nothing was written.  So there's no written

16   document to say that we agree to extend the lease.

17   Q    But they do -- the tenants did present you at least

18   twice with the check of $9,500; is that correct?

19   A    That should be the increased rent.

20   Q    And you deposited those checks.

21   A    Yes.

22   Q    Referring you to Exhibit 9, and in that Exhibit 9,

23   referring you to page 168.  If you read from line 4 to line

24   6, does that change your recollection as far as the option

25   agreement?

1  A    Verbally.

2  Q    So the agreement was made verbally?

3  A    Between the two agents, not through me.

4  Q    Was one of those agents representing you?

5  A    I hired him to get me an idea of how much the rental

6  property is on market value.

7  Q    And the agreement was as far as the value of the rent

8  payment was $9,500?

9  A    Yes.

10  Q    Referring you to Exhibit 13 in the white binder.  Do

11  you recognize the front as Haas Najarian, LLP?

12  A    Yes.

13  Q    Is that the firm where Ms. Phoebe Zen is employed?

14  A    Yes.

15  Q    Ms. Phoebe Zen as you previously informed us writes

16  letters on your behalf on the subject property?

17  A    Yes.

18          MR. VOLKOV: Your Honor, I move to admit this

19  exhibit into evidence.

20          THE COURT: Any opposition?

21          MR. JOHNSON: Yes.  It hasn't been authenticated

22  at all.

23          THE COURT: Sustained.

24          MR. VOLKOV: Your Honor, it was adopted, the

25  statement by the agent of the opposing party, so --

1    THE COURT: She doesn't know if she's ever seen

2  this document before.  All she said was that Phoebe Zen is

3  a lawyer with Haas Najarian.  There's no discussion of this

4  letter.  You can try again, but you're not getting it in

5  yet.

6  BY MR. VOLKOV:

7  Q    Ms. Sun, have you ever seen this document?

8  A    It's almost a year ago.  I cannot say I have or I have

9  not.

10 Q    If you put your attention to paragraph 2 on the front

11 page --

12 A    M-hm.

13 Q    -- particularly to the sentence:

14          "As I understand, the brokers for both parties

15          have agreed to increase the rent during the

16          option period for $9,500 a month plus n and m,

17          plus rental increases."

18 Does this sentence -- is it a fair statement of that

19 agreement made between the brokers?

20          MR. JOHNSON: That lacks foundation and calls for

21 speculation.

22          MR. VOLKOV: It asks for personal opinion.

23          THE COURT: About some agreement that she wasn't a

24 party to, so I'm going to sustain that objection as well.

25 ///

1  BY MR. VOLKOV:

2  Q    Ms. Sun, a different question, do you recall Ms. Cindy

3  Lee billing you for $2,000 in connection with the subject

4  property?

5  A    Yes.

6  Q    What was this bill for?

7  A    A background check for the tenants that Pleasures

8  Seven supposedly wanted to sell their business to.

9  Q    The whole $2,000 was a background check?

10 A    With other documentation back and forth with -- that's

11 a broker who represents Pleasures Seven or the new tenant.

12 Q    Yes.

13 A    So I believe it's documented in the lease invoice.

14        MR. VOLKOV: Your Honor, may I ask the witness

15 about the previously excluded exhibit for this invoice?

16        THE COURT: You can attempt to authenticate that

17 again, yes.

18 BY MR. VOLKOV:

19 Q    Ms. Sun, can you refer to Plaintiffs' Exhibit 19.

20 Please tell us if that's the invoice you were referring to?

21 A    Yes.

22        MR. VOLKOV: Your Honor, I move to admit this

23 invoice into evidence.

24        THE COURT: Any opposition:

25        MR. JOHNSON: Well, I think it still has a

1  question about authentication because she -- the

2  information might be consistent, but we still don't know

3  what the preparer of the document intended to convey.

4          THE COURT: That doesn't mean the invoice isn't

5  what it purports to be, and your client has admitted that

6  she's seen it and recognizes it as an invoice received from

7  Cindy Lee.  So I'm going to admit Exhibit 19 into evidence.

8                          (Whereupon, Plaintiffs' Exhibit

9                          19, Invoice from Cindy Lee dated

10                         January 28, 2013, is admitted into

11                         evidence.)

12 BY MR. VOLKOV:

13 Q    Ms. Sun, except for -- I mean -- sorry, besides your

14 recollection about the background check which was part of

15 that $2,000 deal, do you recall that the $2,000 was also

16 for drafting a new lease?

17          MR. JOHNSON: Lacks foundation and speculation.

18          MR. VOLKOV: It's exploration of Ms. Sun's

19 understanding.

20          THE COURT: I'm going to overrule the objection.

21 You can answer the question if you can recall.

22          THE WITNESS: I don't remember, Your Honor.

23          THE COURT: Okay.

24 BY MR. VOLKOV:

25 Q    If I refer you on Exhibit 8 to page 30, that's three-

1  zero, lines 11 through 14 -- I would even say lines 9

2  through 14 -- does that refresh your recollection as to

3  what the 2,000 charge was for?

4          MR. JOHNSON: Your Honor, could I request that the

5  witness be directed to the entire page 30 along with the

6  first six -- I'm sorry, five lines of page 31?

7          MR. VOLKOV: Certainly.

8          THE COURT: Yes.

9          MR. VOLKOV: And I also have the entire transcript

10  if this one is put in question, with me.

11          THE COURT: You're not disputing that this is an

12  incorrect copy of the transcript.

13          MR. JOHNSON: No.

14          THE COURT: You just want her to refer to more

15  than the few lines that Mr. Volkov referred to.

16          MR. JOHNSON: Yes, to put it into context, yes.

17          THE COURT: Okay.  Understood.  So, Ms. Lee, why

18  don't you just take -- or Ms. Sun, I'm sorry -- why don't

19  you just take a moment and read through page 30 and then

20  the first few lines of page 31, please, and just let us all

21  know when you're finished.

22          THE WITNESS: I will.

23      (Pause.)

24          Yes, I'm finished, Your Honor.

25          THE COURT: All right.  Go ahead and ask

1  questions, Mr. Volkov.

2  BY MR. VOLKOV:

3  Q    Does this refresh your recollection as to what the

4  $2,000 charge was for?

5  A    Yes.

6  Q    What's your recollection now?

7  A    Like I said before, all the service that's rendered

8  by Cindy Lee, and at least the new lease.  I only have the

9  lease to obtain this request -- I mean as it's stated in

10  the lease, it should be done.  That's all.

11  Q    And further referring you -- I'm not sure if you

12  reviewed that page, but the page 25 of the same document --

13  A    35?

14  Q    25, two-five.

15  A    Oh, I'm sorry.  Two-five?

16  Q    Yes.

17  A    Sorry, I did not look at that.

18        THE COURT: Well, nobody told you to.  It's okay.

19  BY MR. VOLKOV:

20  Q    The lines from 18 through 25.

21  A    All right.

22  Q    Does that further refresh your recollection as to what

23  the $2,000 charge was for?

24  A    Actually it would still be the same for what was

25  stated.

1  Q    All right.  As far as -- a different question, just

2  establishing the timing and obviously I just forgot if I

3  already asked you, but is it fair to agree that the

4  incident of the fire happened in March 23, 2013?

5  A    Yes.

6  Q    Is it fair to agree that the tenants recovered

7  possession of the property on May 16, 2014?

8  A    I don't remember the exact date, but somewhere around

9  that.

10 Q    Do you recall it was somewhere in the middle of May?

11 A    Yes.

12 Q    2014?

13 A    Yes.

14 Q    And do you recall a conversation following the fire --

15 strike my question.  I forgot I'm not pleading it in this

16 issue here.

17          With that, no further questions.

18          MR. JOHNSON: Very briefly, Your Honor.

19          THE COURT: Uh-huh.

20                  CROSS-EXAMINATION

21 BY MR. JOHNSON:

22 Q    Were you present when your attorney, Ms. Lee, drafted

23 her invoice?

24 A    I'm sorry, what do you mean by "present"?

25 Q    Were you there in her office --

1    A      No.

2    Q      -- when she drafted that invoice?

3    A      No.

4    Q      You indicated that was for a background check to be

5    performed on the new tenant?

6    A      Yes.

7    Q      And was that in contemplation of a potential

8    assignment of the lease and purchase of the business?

9    A      Yes.

10   Q      Did you yourself ever make any demand upon this

11   potential new tenant, this buyer of the business?

12   A      No.

13   Q      Did you ever even speak to them?

14   A      No.

15   Q      And you never signed any agreement to extend the

16   lease.

17   A      No.

18          MR. VOLKOV: Objection as irrelevant.

19          THE COURT: Overruled.

20   BY MR. JOHNSON:

21   Q      You've received payments from the bankruptcy trustee

22   in this case?

23   A      Yes.

24   Q      And how much have you received?

25   A      I do not remember the exact amount.  It should be

1  about $20,000 so far.

2  Q    Now this ninety-five hundred dollar amount that you

3  testified receiving --

4  A    Yes.

5  Q    -- you received that for two months?

6  A    Yes.

7  Q    This year, 2015?

8  A    Yes.

9  Q    And yet the lease expired at the end of June 2014; is

10  that right?

11         MR. VOLKOV: Asks for a legal conclusion.

12         THE COURT: I'll sustain that objection.  You

13  should probably ask a different question.

14         MR. JOHNSON: All right.

15  BY MR. JOHNSON:

16  Q    Did you ever receive the sum of ninety-five hundred

17  dollars from the Gereviches for any single monthly rental

18  payment in the year 2014?

19  A    No.

20  Q    And this lease was a ten-year lease entered into

21  originally in 2004, correct?

22  A    Yes.

23  Q    So if it was going to be extended, that would have to

24  have taken place in 2014 or earlier, correct?

25  A    Correct.

1  Q    Do you remember the testimony that you gave earlier in

2  response to Mr. Volkov's questions concerning waiver of

3  taxes and insurance?

4  A    Yes.

5  Q    And you remember seeing the reference to a waiver

6  of taxes and insurance for the year 2008, correct?

7  A    You mean in writing?

8  Q    Yes.

9  A    No.

10  Q    Let me see if I can find the exhibit.  Take a look, if

11  you will, at the white notebook, Plaintiffs' Exhibit 6.  Do

12  you see that it consists of a number of pages?

13  A    Yes.

14  Q    Could you go to the fourth page.  Do you see the

15  heading on the fourth page says "Notice of Tax and

16  Insurance Payment Due;" do you see that?

17  A    Yes.

18          THE COURT: Hold on.  Let me make sure the

19  Judge --

20          THE WITNESS: The C & C Property Management?

21          THE COURT: Hold on, Ms. Sun.

22          THE WITNESS: Sorry.

23          THE COURT: That's okay.  I just want to make sure

24  I'm on the same page.

25          MR. JOHNSON: Exhibit 6, fourth page in.

1    THE COURT: I've got it.  Okay.  I was on page 5.

2  I apologize.  Thank you.

3    THE WITNESS: Exhibit 6, what page?

4    MR. JOHNSON: It would be the fourth page in.  It

5  looks like a Notice of Tax and Insurance Payment Due.

6    THE WITNESS: From C & C?

7    MR. JOHNSON: May I, Your Honor.

8    THE COURT: You may, yes.

9  BY MR. JOHNSON:

10  Q    Do you remember being asked questions about that

11  document by Mr. Volkov?

12  A    Yes.

13  Q    And you see that the document is dated March 30, 2009.

14  Do you see that?

15  A    Yes.

16  Q    And you see the little notation there, April 8, 2009

17  with some handwriting with the word "waived" next to the

18  date 4-8-09.

19  A    Yes.

20  Q    Do you see that?

21  A    Yes.

22  Q    And you testified that that's not your handwriting?

23  A    No.

24  Q    Now, if you take a look at this document, does this

25  refer to the typewritten document, the second paragraph,

1  under the salutation.  It says:

2          "Following are the calculations for your 2008

3          share of property taxes and insurance."

4  Do you see that?

5  A    Yes.

6  Q    Did you ever waive property taxes and insurance for

7  the year 2009?

8  A    No.

9  Q    Are you aware of any document that indicates you ever

10 waived those taxes and insurance payments for the year

11 2009?

12 A    No.

13         MR. JOHNSON: Nothing further, Your Honor.  Thank

14 you, Ms. Sun.

15         THE COURT: Okay.  Mr. Volkov, anything further?

16         MR. VOLKOV: Yes, just quickly.

17                     REDIRECT EXAMINATION

18 BY MR. VOLKOV:

19 Q    I thought we had established this, so I'll ask again

20 your intention on the Exhibit 8 in the white binder, page

21 80.

22 A    Did you say 80?

23 Q    80, eight-zero.

24         THE COURT: Eight-zero.

25         THE WITNESS: Eight-zero.

1  BY MR. VOLKOV:

2  Q    I understand that you just said you might not have

3  something in writing as to the waiver, but isn't it your

4  testimony here saying that you recall that in 2009, you

5  waived taxes and insurance, and the response is yes?

6         MR. JOHNSON: Well, could we have the question

7  read for context and clarity?

8         THE COURT: Sure.  Why don't you go ahead and read

9  it for the record, Mr. Volkov.

10  BY MR. VOLKOV:

11  Q    I will restate my question because I already forgot my

12  question, so --

13         THE COURT: Okay.

14  BY MR. VOLKOV:

15  Q    You see your testimony on page 80, lines -- it was

16  basically one word "yes" in response to my question.  It's

17  lines 15 through 17.

18  A    All right.

19  Q    So as of you're sitting here today, you just testified

20  you don't recall waiving the taxes in 2009.  And back in

21  October 2nd, 2014, this was your testimony that you do

22  recall waiving in 2009.  Are you now retracting your prior

23  statement?

24         MR. JOHNSON: I think that misstates her testimony

25  that a waiver in 2009 doesn't necessarily refer to property

1  taxes -- 2009 taxes.

2          THE COURT: Waiver of the taxes for 2009.  Yeah.

3          MR. JOHNSON: That's what I think is clear from

4  this witness and maybe we should develop that.

5          THE COURT: I think that that is a justifiable

6  point.

7          MR. VOLKOV: And I will even agree, Your Honor,

8  because my next question will be, and it was --

9          THE COURT: Okay.  So I'll sustain the objection.

10 Go ahead.

11         MR. VOLKOV: -- raised before --

12 BY MR. VOLKOV:

13 Q    Ms. Sun, when you -- I already turned back to this

14 exhibit so it will be clear to say this was Exhibit 6, page

15 4, also stamped as page 2 of 24.  When you refer or your

16 manager would refer on your behalf to years like here it

17 says calculations for 2008, is this a calendar year or is

18 it a different period, and I realize that first we

19 establish your understanding whether you know that the

20 property taxes are not paid by calendar year.

21 A    I don't know what Mr. Casey is referring to, whether

22 it's calendar year or the tax year.

23 Q    Well, will it be fair to suggest that this was a

24 reference to tax year spanning from 2008 to 2009?

25 A    I don't know.

```
 1            MR. JOHNSON: Speculation.

 2            THE COURT: Sustained.

 3   BY MR. VOLKOV:

 4   Q    On your previous testimony you said you have an

 5   understanding of a ten-year lease -- that's the subject

 6   lease,

 7   A    Yes.

 8   Q    It started in 2004.  Are you also aware that this ten-

 9   year lease had one five-year -- a right for one five-year

10   extension, also referred to as option?

11   A    Yes.

12   Q    You testified that you are receiving payments from the

13   trustee.

14   A    Yes.

15   Q    Do you have any knowledge as pertaining to what

16   document those payments are made?

17   A    I'm sorry, I don't understand.

18   Q    You receive a check in the mail.

19   A    Yes.

20   Q    It says in essence that it comes from the U.S.

21   bankruptcy trustee.

22   A    Yes.

23   Q    Do you know what it is for?

24   A    It just says for -- on the Bankruptcy Court.

25   Q    Do you have any understanding what it is for, your
```

1 personal understanding?

2 A    It's from Pleasures Seven.  It's for the money they

3 owed.

4 Q    By "they," you mean the tenants, the Plaintiffs.

5 A    The Gereviches.

6 Q    It's probably -- I should first ask -- but you are

7 aware that my clients, the tenants, they filed the

8 bankruptcy.

9 A    Yes.

10 Q    And when they filed the bankruptcy, there was a

11 certain procedure made under which you receive those

12 payments.

13          MR. JOHNSON: Vague.  Relevance.

14          MR. VOLKOV: Your Honor, the defense is trying to

15 establish that making payments under the Plan is somehow

16 conceding to the claim, and the Plan was done with express

17 reservations and objections, right to object.

18          THE COURT: Okay.  I do think the question as

19 phrased is vague, so I'll sustain that objection.

20 BY MR. VOLKOV:

21 Q    Do you have any personal knowledge or understanding of

22 under what payment Plan those payments are made to you?

23 A    No.

24 Q    You testified as far as this -- Ms. Cindy Lee's $2,000

25 invoice that you were not present in her office when she

1  drafted the invoice.

2  A    I'm not.

3  Q    How many years was Ms. Cindy Lee your attorney?

4  A    Since -- I don't remember exactly how many years, but

5  for a very long time.

6  Q    More than ten years?

7  A    More than ten years.

8  Q    How often did Ms. Cindy Lee bill you?

9  A    Not very often, only when there's cases.

10  Q    So is this the only invoice you ever received from Ms.

11  Cindy Lee?

12  A    No.

13  Q    So there were other invoices?

14  A    Yes.

15  Q    How many approximately?

16  A    I can't remember.

17  Q    More than one per year?

18  A    Maybe.

19  Q    So is it fair to say that you received at least more

20  than ten invoices from Ms. Cindy Lee?

21  A    I don't remember how many.

22  Q    Have you paid all her invoices?

23  A    I have.

24  Q    Have you ever been present in her office when she

25  drafted each of those invoices?

1   A       No.

2   Q       Have you ever been present in her office when she

3   drafted at least one invoice?

4   A       No.

5   Q       Is it fair to say that you trusted your attorney, Ms.

6   Cindy Lee?

7   A       Yes.

8               MR. VOLKOV: No further questions.

9               MR. JOHNSON: Nothing further, Your Honor.

10              THE COURT: Okay.  You're excused.  Thank you, Ms.

11  Sun.

12              THE WITNESS: Thank you, Your Honor.

13              THE COURT: You just leave those right there.

14              Mr. Volkov?

15              MR. VOLKOV: Your Honor, I would call Ms. Sima

16  Gerevich, but before I do that, I want to know how much

17  time I have left on the record.

18              THE COURT: Okay.

19              COURTROOM DEPUTY: I have Plaintiffs at two hours

20  and 19 minutes, and Defendants at 48 minutes.

21              MR. VOLKOV: Two hours and --

22              THE COURT: 19.

23              MR. VOLKOV: 19.  Does this time include my

24  argument or just the --

25              THE COURT: It included your opening statement,

1  yes.

2           MR. VOLKOV: And will the --

3           THE COURT: The opening statement took exactly 60

4  seconds.

5           MR. VOLKOV: No, I meant my argument as a closing

6  argument.  Does -- I just don't --

7           THE COURT: How long do you think you're going to

8  take to close?

9           MR. VOLKOV: A few minutes, Your Honor.

10          THE COURT: Okay, we'll allow you to exceed your

11 three-hour limit for your closing arguments.

12          MR. VOLKOV: Thank you, Your Honor.

13          THE COURT: And that of course -- same courtesy

14 will extend to the Defendants.

15          MR. VOLKOV: And I will try to blazenly fast with

16 Ms. Sima Gerevich.

17          THE COURT: All right.  I appreciate that.  And

18 Mr. Gapuz, can you give me the time for the Defendants

19 again, please?

20          COURTROOM DEPUTY: 48 minutes.

21          THE COURT: 48?  Thank you.  All right.  All

22 right, so we're first going to swear the translator and

23 then we'll swear Ms. Gerevich.

24        SVETLANA SHIRINOVA, COURT INTERPRETER, SWORN

25          COURTROOM DEPUTY: Raise your right hand.  Do you

1  hereby affirm under penalty of perjury that in this

2  proceeding you will truthfully and accurately interpret and

3  translate to the witness in Russian all the questions put

4  to her by counsel or by the Court and you will truthfully

5  and accurately interpret and translate into English the

6  responses of the witness to the best of your skill and

7  ability?

8           MS. SHIRINOVA: Yes, I will.

9           COURTROOM DEPUTY: Please state your full name and

10  spell it for the record.

11          THE COURT: Your name, ma'am.

12          MS. SHIRINOVA: Oh, my name.

13          THE COURT: Yes, thank you.

14          MS. SHIRINOVA: S-v-e-t-l-a-n-a, last name

15  S-h-i-r-i-n-o-v-a.

16          COURTROOM DEPUTY: Now I'm going to swear Ms.

17  Gerevich.

18              SIMA GEREVICH, PLAINTIFFS' WITNESS, SWORN

19          COURTROOM DEPUTY: (Through the Interpreter)

20  Please raise your right hand.  Do you hereby affirm under

21  penalty of perjury that the testimony you are about to give

22  in the matter now pending before this Court shall be the

23  truth, the whole truth, and nothing but the truth?

24          THE WITNESS: (Through the Interpreter) Yes, I do.

25          COURTROOM DEPUTY: Please State your full name and

1 spell it for the record.

2            THE WITNESS: Sima Gerevich.

3            COURTROOM DEPUTY: Spell it please.

4            THE WITNESS: S-i-m-a, G-e-r-e-v-i-c-h.

5            COURTROOM DEPUTY: Thank you.

6            THE COURT: All right.  Ms. Shirinova, would you

7 like a chair.  We can probably pull one up for you.  Okay,

8 you've already got it.  All right.

9            MS. SHIRINOVA: There's one here.  Thank you.

10            THE COURT: Thank you.  We have one, thank you,

11 Mr. Johnson.  Okay.  Two admonitions for Ms. Gerevich.

12 First, we need you to speak directly into the microphone so

13 that the Court's electronic recording system can pick up

14 everything you say.  Do you understand?

15            THE WITNESS: (Through the interpreter) Yes, I do.

16            THE COURT: Thank you.  The second thing is when

17 you're responding to a question, you must do so audibly.

18 You can't nod your head or shake your head or otherwise

19 physically gesture in response to a question.

20            THE WITNESS: I understood you.

21            THE COURT: Okay.  Thank you.  Go ahead, Mr.

22 Volkov.

23            MR. VOLKOV: Thank you, Your Honor.

24 ///

25 ///

1       DIRECT EXAMINATION

2  BY MR. VOLKOV:

3  Q     (Through the Interpreter) Ms. Gerevich, are you a

4  tenant of the subject property at 554-556 Commercial

5  Street, particularly the unit 554 Commercial Street?

6  A     (Through the interpreter) Yes.

7  Q     Do you operate a restaurant there?

8  A     Yes.

9  Q     With your husband Michael Gerevich?

10 A     Yes.

11 Q     Who is present here in the court?

12 A     Yes.

13 Q     You became a tenant -- well, let me rephrase it.

14        Do you recall how you became the tenant of 554

15 Commercial Street?

16 A     Yes.

17 Q     I refer you to Defendants' -- and Defendants' is the

18 black binder; Plaintiffs' is the white binder, so

19 Defendants' black binder, Exhibit G.  I will ask you if you

20 recognize this document?

21 A     Yes.

22 Q     Is this the lease agreement?

23 A     Yes.

24 Q     Between you and the Plaintiff?

25 A     Yes.

1  Q    Do you recall a person called Vienna Shuriatana

2  (Phonetic)?

3  A    Yes.

4  Q    Who was --

5           THE COURT: I'm sorry, Mr. Volkov to interrupt

6  you.  I just want to establish, Ms. Gerevich, can you read

7  English?

8           THE WITNESS: Yes.  I know how to read English,

9  but I'm concerned that during the hearing, they will be

10  giving me special terms which I won't be able to

11  understand.

12          THE COURT: Okay.  If you ever have a question

13  about anything that anyone asks you about, please speak up

14  and we'll make sure to clarify the term or the question

15  itself, okay?

16          THE WITNESS: May I ask a question?

17          THE COURT: Yes.

18          THE WITNESS: Did I understand you correctly that

19  the Court wants me to provide my answers in English

20  language and only resort to the interpreter's services when

21  necessary?

22          THE COURT: No, no, no.  I want you to speak in

23  your native tongue and we'll accept as your answers the

24  translator's responses from Mr. Shirinova.  Okay?

25          THE WITNESS: Thank you.

1          THE COURT: okay.  Go ahead, Mr. Volkov, thank

2     you.

3     BY MR. VOLKOV:

4     Q     Ms. Gerevich, do you know a person called Vienna

5     Shuriatana?

6     A     Yes.

7     Q     Who is Vienna Shuriatana?

8     A     It's the seller who sold the business to me.

9     Q     Referring your attention to Exhibit E in the black

10    binder.  Do you recognize this document?

11    A     Yes.

12    Q     What is this document?

13    A     As far as I understand it, Vienna had a lease and this

14    document was created as a document transferring the lease

15    to my name.

16    Q     Referring your attention to Plaintiffs' Exhibits; it's

17    the white binder, No. 33.  And my question will be first,

18    do you recognize this document?

19    A     Yes.

20    Q     And the date on the document says June 7, 2006.  Is it

21    fair to say that around that time, you received this lease

22    and the business from Shuriatana?

23    A     Yes, and to be exact, this happened on June 8th, 2008.

24          THE INTERPRETER: I'm sorry, interpreter's

25    correction, 2006.

1          THE COURT: Thank you.

2    BY MR. VOLKOV:

3    Q    And do you see the name from Ray Szeto, S-z-e-t-o?

4    A    Yes.

5    Q    Who is Ray Szeto?

6    A    At that time he was the manager.

7    Q    The manager of the property?

8    A    Yes.

9    Q    And I should probably ask, was he the manager of the

10   property for Ms. Annie Sun?

11   A    Yes.

12   Q    And since we're at it, do you know the person named

13   Annie Sun?

14   A    I got to know her after the fire which happened in

15   2013.

16   Q    But as of her name, did you prior to the fire, have

17   recognition of the name Annie Sun?

18   A    I saw that name in the documents.

19   Q    What was your understanding of who Annie Sun is?

20   A    She was the landlord of the entire building where we

21   rented for the restaurant business.

22          MR. VOLKOV: Your Honor, I move to enter into

23   evidence Plaintiffs' Exhibit 33.

24          THE COURT: Any opposition?

25          MR. TUKIA: No objections, Your Honor.

1      THE COURT: Okay.  Exhibit 33 will be admitted.

2  Thank you.

3                          (Whereupon, Plaintiffs' Exhibit

4                          33, Escrow Instructions in

5                          connection with assignment of the

6                          subject lease to the Plaintiffs,

7                          is entered into evidence.)

8  BY MR. VOLKOV:

9  Q    Ms. Gerevich, on that Exhibit 33, I put your attention

10 to Item No. 4.  Do you have any knowledge of what this

11 payment was for?

12 A    Yes.

13 Q    What was this payment for?

14 A    That was paid to prepare a new lease.

15 Q    Do you refer back to the assignment from the lease?

16 A    Yes.

17 Q    Do you refer -- is that the document in Defendants'

18 black binder, Exhibit E?  Do you recognize the name Feng

19 and Lee (Phonetic)?

20 A    Which document are you referring to?

21 Q    Oh, I'm sorry, your attention on Exhibit 33 in the

22 white binder, Plaintiffs' Exhibit.

23 A    I did not recognize the name Feng, but I think the

24 name Lee stands for the attorney whose last name was Lee,

25 Cindy Lee.

1  Q    Do you recall the date of the fire?

2  A    Yes.

3  Q    What was that date?

4  A    March 23rd, of 2013.

5  Q    What was the condition of the plumbing in your

6  restaurant on the day before the fire?

7        MR. TUKIA: Objection, calls for speculation and

8  expert testimony.

9        MR. VOLKOV: Your Honor, I asked for personal

10  knowledge.

11        THE COURT: If she had knowledge of the condition

12  of the plumbing, she can speak to it.

13        THE WITNESS: I had no problems with the plumbing.

14  My restaurant was in continuous operation, and as a matter

15  of fact, on the eve of the fire, we had a party that was to

16  take place at the restaurant and we were about to serve

17  people.

18  BY MR. VOLKOV:

19  Q    Do you recall servicing the plumbing prior to the fire

20  in the year 2013?

21  A    Yes, recently.

22  Q    After the fire happened, were you able to use your

23  restaurant?

24  A    No.

25  Q    Do you recall when did you come back to the

1  restaurant, when you received the keys?

2  A    On May 6.

3            THE COURT: What year, please?

4            THE WITNESS: 2014.

5            THE COURT: Thank you.

6  BY MR. VOLKOV:

7  Q    So you testify as to May 6; is that your testimony?

8  A    Yes.  Oh, excuse me, it might have been 16.  I think I

9  made a mistake.

10  Q    Returning your attention to Defendants' –- the black

11  binder –- Exhibit E, and particularly page 3, also bates

12  stamped as AS00788.  Do you see paragraph 15 there?

13  A    Yes.

14  Q    Do you recognize your names under "Assignee."

15  A    Yes.

16  Q    And the address right under your names is 554

17  Commercial Street.  That's the subject property.

18  A    Yes.

19  Q    And right below, there is an alternate address with

20  your names and the address 3836 Pacheco Street.  Do you

21  recognize this address?

22  A    Yes, this is our home address.

23  Q    Have you ever received any correspondence from anyone

24  on behalf of Ms. Sun at your 3836 Pacheco Street property?

25  A    No.

1  Q    Above the addresses, there is a paragraph under

2  paragraph 15, and the second sentence of it says:

3          "Notices shall be delivered either by hand

4          delivery or certified mail with return receipt to

5          the following addresses."

6  Do you see that sentence?

7  A    Yes.

8  Q    Was there any reason to specify the delivery by

9  personal delivery or certified mail?

10  A    I don't get the question.

11  Q    Was there any reason to specify delivery of notices

12  as of by personal hand delivery or by certified mail with

13  return receipt?

14  A    Because the previous owner explained to me that the

15  area was so that mail was getting lost.

16  Q    And by previous owner, you mean Vienna Shuriatana?

17  A    Yes.

18  Q    Have you personally experienced ever mail being lost?

19  A    Yes.

20  Q    Was it more than one instance?

21  A    Yes, many times.

22  Q    Approximately how many times per year?

23  A    There were several serious pieces of mail lost over

24  the years, like one time it was a letter from the IRS and

25  there were several P.G. & E. bills.  I cannot allocate the

1  lost mail by year but I know that it happened several

2  times.

3  Q    Does the property have a mailbox?

4  A    Currently we have one.

5  Q    Is it a secured mailbox?

6  A    Yes, it's got a lock.

7  Q    Well, when did you install this mailbox?

8  A    After our return after the fire.

9  Q    Is it fair to say it was 2014?

10  A    Yes.

11  Q    Do you have a recollection as to the month?

12  A    I can't remember, but it was very soon, maybe within

13  a month.  Maybe it was in a couple of months.

14  Q    Prior to that, did the property have a mailbox?

15  A    No.

16  Q    Referring your attention to Plaintiffs' white binder,

17  Exhibit 6 and particularly page 4, also stamped as page 2

18  of 24.  It's a handwritten mark on page 4.  Yeah, that's

19  the one.  Are you on the page dated March 30, 2009?

20  A    Yes.

21  Q    Do you recall receiving this letter?

22  A    No.

23  Q    Next page.  Are you on the page dated April 3, 2010?

24  A    Yes.

25  Q    Do you recall receiving this letter?

1    A    No.

2    Q    Next page should be a letter dated November 18, 2010.

3    A    Yes.

4    Q    Do you recall receiving this letter?

5    A    No, I don't remember receiving this letter.

6    Q    Next, I'll jump a few pages to the next letter.  It

7    will be stamped page 14 of 24, dated January 2, 2013.  On

8    the very bottom, the stamp is page 14 of 24.  Are you on

9    the page dated January 2, 2013?

10   A    Yes.

11   Q    Do you recall receiving this letter?

12   A    Yes.

13   Q    Do you also recall -- oh, here it is -- please turn

14   to page 18 of 24.  Are you on the page dated January 11,

15   2012?

16   A    Yes.

17   Q    Do you recall receiving this letter?

18   A    I think so.

19   Q    Do you recall at that time in 2012 communications with

20   the landlord or landlord's property manager or attorney,

21   someone representative of the landlord regarding unpaid tax

22   and insurance?

23   A    I communicated with attorney Cindy Lee, but it didn't

24   concern this issue.  I had a different reason to speak with

25   her.

1  Q    What was the reason?

2  A    I asked her to get my rent reduced temporarily by some

3  number.

4  Q    But was the issue of tax and insurance also discussed?

5  A    She said that the reduction of rent would be

6  contingent on me beginning making payments of taxes and

7  insurance.  That would be the condition.

8  Q    Do you recall making payments in 2012 toward back tax

9  and insurance?

10 A    Yes.

11 Q    Do you recall making five payments of $1,000 each?

12 A    Yes.

13 Q    Do you have any understanding of what tax or insurance

14 those payments were made for?

15 A    I guess it's for the period that is reflected in this

16 letter that was sent to me.

17 Q    Do you recall trying to sell your property in 2012?

18 A    Yes.

19 Q    Do you recall being billed $2,000 for the landlord's

20 attorney services?

21 A    Yes.  They said that that was for the lease transfer

22 to the new buyer.

23 Q    Putting your attention towards Exhibit 18 in the white

24 binder.  It says here that your e-mail is

25 frisco0415@sbcglobal.net.  Is this your address, e-mail

1   address?

2   A    It used to be.

3   Q    Was it at the time of February 7, 2013?

4   A    Yes.

5   Q    Do you recall receiving this e-mail?

6   A    Yes.

7   Q    And on the second page of the same exhibit, do you

8   recall receiving this letter?

9   A    Just a moment.  I need to concentrate.

10       (Pause.)

11  Yes, I remember.

12  Q    Putting your attention to Exhibit 19.  Does this

13  look -- do you recognize this document?

14  A    Yes.

15  Q    What is this document?

16  A    As far as I understand, this is a printout of the

17  services for which I was charged.

18  Q    And by the services for which you were charged, are

19  you referring to Cindy Lee's $2,000 services?

20  A    Yes.  I remember it was mailed to me with a letter.

21  Q    And is it fair to say that the sale, the anticipated

22  sale of your restaurant in 2012 did not happen?

23  A    Yes.

24  Q    Yes, as it did not happen.

25  A    Yes, I did not sell it.

1  Q    And was the buyer approved by the landlord?

2  A    Not originally.  It took them a long time to review

3  the application.  They dragged the time for several months,

4  and after several months had passed and the buyer was no

5  longer interested, they said go ahead.  But by that time,

6  we lost the sale.

7  Q    Have you received a newly drafted lease?

8  A    No.

9  Q    Referring your attention to Exhibit 39.  And my

10  question will be, whether you recognize those pictures.

11  A    Yes.

12  Q    Who made those pictures?

13  A    Some of them were taken by Michael.  Some of them were

14  taken by me.

15  Q    Well, please identify which one was made by you.

16  A    The two last ones ending No. 470 and ending No. 474.

17  Q    What was the reason you made those pictures?

18            MR. TUKIA: Objection as to relevance.

19            THE COURT: I'll let her answer the question.

20  BY MR. VOLKOV:

21  Q    What was the reason you made those pictures?

22  A    We had many, many problems with this issue before the

23  fire.  Upon our return after the fire, we discovered that

24  the problem remained and we had asked the management to pay

25  attention to this issue many times, and that's why we took

1  the pictures.

2  　　　　MR. TUKIA: Move to strike as again irrelevant.

3  This is after the fire.

4  　　　　THE COURT: I'm going to strike the testimony.

5  She refers to "this issue."  I don't know what the issue

6  is.  It's not probative of any issue before me and

7  therefore irrelevant.

8  　　　　THE WITNESS: Can I answer?

9  　　　　THE COURT: There's no question pending.

10 　　　　MR. VOLKOV: There's no question.

11 BY MR. VOLKOV:

12 Q    When you said "this issue," what did you mean by "this

13 issue"?

14 A    We had this issue -- okay, this homeless.

15 Q    What was your problem with homeless?

16 　　　　MR. TUKIA: Again, objection.  This issue has been

17 already excluded from this trial.  It's irrelevant.  Move

18 to strike.

19 　　　　THE COURT: Mr. Volkov, we've been over this

20 before.  Why is this important?

21 　　　　MR. VOLKOV: There are two issues on the homeless

22 around the property, and I will refer to the Court's

23 decision on that one.  One is for the security of the mail,

24 and another is for the fire.

25 　　　　THE COURT: And what -- so your implication that

1   you'd like me to draw from this homeless problem is that

2   somebody stole the mail?

3           MR. VOLKOV: Well, it appears to be a recurring

4   problem.

5           THE COURT: What appears to be a recurring

6   problem?

7           MR. VOLKOV: Stolen mail until they installed the

8   mailbox.

9           THE COURT: I mean you've already established that

10   sometimes mail got lost there.  Okay?  And with respect to

11   the fire, what's the point?

12           MR. VOLKOV: I agree with the Court and I'll move

13   on.

14           THE COURT: Okay.  Let's move on to a different

15   topic.  Thank you.

16   BY MR. VOLKOV:

17   Q    Ms. Gerevich, in the year 2013, have you received any

18   discounts or decreases on your dues as to the tax or

19   insurance from the landlord?

20   A    No.

21   Q    2014?

22   A    No.

23   Q    And same question for 2015.

24   A    I haven't paid anything for the '15.

25   Q    But the question was whether you received any

1  communication establishing a discount of --

2  A    No.

3  Q    You probably heard prior testimony about the payments.

4  Is it true that you made a payment of $9,500 for the last

5  two months in the year 2015?

6  A    Yes.

7  Q    And prior to that, what was your payment amount?

8  A    $6,100.

9  Q    How did you arrive to that number?

10 A    This is the amount requested by Ms. Sun to start our

11 new lease under the option.

12 Q    You mean the amount of $9,500?

13 A    Yes.

14 Q    How did you arrive to the amount of $6,100?

15 A    Our original rent was 5,500 and gradually it got

16 increased to sixty-one hundred.  It was raising a little

17 bit at a time.

18 Q    Do you recall exercising your right for a five-year

19 extension under the lease?

20 A    Yes.

21 Q    Do you recall when did it happen?

22 A    At the end of 2013.

23 Q    Do you recall making any payments in connection with

24 that exercise of your right?

25 A    I have paid off the balance of the taxes and

1  insurance, the ones that didn't get included into the

2  bankruptcy proceedings.

3  Q    Referring your attention in the white folder to

4  Exhibit 15, 1-5, and particularly the third page.  Do you

5  recognize this document?

6  A    Yes.

7  Q    What is it?

8  A    This is a cashier's check that represented my payment

9  for the balance of insurance and taxes payment.

10  Q    On the top of it, it says "Federal Credit Union."  Do

11  you see that?

12  A    Yes.

13  Q    Is that the credit union you bank with?

14  A    Yes.

15  Q    Do you know whether this checks was cashed?

16  A    Yes.

17        MR. VOLKOV: No further questions, Your Honor.

18        THE COURT: Okay.  Mr. Tukia.

19        MR. TUKIA: Ready?

20        THE COURT: Yep.

21                    CROSS-EXAMINATION

22  BY MR. TUKIA:

23  Q    Good afternoon, Mrs. Gerevich.  A few questions here

24  about -- are you a plumber?

25  A    No.

1  Q    Do you have -- in fact, you don't have any plumbing

2  experience; is that correct?

3  A    Just as a housewife.

4  Q    Meaning at home; is that correct?

5  A    I think if the problem is complex, I'll summon a

6  plumber because I would be unable to fix it.

7  Q    Is it true that you never performed any plumbing work

8  at the 554 Commercial Street; is that correct?

9  A    I don't understand your question.

10  Q    You never fixed any pipes or any plumbing?

11  A    I didn't fix anything with my own hands, but I have a

12  company which I constantly use if I need something to be

13  fixed.

14  Q    But you didn't do it yourself because you don't have

15  that expertise; is that correct?

16  A    Correct.

17  Q    Okay.  Let's go to the issue of the $2,000 that you

18  were asked question of earlier, in regard to a potential

19  new tenant that would have or would possibly have purchased

20  your lease for the 554 Commercial Street property.  And

21  this new tenant was Mr. Antonio D'Battimo (Phonetic),

22  B-a-t-t-i-m-o; is that correct?

23  A    Yes.

24  Q    Did you send any background papers about Mr. D'Battimo

25  to Annie Sun or her attorney?

1  A     Yes.  We had a full package of documents submitted.

2  It contained banking information and other documents.

3  Q     What were those other documents?

4  A     I saw some document related to his interest in

5  property and some other documents.  I don't remember all of

6  them.

7  Q     But these are all documents pertaining to the

8  financial background of Mr. D'Battimo?

9  A     I think so.

10 Q     Did you yourself send those documents to Ms. Sun

11 either by mail or personally?

12 A     Our broker dealt with that.

13 Q     Okay.  Who's that broker?

14 A     Mr. Zimmerman.

15 Q     Okay.  And again, there was questioning to you about

16 a $2,000 fee by Cindy Lee.  Do you know if her $2,000 fee

17 was I included in the proposed lease for this new tenant,

18 Mr. D'Battimo?

19 A     I don't understand your question.

20 Q     You were trying to bring in Mr. D'Battimo to purchase

21 your lease; is that correct?

22 A     Yes, my broker did.

23 Q     And he would have assumed the lease that you were on

24 at 554 Commercial Street?

25 A     Not necessarily, sir.  As far as I understand, he

1  wanted to increase it and he had negotiations over that.

2  Q    And increase what, ma'am?

3  A    He wanted a longer term on the lease.

4  Q    Okay.  All right.  But do you have any understanding

5  as to whether he was also going to be charged the $2,000

6  that Cindy Lee had on her invoice?

7  A    I don't know whether he should have paid it or I

8  should have paid it.  I know he paid nothing.

9  Q    Again, my question is, you have no understanding --

10  you don't know if he was supposed to pay that $2,000; is

11  that correct?

12  A    I don't know.  It just never came to that.

13  Q    But it was charged to you; is that correct, the 2,000?

14  A    They requested that money from me.

15  Q    That's correct.  All right.  And in the end, Mr.

16  D'Battimo never did sign a new lease; is that correct?

17  A    He was not given an opportunity to sign a lease.  It

18  was demonstrated to him that they were not interested in

19  having that purchase happen.

20  Q    And therefore he did not sign a new lease.

21           THE COURT: Okay.  Let's just move on.  We've

22  established that he didn't take over the premises.  Thanks.

23           MR. TUKIA: Okay.

24  BY MR. TUKIA:

25  Q    And all this took place around 2012; is that correct?

1 A    Yes.

2 Q    Now in regard to your lease, ma'am, you understood

3 that you had to pay a portion of the property taxes and the

4 insurance on the property; is that correct?

5        MR. VOLKOV: Vague and ambiguous.

6        THE COURT: There's an objection.  It was vague

7 and ambiguous was the objection.  Can you respond to it,

8 Mr. Tukia?

9        MR. TUKIA: I'm not sure why it was vague and

10 ambiguous.

11        MR. VOLKOV: There are several different

12 provisions in the lease as to the payment of taxes and

13 insurance.

14        THE COURT: I understand the question, so I'll

15 overrule the objection.  If Ms. Gerevich understands the

16 question, she can answer.

17        THE WITNESS: May I please have the question back?

18 BY MR. TUKIA:

19 Q    You understood that under the lease for 554 Commercial

20 Street, you had to pay at least a portion of property taxes

21 and insurance for the property; is that correct?

22        MR. VOLKOV: Misstates the express terms of the

23 document.  The document speaks for itself.

24        THE COURT: He's asking for her understanding,

25 Mr. Volkov.  Objection is overruled.

1     THE WITNESS: Do you want me to explain what I

2 understand as it concerns to the insurance and taxes?

3     MR. TUKIA: Yes.

4     THE WITNESS: I understand that there is a line

5 there in the lease which concerns the payment of taxes and

6 the insurance payments. And as much as I could understand

7 with my limited English and let me mention that at that

8 time, I had neither an interpreter nor an attorney, I

9 understood that I was supposed to get a letter demanding

10 the payment and then within 30 days, I should have paid it.

11 BY MR. TUKIA:

12 Q    Okay. And how much were you supposed to pay? What

13 was your understanding in that regard?

14 A    I don't understand your question.

15 Q    According to the lease, what's your understanding as

16 to how much you were supposed to pay in regard to taxes

17 and insurance?

18     MR. VOLKOV: Your Honor, the question is at least

19 misleading because the lease does not say how much is due.

20     THE COURT: I'll sustain that objection.

21 BY MR. TUKIA:

22 Q    Did you in fact pay a portion of the taxes and

23 insurance for 554 Commercial Street in 2007?

24 A    Yes.

25 Q    And that payment was based on amounts and figures

1  provided to you by Ms. Sun or her property manager; is that

2  correct?

3  A     Yeah, the manager had mailed me a letter and the

4  letter had attachments and with papers from the City and

5  all other stuff.

6  Q     And you paid the taxes and insurance for 2007.

7  A     Yes, I did.

8  Q     You did not dispute the accounting at that time; is

9  that correct?

10  A     I never disputed anything.  I always trusted them.

11  Q     For 2008, you did not pay taxes or insurance for the

12  554 Commercial Street property; is that correct?

13  A     Correct.

14  Q     For 2009, you did not pay taxes or insurance for 554

15  Commercial; is that correct?

16  A     Correct.

17  Q     And the same for 2010.

18         MR. VOLKOV: Your Honor, objection as to counsel

19  doesn't define whether it's calendar or fiscal year.

20         THE COURT: The question speaks for itself.  I

21  don't think he needs to define it.

22         MR. TUKIA: I agree.

23         THE COURT: So the objection is overruled.

24         THE WITNESS: Correct.  I did not pay it.

25  ///

1 BY MR. TUKIA:

2 Q    How about for 2011, did you pay taxes or insurance in

3 regard to 554 Commercial Street?

4 A    No.

5 Q    For 2012, did you pay taxes or insurance in regard to

6 554 Commercial Street?

7 A    I began making payments in 2012.

8 Q    Okay.  And we'll get to that.  If I can direct you to

9 the black exhibit book, ma'am.  Starting at Exhibit F as in

10 Frank, a November 18, 2010 letter from John Casey to

11 Michael and Sima Gerevich.  Do you see that exhibit in

12 front of you, ma'am?

13 A    Yes.

14 Q    As of November 18, 2010, were you running a business

15 called Seven Pleasures Café at 554 Commercial Street in

16 San Francisco, California?

17 A    Yes.

18 Q    Do you recognize this letter, and I apologize, this

19 may have been asked already on direct.

20 A    No.

21 Q    I should have asked a more direct question, ma'am.  Do

22 you know if you ever received this letter of November 18,

23 2010?

24 A    I did not receive this letter.

25 Q    How do you know that?

1  A    I have never held it in my hands.  I have never opened

2  this letter.  I have never seen this letter.

3  Q    Okay.  Let me direct your attention to Exhibit G,

4  ma'am, a January 11, 2012 letter from John Casey to you and

5  your husband.  My question to you is, have you ever

6  received this letter or a copy of it?

7  A    I guess I did.  I think I saw this letter before.

8  Q    And did you ever dispute those numbers that were

9  provided by Mr. Casey in this January 11, 2012 letter?

10 A    No.  I don't know.

11 Q    Okay.  And this letter was addressed to you and Mr.

12 Gerevich, again, at 554 Commercial Street in San Francisco.

13 A    Well, that's what it says on the letter.

14 Q    Okay.  So let me direct your attention to Exhibit H

15 of Defendants' exhibit book, a January 12, 2012 letter from

16 Cindy Lee to you and your husband.  Do you recall receiving

17 that letter?

18 A    Yes.

19 Q    And this letter was pertaining to outstanding taxes

20 and insurance; is that correct?

21 A    Judging by this letter, it was.

22 Q    Okay.  And in fact, this is for the yers 2008 through

23 2011; is that correct?

24 A    That's what the letter says here.

25 Q    In response to this letter, did you reach out to Cindy

1  Lee?

2  A     Yes.  But it was not in response to this letter.  As I

3  said before, I had another reason to talk to her.

4  Q     But this letter by Cindy Lee dated January 12, 2012

5  spurred you to contact her; is that correct?

6  A     And the letter as well.

7  Q     Sorry?  And --

8  A     And the letter as well.

9  Q     Correct.  Because in order to contact her, you would

10 have to obtain her contact information on this letter of

11 January 12, 2012; is that correct?

12 A     I said so, yes.

13 Q     Okay.  Now -- so you spoke to her how, by phone or in

14 person?

15 A     Over the phone.

16 Q     And when you spoke to her on the phone, you did not

17 dispute the outstanding amounts that she stated in her

18 letter of January 12, 2012; is that correct?

19 A     As I have already stated, at first I trusted them,

20 and secondly, I didn't really understand how it worked.

21 Q     So you did not dispute it.

22 A     Not at that time.

23 Q     You did not dispute the accounting of the outstanding

24 debts with Ms. Lee; is that correct?

25 A     Well, I'm sorry, I don't believe this is the right

1  question to me whether or not this was correct.  Maybe the

2  manager should have checked it.  I had this question for

3  Cindy Lee because there was no accompanying documents or

4  calculations, and I did ask her for those.

5  Q    What question is that?

6  A    I asked -- one of my questions to Cindy Lee was, if

7  she had any documents to support the numbers, any

8  accompanying documents.

9  Q    And what did she say to you?

10 A    She said she would direct the question to the manager,

11 and he would take care of that.

12 Q    Okay.  Let's move on to Exhibit J, please, ma'am, a

13 January 26, 2012 correspondence from yourself to Cindy Lee.

14 And is this correspondence in response to the January 12,

15 2012 letter from Cindy Lee?

16 A    And what is the question?

17 Q    That's my question.

18          MR. VOLKOV: Misstates the statement on the

19 document.

20 BY MR. TUKIA:

21 Q    Well, let me ask you this, you wrote this document; is

22 that correct?

23 A    Yes.

24 Q    And this is after you received the letter from Cindy

25 Lee of January 12, 2012 and speaking with her; is that

1  correct?

2  A    Yes.

3  Q    And you attached a check for $1,000.  It's on the

4  second page of Exhibit J.

5  A    Yes.

6  Q    And in this correspondence of January 26, 2012, you

7  did not -- again, you did not dispute the outstanding

8  amounts of taxes and insurance that were due; is that

9  correct?

10        MR. VOLKOV: Objection as to it has no say about

11  the amounts; the letter does not mention amounts.

12        THE COURT: Mr. Tukia, do you have a response to

13  the objection?

14        MR. TUKIA: Well, okay, I'll rephrase the

15  question.

16  BY MR. TUKIA:

17  Q    Ma'am, in this letter, does it mention anything about

18  objecting to the outstanding amounts of taxes and

19  insurance?

20  A    Not in this letter because at that time, I was very

21  much interested in getting my rent reduced, and I was only

22  concerned with that.

23        MR. TUKIA: I'm going to move to strike after the

24  word "because."

25        THE COURT: On what basis?

1          MR. TUKIA: It's not responsive.

2          MR. VOLKOV: It explains the person's

3 recollection.

4          THE COURT: I agree, and I'll overrule the motion

5 to strike.

6          THE WITNESS: Can I add something to my answer?

7          THE COURT: Yes.

8          THE WITNESS: Well, when you write a letter like

9 that, you're trying to write a letter asking for a

10 reduction.  I needed to use help of an interpreter; it

11 might have been an interpreter over the phone or some

12 friend, and certain words don't really come across the way

13 I meant them to come across.  But this is how it came

14 across, just delivering my point that I wanted a rent

15 reduction.

16 BY MR. TUKIA:

17 Q    This letter of January 26, 2012 that you wrote, it

18 does not contain any language where you dispute the

19 accounting for the outstanding taxes and insurance that was

20 due; is that correct?

21 A    In this letter, I did not say so.

22 Q    Let's go to Exhibit K, please, a January 30, 2012

23 letter from Cindy Lee to you and your husband.  Do you

24 recall –- I'm sorry -- do you see that letter in front of

25 you, ma'am?

1  A    Are you asking me if I saw this letter before?  There

2  were several letters that looked alike.  I guess I might

3  have seen one of these two letters.

4  Q    Okay.  And this letter -- did you ever dispute the

5  total taxes and insurance due that's listed in this letter

6  of January 30, 2012?

7  A    No, I didn't dispute it.

8  Q    This letter refers to a telephone conversation that

9  you had with Cindy Lee on January 19, 2012.  Does that

10  refresh your recollection that you had a telephone

11  conversation with Cindy Lee around that time?

12  A    I never felt good about the fact of having the

13  conversation with her over the phone.

14  Q    How long was your conversation?

15  A    A few minutes.

16  Q    And it's true that you discussed with Ms. Lee the

17  outstanding taxes and insurance due; is that correct?

18  A    No.

19  Q    What's not true?  Sorry.  Let me ask a better

20  question.  So are you saying that on or around January 19,

21  2012, you never discussed with Cindy Lee outstanding taxes

22  and insurance that you owed?

23  A    We never discussed these numbers.

24  Q    That's not my question, ma'am.  My question was, did

25  you ever discuss outstanding taxes and insurance that you

1  had to pay with Cindy Lee on or around January 19, 2012?

2  A    Yes.  She offered a payment plan, but the installment

3  payments were very large, and I spoke with her about it.

4  Q    And this letter as a result was sent to you?

5  A    I think so.  I guess so.

6        MR. VOLKOV: Your Honor, the question is to

7  timing.  I do not object to this line of questioning, but

8  just that it appears to be outside the scope of cross,

9  which is fine with us.  It could be direct just in terms of

10  allocation of time.  These letters and dates were not asked

11  of Ms. Gerevich before, and I'm -- it's perfectly fine to

12  ask her.  It's only that administrative concern.

13        THE COURT: Sure.  You know, I'm going to -- this

14  is not coming out of your time.  That's for sure.

15        MR. VOLKOV: Perfect.

16        THE COURT: I mean whatever he's asking questions

17  is coming out of his time not yours.

18        MR. VOLKOV: Thank you, Your Honor.

19        MR. TUKIA: And it's directly related to.

20        THE COURT: He's not making an objection, so --

21        MR. TUKIA: Oh, okay, sorry.

22        THE COURT:  -- keep going.

23        MR. VOLKOV: No objection, no.

24  BY MR. TUKIA:

25  Q    Let's move on to the lease, ma'am, and I know you've

1  discussed it earlier that you assumed the lease that

2  started in 2004, and you assumed it around approximately

3  2006; is that correct?

4  A    Yes.

5  Q    And it was a ten-year lease starting from 2004, ending

6  on June 30, 2014.

7            MR. VOLKOV: Asks for a legal conclusion.

8  BY MR. TUKIA:

9  Q    Is that your understanding that this lease that you

10  were under was to end on June 30, 2014 unless you exercised

11  an option to go five more years?  Is that your

12  understanding?

13  A    It was my understanding that I had a ten-year lease

14  plus five years option triggered automatically.

15  Q    Okay.  And was it your understanding that the ten-year

16  lease would have ended on June 30, 2014?

17  A    Yes.

18  Q    And it's your contention that you actually exercised

19  that five-year option to go five years more beyond June 30,

20  2014; is that correct?

21  A    Of course, that is my understanding because everything

22  that's been happening with me during the past two years

23  demonstrates how a passionate guy would like to stay and

24  continue with my lease.

25  Q    Okay.  And so starting July 1, 2014, would have been,

1  for lack of a better word, but –- would have been an

2  extension of that ten-year lease.  Is that correct?

3  A     No.

4  Q     It would not have been an extension of the ten-year

5  lease?

6  A     No, it started much later as far as I understand it.

7  Q     What is your understanding as to when the extension

8  started?

9  A     Ten months later.

10 Q     Ten months later from what?

11 A     From July 1st.

12 Q     July 1, 2014?

13 A     Yes.

14 Q     What is your basis for that?

15 A     Unjustified delay by the landlord and the contractors

16 and the bad faith in not letting me back into the premises.

17 Q     Is there any provision in the lease that you are

18 pointing to that says that you –- that the extension to the

19 lease does not start until ten months after July 1, 2014?

20       MR. VOLKOV: Asks for a legal conclusion.

21       THE COURT: I'll allow her to answer the question,

22 if she has an understanding.

23       THE WITNESS: Then I would like to have the

24 question back.

25 ///

1  BY MR. TUKIA:

2  Q    Is there any provision in the lease that says that the

3  extension of that ten-year lease starts ten months after

4  July 1, 2014?

5  A    I'm sorry, I can't answer this question.

6  Q    Why not?

7  A    Because I don't have a complete understanding of this,

8  and I cannot answer this question.

9  Q    Okay.  Other than that, do you have any other grounds

10  as to why you think the extension to the lease does not

11  start until ten months after July 1, 2014?

12  A    These are my grounds, and my understanding has been

13  supported by many facts.

14  Q    In fact, that's the reason why you paid or started

15  paying your rent for 554 Commercial Street in the amount of

16  ninety-five hundred dollars starting in some time in 2015;

17  is that correct?

18  A    From May 2015.

19  Q    And in fact, you did not pay -- you did not start

20  paying ninety-five hundred dollars a month on July 1, 2014.

21         MR. VOLKOV: Your Honor, the difference in rents

22  or any portions of any unpaid rent are not part of the

23  claim.

24         THE COURT: Okay.  So your objection is on what

25  ground?

1          MR. VOLKOV: I'm questioning the relevancy of this

2    line of questioning.

3          THE COURT: Okay.  So --

4          MR. TUKIA: Let's go to the breach of the lease

5    and why the exercise of the option was improper.

6          THE COURT: But if -- the rent didn't increase

7    until after the --

8          MR. TUKIA: Well, that's what she's claiming.

9          THE COURT: But if she didn't start paying

10   additional rent until some time in 2015, I mean what's the

11   point?

12         MR. TUKIA: But she's already testified that she

13   was supposed to start paying that ninety-five hundred on

14   July 1, 2014.

15         THE COURT: I don't think that's been established

16   at all.

17         MR. VOLKOV: Your Honor, we're here on a claim

18   which is pre-petition by definition up to April 29, 2013.

19   None of the unpaid portions of rent are part of the claim.

20   Our complaint, which we decided not to litigate, addresses

21   those issues and are not the cause of election.

22         THE COURT: Okay.  So again, Mr. Tukia, why is

23   this payment in 2015 relevant to a breach of the lease, at

24   the time of -- the point at which she attempted to exercise

25   her option to extend it.

1          MR. TUKIA: It's a continuous --

2          THE COURT: Let me finish, please.

3          MR. TUKIA: Oh, sorry; I'm sorry.  I thought you

4 were.

5          THE COURT: Why is the payment in 2015 of ninety-

6 five hundred dollars a month rent relevant to a breach that

7 might have existed in the end of --

8          MR. VOLKOV: 2013.

9          THE COURT:  -- 2013, thank you, when she

10 attempted to exercise her option to extend the lease?

11          MR. TUKIA: Well, it's a continuous lease breach.

12 I guess further evidence shows that we're not waiving that

13 exercise, but we were stuck with this.  I believe the

14 ninety-five hundred dollars a month rent was established by

15 Ms. Sun in her direct testimony.

16          THE COURT: Okay.  That doesn't answer my question

17 at all.  So just a minute, please.  Go ahead, Mr. Gapuz.

18          COURTROOM DEPUTY: Ms. Shirinova, when you're

19 translating what's going on here, if you could press that

20 button on that microphone, so I'm not picking you up.

21          THE COURT: So the problem, Ms. Shirinova, is that

22 when you're translating to Mr. Gerevich, would you

23 absolutely should be doing, when other people are talking,

24 it's sort of drowning out what everybody else is saying.

25 So when Ms. Gerevich is not testifying --

1          THE INTERPRETER: Okay.  You don't want me to --

2          THE COURT: No, I want you to.  I want you to

3   translate everything, but the problem is the microphone is

4   sort of picking up everything, and it's --

5          THE INTERPRETER: Push this, right?

6          THE COURT: Yeah, just move that microphone.

7          THE INTERPRETER: Just like that?

8          THE COURT: Yeah, you just have to hold your

9   finger down on it.

10         THE INTERPRETER: Oh.  Like that?

11         THE COURT: Yeah, exactly.  Okay?

12         THE COURTROOM DEPUTY: Thank you.

13         THE INTERPRETER: I apologize.

14         THE COURT: That's not your fault.  It's all

15  right.  Okay.  So Mr. Volkov, you were making a point?

16         MR. VOLKOV: No, that was Mr. Tukia responding to

17  a question.

18         THE COURT: Okay.

19         MR. VOLKOV: I was just saying that I don't think

20  it's disputed between the parties as established by the

21  testimony that there were two payments of ninety-five

22  hundred made in 2015.  That is not a part of --

23         THE COURT: Yeah, I understand your point.  I'm

24  trying to understand how a payment in 2015 establishes a

25  breach in 2013.

1   MR. TUKIA: You know what, Your Honor, good point.

2   I'm going to drop it.

3   THE COURT: Okay.

4   MR. TUKIA: I'm going to drop that.

5   THE COURT: That's a great idea.  Let's move on.

6   BY MR. TUKIA:

7   Q   Just a few more questions, ma'am.  Have you ever

8   spoken to the bankruptcy trustee for your bankruptcy?

9   A   Which one is it?

10   THE INTERPRETER: You personally.

11   BY MR. TUKIA:

12   Q   Are you aware that -- well, strike that.

13   Are you aware if the bankruptcy trustee has ever

14   objected to making any payments to Ms. Sun as a creditor in

15   your bankruptcy?

16   MR. VOLKOV: On what grounds?  Asks for a legal

17   conclusion, Your Honor.

18   THE COURT: I think he's just asking whether an

19   objection has been raised and not any basis for any kind of

20   objection.  So I'll overrule that objection.

21   THE WITNESS: I don't understand.  What kind of

22   objections, over what?

23   BY MR. TUKIA:

24   Q   Have you made any objections or are you aware of any

25   objections made by the bankruptcy trustee to make any

1  payments to Annie Sun as a creditor?

2  A    No.  Several weeks ago, I got a letter from the

3  trustee.  There is nothing of that kind.  There's nothing

4  concerning any objections.  I actually have that letter

5  somewhere.

6       MR. VOLKOV: Your Honor, do I understand that the

7  questions are about third-party knowledge of the trustee's

8  objections?

9       THE COURT: If I understand you correctly, Mr.

10 Tukia, you're asking whether Ms. Gerevich is aware of any

11 challenge the trustee may have made to the payments that

12 your client is receiving.

13      MR. TUKIA: That's correct.

14      THE COURT: Okay.  Not the basis for the

15 objections, right?

16      MR. TUKIA: That's correct.

17      THE COURT: Okay.  And she said no.  All right.

18 So let's move on.

19      MR. VOLKOV: Our objection was stated in the Plan.

20      THE COURT: I understand.  I can read the

21 document.

22      MR. TUKIA: Your Honor, at this time I believe I'm

23 finished.  I would move to admit into evidence Exhibits --

24 I know some have already been brought in -- Exhibit H -- I

25 don't have that in front of me -- oh, I'm sorry -- H, I,

1  and J and K, please.

2          THE COURT: Any opposition?  I has already been

3  admitted.

4          MR. VOLKOV: I agree with H, I, J.  I don't recall

5  if we established knowledge about Exhibit K, but if we did,

6  then there's no objection.

7          THE COURT: Okay.  I believe we did.  So I'll

8  admit Exhibits H, J and K.  I has already been admitted.

9                          (Whereupon, Defendants' Exhibits

10                          H, J and K are admitted into

11                          evidence.)

12          MR. TUKIA: Thank you, Your Honor.

13          THE COURT: Okay.  Mr. Volkov, anything further?

14          MR. VOLKOV: Quickly.

15          THE COURT: Okay.

16                  REDIRECT EXAMINATION

17  BY MR. VOLKOV:

18  Q   Ms. Gerevich, on the just admitted Exhibit I in the

19  black folder, the letter dated March 7, 2012.

20  A   Yes, I see the letter.

21  Q   Do you see the references to initial balance and the

22  current balance made in the letter?

23  A   Yes.

24  Q   Do you recall receiving any attachments besides the

25  one-page -- I apologize -- two pages stated in this exhibit

1  below?

2  A     No.

3  Q     Referring your attention to Exhibit H, particularly

4  the second page.  Do you recall receiving any attachments

5  connected with this letter?

6  A     I didn't get any attachments and as a matter of fact,

7  I spoke about that at first with an attorney and later with

8  the manager.

9  Q     Also on this page, do you see lines 2008 having an

10  asterisk and that that asterisk below says minus so and so

11  per memo due to economy?

12  A     Yes.

13  Q     There are two references.  One is minus 2008 taxes and

14  minus 2008 insurance.

15  A     Yes.

16  Q     Do you have any personal understanding whether it

17  refers to fiscal year 2008 to 2009 or calendar year 2008?

18  A     Well, I guess calendar.  I don't understand -- I'm

19  afraid I can't answer this question.  I don't understand

20  it.

21  Q     Then I guess we haven't asked on that background

22  point.  Mr. Tukia asked you if you have plumbing

23  experience, but do you have accounting experience?

24  A     No.

25  Q     Do you have bookkeeping experience?

1   A     No.

2   Q     Do you have tax preparing experience?

3   A     Absolutely, no.

4   Q     And you're not a licensed attorney.

5   A     No, of course, no.

6   Q     Do you have any legal training?

7   A     No.

8   Q     You testified that since July 1, 2014, you were paying

9   your rent every month at the previous rate, rent rate.

10  A     Yes, I did exactly what I was supposed to pay.

11  Q     And were any of your checks cashed by the landlord?

12  A     Yes.  They always cashed the check, and even though in

13  May we moved in, from the middle of May, they're still

14  charging me for the entire month of lease.

15  Q     So they cashed every check you made?

16  A     Yes.

17          MR. TUKIA: I'm going to move to object to this

18  line of questioning because I think we went through this,

19  and I thought --

20          MR. VOLKOV: I was in the scope of cross.

21          THE COURT: Let him finish, Mr. Volkov.

22          MR. TUKIA: You know, and I believe the Court

23  brought up a point that she wasn't sure if this is really

24  relevant to the core issues remaining in this trial, and I

25  agreed.  So I'm not sure why we're going back.

1          MR. VOLKOV: (unintelligible.)

2          THE COURT: Okay.

3  BY MR. VOLKOV:

4  Q     Referring you to Defendants' Exhibit G you were

5  asked by Mr. Tukia about, and that is dated January 11,

6  2012.  That's G.  You're probably on J.  Also bates stamped

7  AS01146.

8  A     Yes, correct.

9  Q     Do you recall any attachments included in this letter?

10 A     No, there was none.

11 Q     I'm not sure if we established before, but do you

12 recall when did you file your bankruptcy petition?

13 A     On April 29th.

14 Q     What year?

15 A     2013.

16 Q     So in testimony in response to Mr. Tukia's question,

17 you said you paid your taxes as requested in 2007?

18 A     Yes.

19 Q     And also you started making monthly installment

20 payments in 2012?

21 A     I paid -- okay, I paid taxes owed for the 2006 in

22 2007, and taxes owed for 2007 in 2008.

23 Q     Regarding the questions of Mr. Tukia about the sale,

24 Mr. Zimmerman was your broker; is that right?

25 A     Yes.

1  Q    And that $2,000 or initially fifteen hundred dollars

2  of Ms. Cindy Lee's fee --

3          MR. TUKIA: I'm going to object to that question

4  in regard to initially fifteen hundred.  That's not -- that

5  hasn't been established.  Lacks foundation.  It's

6  argumentative.

7  BY MR. VOLKOV:

8  Q    Ms. Gerevich, referring your attention to --

9          THE COURT: I'll sustain the objection.

10 BY MR. VOLKOV:

11 Q    Referring your attention to -- it takes me a moment --

12         THE COURT: Take your time.

13 BY MR. VOLKOV:

14 Q    -- to Exhibit F of the complaint, which itself is

15 Exhibit 1 of the white folder, and is not -- actually

16 Document 1-3, page 10 of 13.

17         THE COURT: Okay.  So we're going to the

18 complaint, which is your Exhibit 1 and what exhibit to the

19 complaint?

20         MR. VOLKOV: Exhibit F.

21         THE COURT: F as in Frank?

22         MR. VOLKOV: F as in Frank.

23         THE COURT: Thank you.

24         MR. VOLKOV: May I approach to show the witness?

25         THE COURT: Yes.  Okay.  And Mr. Volkov, Mr. Gapuz

1  informs me you have about five minutes.

2          COURTROOM DEPUTY: You're at about two hours and

3  55 minutes.

4  BY MR. VOLKOV:

5  Q    The question is, do you recognize this document?

6  A    Yes.

7  Q    On the second page, do you recognize the item 4-C?

8  A    Yes.

9          MR. VOLKOV: Your Honor, I would like to move this

10  document into evidence.

11          MR. TUKIA: Object, Your Honor, it's hearsay.  It

12  lacks foundation.

13          MR. VOLKOV: We have to establish with this

14  knowledge.

15          THE COURT: I want to know what I'm being asked to

16  admit.  Exhibit 1 or just Exhibit F to Exhibit 1?

17          MR. VOLKOV: Exhibit F of Exhibit 1.

18          THE COURT: I'm not going to admit a portion of

19  an exhibit.

20          MR. VOLKOV: May we then move the entire exhibit

21  1?

22          MR. TUKIA: I object to that.  It hasn't been

23  authenticated, at least this exhibit, and it's hearsay.

24          MR. VOLKOV: Your Honor, defense proposed this

25  exhibit in their list of exhibits.  It's Exhibit A of the

1   Defendants' binder, even in the bigger -- I may be mistaken

2   that it's Exhibit A, but they're proposing my entire

3   complaint.  It's actually Exhibit C of the Defendants'

4   binder and it includes Exhibit F in it.

5           MR. TUKIA: It doesn't establish that it's

6   foundation.  It's hearsay.  You haven't asked for it to be

7   admitted.

8           MR. VOLKOV: Well, in fact, it was already filed

9   with the Court by the defense.

10          THE COURT: What was filed with the Court?

11          MR. VOLKOV: I apologize for my comment, Your

12  Honor, but defense filed all their exhibits with the court.

13          THE COURT: Right.  And I didn't look at a single

14  one of them.  I'm going to sustain the objection and

15  exclude the exhibit.  You don't have a witness who can

16  authenticate this, and it does appear to be hearsay.

17  BY MR. VOLKOV:

18  Q    Ms. Gerevich, were you asked by Ms. Sun's

19  representative, by the landlord's representative, to pay

20  $2,000 fee for Ms. Cindy Lee's services?

21  A    Yes.

22  Q    Were you asked to pay this $2,000 after the

23  anticipated sale did not happen?

24  A    Yes.

25          THE COURT: Before you ask an additional question,

1 Mr. Volkov, how much longer would you have, had you not run

2 up against these time constraints?

3          MR. VOLKOV: I have three mor questions, Your

4 Honor.

5          THE COURT: Carry on, and I'll give you a

6 commensurate amount of time.

7          MR. VOLKOV:  In fact, those are not in the --

8          THE COURT: Take your time, that's fine.

9 BY MR. VOLKOV:

10 Q    I refer your attention to Exhibit 4 of the white --

11 that's Plaintiffs' Exhibit 4, and on that Exhibit 4, page

12 4, fourth item from the bottom for the $2,000, in your

13 understanding, what is this claim portion for?

14 A    Well, my understanding was that if I complete the sale

15 of my business, this would be the charge to prepare a new

16 lease.  This has been submitted many times by way of

17 different documents.

18 Q    So that's the $2,000 we just spoke about before asking

19 about this exhibit.

20 A    Yes.  It's true that in the e-mail I saw originally a

21 fifteen hundred dollar charge.  And then I got a letter it

22 was 2,000.

23          MR. TUKIA: Object in regard to that e-mail, lacks

24 foundation, not responsive.

25          MR. VOLKOV: Your Honor, we're here to address the

1   2,000, so I have no objection of not establishing the prior

2   fifteen hundred.

3            THE COURT: Yeah, I'm not worried about it,

4            MR. VOLKOV: Your Honor, as far as the witness, I

5   have no other questions.  I have one question whether --

6   and a request not to ask any witness about it, but whether

7   we should admit and ask the Court to take the requested

8   judicial notice of the pleadings, meaning the complaint and

9   the answer.

10           THE COURT: Okay.  Let me -- I'll address that in

11  just a second.  Do you have any further questions for Ms.

12  Gerevich?

13           MR. TUKIA: No, Your Honor.

14           THE COURT: Okay.  You're excused.  You may have a

15  seat at counsel table.

16           Any objection to taking the request for judicial

17  notice of the complaint and other -- well, the only

18  specific request was of the complaint, and what that would

19  mean is that the fact that there's a complain on file, it

20  contains the attachment.  It attaches and it says what it

21  says, not that its contents are accepted as true for all

22  purposes.  Any opposition?

23           MR. TUKIA: No objection, Your Honor.

24           THE COURT: Okay.  The request for judicial notice

25  is granted.

1          MR. VOLKOV: Your Honor, I just was informed that

2     the translator has to leave, so I don't know if the defense

3     has any more further questions to Ms. Gerevich.

4          THE COURT: No.  They passed the witness.  She's

5     been excused.

6          MR. TUKIA: Just real quick housekeeping with --

7     that we have to pay her.

8          THE COURT: That's okay.  Why don't we take a

9     short recess.  I'm concerned about the interpreter's

10    departure, however.  I understand that you may have

11    schedule constraints, but I mean the purpose of her being

12    here was for the parties to understand the proceedings, and

13    I'm concerned that they may not understand the proceedings

14    if they don't have an interpreter with them.  Are you

15    willing to waive that on behalf of your clients?

16         MR. VOLKOV: Your Honor, we were not the party who

17    hired the interpreter.  We would of course prefer the

18    interpreter stay with us, but I understood that her scope

19    of hiring was up to 4:00 p.m., so -- and I'm not the one

20    who hired her, so I didn't have authority to dispute it.

21         MR. TUKIA: That's not my understanding.  My

22    understanding is she was hired for the whole day, whatever

23    that takes.

24         MR. VOLKOV: Well, I agreed to split the cost, but

25    we of course would prefer her to stay.

1           THE COURT: Okay.  So what's the point here?

2           THE INTERPRETER: Your Honor, if the Court cares

3   to hear what I have to say?

4           THE COURT: I would love it, yes, please.

5           MR. TUKIA: Yes, please.

6           THE INTERPRETER: Your Honor, we have two

7   bilingual attorneys here, and they can fill in the clients.

8   The certified court interpreter is necessary to preserve

9   the integrity of the hearing when sworn witnesses testify.

10  Then you have to have a licensed interpreter to put it on

11  the record.

12          As for the understanding, I think these are

13  brilliant attorneys, perfectly bilingual, and they can fill

14  in the clients.  But I would like to go, Your Honor.  I

15  already, out of respect to this Court, and as my apology

16  for being late in the morning, I already delayed my

17  departure.

18          THE COURT: You're free to go.

19          THE INTERPRETER: Thank you.

20          MR. VOLKOV: Thank you, Your Honor.

21          THE COURT: Okay.  What else do we need to

22  address?  Do you have any further witnesses?

23          MR. VOLKOV: For the Plaintiffs, there are no more

24  further witnesses to be called.

25          THE COURT: Okay.  Do you have any additional

1  exhibits to move into evidence?  What I have so far on

2  behalf of the Plaintiffs are Exhibits 6, 15, 4, 32, 18, 19,

3  37 and 33.  I granted a request for judicial notice as to

4  Exhibit 5, and excluded Exhibit 19 and Exhibit F to Exhibit

5  1.

6         MR. VOLKOV: Well, the excluded Exhibit 19 was

7  later readmitted after it was authenticated as you just --

8         THE COURT: Oh, right.  Right.  Yeah, we finally

9  got there.  Thank you for the correction.

10        MR. VOLKOV: And on the request for judicial

11 notice, we have the complaint and the answer, but actually

12 we did not address -- was aware of meeting the truncated

13 version as Exhibit 1 of the Plaintiff or the full version

14 as it was in Exhibit C of the Defendants.

15        THE COURT: I'm willing to take judicial notice of

16 the complaint and all exhibits.  I'm not admitting those

17 documents into evidence.

18        MR. VOLKOV: So that will be the request granted

19 for Exhibit C of the defense.

20        THE COURT: I'm sorry.  I guess I'm missing your

21 point.  Your copy of the complaint does not include all

22 exhibits; is that what you're trying to tell me?

23        MR. VOLKOV: That's correct, Your Honor.

24        THE COURT: Okay.  So --

25        MR. VOLKOV: And I have no objection of admitting

1   the whole complaint into the request for judicial notice.

2   I just need to know which one --

3   THE COURT: Okay.  All right.  I would prefer to

4   take judicial notice of the complete copy of the entire

5   document.  Is that acceptable to you, Mr. Tukia?  And

6   remember, that it's a request for judicial notice and

7   nothing more than that.

8   MR. TUKIA: That's fine, Your Honor.  Thank you.

9   THE COURT: Okay.  It will be the copy that's been

10  submitted by the Defendants.

11  MR. TUKIA: Your Honor, if you don't mind, may I

12  ask you which exhibits on the Defendants' side have been

13  admitted?

14  THE COURT: Sure.  I have Exhibits D, E, F, G, I,

15  N, H, J and K.

16  MR. VOLKOV: Your Honor, I have no further

17  exhibits to submit.

18  THE COURT: Okay.  Are you resting your case in

19  chief?

20  MR. VOLKOV: Yes, with the following argument

21  later.

22  THE COURT: With the what?

23  MR. VOLKOV: With the closing argument.

24  THE COURT: Of course.  Mr. Tukia, do you have any

25  additional witnesses?

1    MR. TUKIA: No.  No, Your Honor.

2    THE COURT: Okay.  Are you resting your case in

3  chief?

4    MR. TUKIA: Yes, Your Honor.

5    THE COURT: Okay.  So let's take ten minutes and

6  recharge and then we'll proceed with closing arguments.

7  Okay?

8    MR. VOLKOV: Thank you, Your Honor.

9    COURTROOM DEPUTY: All rise.

10    (Whereupon, a recess is taken at 4:24 p.m., and the

11  court is reconvened at 4:43 p.m.)

12    COURTROOM DEPUTY: All rise.  Court is now in

13  session.

14    THE COURT: Please be seated.  Thank you.  Okay.

15  Closing arguments.  Mr. Volkov.

16    MR. VOLKOV: Thank you, Your Honor

17                      CLOSING ARGUMENT

18  BY MR. VOLKOV:

19    Your Honor, based on the evidence presented and

20  admitted, this is the action for the first amended claim as

21  Exhibit 4 demonstrates, Exhibit 4 being admitted into

22  evidence, and on the front page, Item 2 clearly establishes

23  what those claims are for.  It clearly says it's for the

24  lease arrears.  Therefore, we argue that the items claimed

25  as due under this claim must be arising as so due under the

1  terms of the lease.

2          And the lease agreement admitted into evidence
3  here is the Defendants' Exhibit D, with the assignment on
4  the Defendants' Exhibit E.  And that's the terms.  The
5  parties are bound on it.  There was a testament that none
6  of these terms were ever changed, modified, or canceled out
7  or added, and so that's the two documents through which the
8  relationship and use of the parties has to be determined.

9          So if I address, Your Honor, to page 2 of the
10 Defendants' Exhibit D, the very top line, second from the
11 top line, it says:  "Tax and insurance ..."  –- I'll wait
12 for the Court.

13          THE COURT: Please, go ahead.  I'll catch up.

14          MR. VOLKOV: It says:

15          "The tax and insurance (capitalized) to be
16          determined in comparison to ..."
17 I'll move on, Your Honor, to page 4 of this exhibit where
18 it talks about rent.  That's paragraph 2, the second
19 paragraph within the Section 2 says on the second line that
20 the rent payments are due without notice or demand,
21 comparing to page 8 of the same exhibit -- that's paragraph
22 6 for tax and insurance, the last paragraph, where specific
23 provisions of how the demand for tax and insurance must be
24 made.  That's the difference between the two dues, rent
25 versus tax and insurance, and it says that such taxes and

1  insurance shall be paid to lessor by lessee no later than

2  30 days after the lessor as made written demand therefor.

3        Each demand shall be accompanied –- shall be

4  accompanied, not may be accompanied –- by the applicable

5  tax bill or insurance premium invoice.  These documents

6  shall indicate that such amounts have been paid or are

7  payable by the lessor within 60 days.  And they ask this

8  about the proration.  Now –-

9        MR. TUKIA: I'm sorry.  What page is that?

10        MR. VOLKOV: That's page 8 also bates stamped

11  AS00766 from the Defendants' Exhibit D.

12        MR. TUKIA: Thank you.

13        MR. VOLKOV: So those are the requirements for

14  making a demand for tax and insurance.  I think it's a very

15  clear demand, and if there is any ambiguity in it, the

16  ambiguity is on the drafter, but I will refer further to

17  Defendants' Exhibit E, and that's the signers of the lease,

18  in the paragraph 15 of it which specifies how the written

19  demand can be made.  And that limits the ways how the

20  written demand can be made either by hand delivery or

21  certified mail with return receipt to certain addresses.

22        And of course, as we heard in testimony, some

23  mail was received; some was not.  I haven't seen one item

24  for any of the years which would completely satisfy all the

25  requirements stated in the lease, meaning both sent

certified mail with return.  The receipt return would have

testimony nothing was personally delivered and contain all

the appropriate tax bills and insurance bills in it.

So that's the receiving stage of reading on the

Plaintiffs' Exhibit 4, the subject items for property tax

and insurance, and now I'll address those first, and they

include five items for property tax, five items for

insurance, and one combined item at the very end on page 5

of this exhibit for property tax and insurance from January

1st, 2013 through April 28, 2013.  So as I previously stated

and included in my tax brief, the first inconsistency with

the numbers is that it's claimed by calendar year while it

was established here that the dues are counted by the

fiscal year.  And in fact, Ms. Sun's, Defendants' own

declaration admitted here into evidence, that's Plaintiffs'

Exhibit 6 which on the first page of it, paragraph No. 2,

says:

"Attached hereto are true and correct copies of

six letters and notices sent on my behalf."

And those notices do have –- some of them do have

attachments which we've had the opportunity to ask Mr.

Casey about, while some tax bills and some insurance which

establishes that the property tax on this property, on the

subject property, is paid as expected within the fiscal

year periods, and the insurance for this property is paid

from the end of September one year through the end of
September of next year.

Now, with this background, if I'm coming back to
Exhibit 4, page 4 first, that means that the last line for
property tax in 2012 and the last line for insurance in
2012 means 2012-2013, the fiscal year, and the end of
September 2012 - end of September 2013 for the insurance.
This has two consequences. One is on April 29, 2013, the
bankruptcy petition was filed. The Proof of Claim is
supposed to list the claims for pre-petition amounts due,
and in the observed sheet, it will be roughly two months of
property tax for 2012, but the big amount, about five
months for the insurance. But what is more important than
that –- I mean every item is important, but additionally to
that, that shows page 5 of this claim an entirely double
billed amount, notwithstanding that we haven't seen any
request for this amount ever given to the tenants, but just
on the face of itself as of the numbers. That's an
additional charge for the same periods already accounted
under 2012 and 2013.

Now, the amounts of 2008 were indisputably waived
as to just an argument that something was waived, because
it just states here and it states on numerous documents,
the reason no one can dispute what exactly was waived, and
we haven't established it. I'm suggesting and suspecting

that it's the 2008-2009 period, but it's not that important
because this claim -- this is an amended claim.  It's an
amended claim to the initial claim filed in August of that
year as it says on Exhibit 4, the first page.  The first
claim was filed on August 23, 2013 in the right column.
Therefore, the claims beyond the four years are barred by
statute of limitations.

         So we at this point don't even care what exactly
was waived in 2008 or 2009.  We say that as of the filing
of August 23rd, 2013, everything up until August 23rd, 2009,
below and older than that, should be barred by statute of
limitations.

         THE COURT: Up to what date in 2009?

         MR. VOLKOV: Four years counted back from August
23, 2013.

         THE COURT: Okay.

         MR. VOLKOV: Yes.  That will be August 24, 22, I'm
not sure, but around August 23rd of 2009.

         THE COURT: Okay.

         MR. VOLKOV: So that's -- that would include some
of these claims.  Now, if we go back to the declaration of
Ms. Annie Sun in Exhibit 6, and observe her true and
correct copies of the letters, and right now, Your Honor,
I'm not even arguing whether those letters were received or
not received by the tenants.  That will up to the finding

1 of fact, but regardless of that, the letter from March 30,

2 2009 has zero exhibits in it, never sent by certified mail,

3 and it's inaccurate as to be claiming calendar year of

4 2008.

5 The demand, second page, that's page 2 of Exhibit

6 6, dated April 3, 2010, again calendar year of 2008.

7 That's outside of any time line as defined by paragraph 6

8 of the lease. No exhibits, not sent by certified mail,

9 besides being testified never received. And both of these

10 are barred by the statute of limitations.

11 Now coming to November 18, 2010, if it would be

12 received, it could include 2010 proportionally, which it

13 will be served on the sixth line on the demand. However,

14 it was not sent by certified mail. It's inaccurate in its

15 sum because it -- the way the amount was, it was for 2008

16 or 2009, it doesn't matter. It still includes them as due,

17 and it was sent untimely. It was sent on November 11,

18 2010, not within 60 days of all payments mentioned in this

19 letter. At least one installment was paid in April 2011

20 and insurance was due on September 5, 2010 and paid on

21 August 24, 2010 as the next page in this exhibit shows.

22 That's for insurance. And the page 12 of 24 shows that the

23 installment -- it only has information about one

24 installment, but that installment was paid outside of the

25 60-days period. That was paid on April 7, 2011.

1          Sorry.  I'm retracting this because I skipped a

2    line.  That's 2011, and it's not addressed here.  No, it is

3    addressed here.  That's the deal –- that's the period of

4    July 10, 2011, July 2011 through June 2011 (sic) and we

5    have this document which is page 12 of 24, which only

6    refers to one of the installments as paid.  The other

7    installment could be due if it was ever properly delivered,

8    but only as of one installment and if it was properly sent.

9          So for the period of 2011, based on the

10   Defendants' own admitted evidence, Exhibit H, second page,

11   top line, there were no demands made.  The property

12   management sent letters dated November 18, 2010, the one

13   we're just addressing right now, and the next one is

14   January 11, 2012.  So 2012-2013 we have just discussed, I

15   think that the witness testified that as to 2012-2013, she

16   did receive the notice that got to her, but the argument is

17   made that it has to be apportioned as to her filing of the

18   claim and it totally overlaps the last line on the claim,

19   which is again the restatement for the same periods.

20          The same story with the insurance.  There is no

21   letter demanding for the 2011 per Exhibit H.  And the

22   mailbox applicable here requires that the mail to be

23   established as delivered has to be properly addressed, and

24   it's 966 F2d, 487-491, a Ninth Circuit case, (1992) citing

25   U.S. Supreme Court, 11 U.S. 185.  It says that it has to be

 1  properly addressed and if that was properly addressed, the
 2  Court may presume that it was received, and the definition
 3  of house has to be properly addressed as defined.

 4       So next item on the claim that's admitted --
 5  going back to Exhibit 4, we're not addressing today.
 6  That's the holding charge which is outside of today's
 7  hearing.

 8       Next line in order, owner's attorney's fees for
 9  $2,000.  That was -- the scope of it, what it was, was
10  addressed here in detail.  Several items of evidence were
11  submitted.  The defense is trying to make it look like a
12  background check.  I personally never heard of a $2,000
13  background check.  But we do have in the exhibits, I
14  believe, Exhibit 19, a bill for the 2,000 named -- it says
15  "name of the matter, 2012 lease."  And some of these
16  items -- none of these items state specifically background
17  check.  Some are neutral, but some are drafting, including,
18  you know, the item from September 14, 2012.  "Draft
19  commercial lease - September 25, 2012.  Finalize commercial
20  lease."

21       Defense is making the point that it was included
22  in the terms of the sale.  It was for the seller to buy, so
23  whether we do or we do not have standing, but the same
24  claim, the same claim for $2,000 repeatedly asked now from
25  my clients as self-evidenced in the claim itself.  And in

1  fact, back in Exhibit 6 on the declaration of Ms. Sun of

2  the true and correct copies, the last letter here, and

3  that's the one which was sent by certified mail because the

4  last page admitted actually has the printout of it being

5  received.  That's the letter from Ms. Cindy Lee which in

6  the second page of that letter, Item No. 3, does talk about

7  $2,000 incurred, so regardless of what was the initial idea

8  of who is going to pay this $2,000, that was and is,

9  continuous as of today, is the charge being asked from my

10  clients to pay.

11        We have California courts, CCP –- the California

12  Code of Civil Procedure, 1950.8, which in Section B says

13  that it shall be unlawful for any person to require, demand

14  or cause to make payable any payment of money including by

15  not meaning key money, however denominated, or the source,

16  attorney's fees reasonably incurred in preparing the lease

17  or rental agreement as a condition of initiating continuing

18  or renewing a lease or rental agreement unless in the

19  amount of payment to state it in the lease or rental

20  agreement.

21        The defense may argue that the parties agreed

22  that attorney's fees has to be paid, but nowhere in the

23  lease the particular amount is stated, and it would be

24  unfair to somebody agreeing it was a background check,

25  which is an exclusion of this 1950, would be $2,000

Case: 14-03056  Doc# 54  Filed: 08/10/15  Entered: 08/10/15 08:11:52  Page 217 of
231

1  service.  So we ask that that item to be excluded.

2          The Faultline Plumbing sump pump is the smallest

3  and however, I object to it pursuant to the same lease,

4  which is Exhibit E, and D and E from the Defendants, I will

5  put your attention, Your Honor, to the Section 18.  I would

6  first refer to page 16 of this document, which talks

7  about --

8          THE COURT: Go ahead.

9          MR. VOLKOV:  -- which talks about two potential

10 scenarios.  One is partial damage insured loss; that's 18

11 too, and another is partial damage uninsured loss.  Lessor

12 has different options what to do, whether it's insured or

13 not, more likely to restore if it's insured, less likely to

14 restore if it's uninsured, and there is a provision for

15 total destruction, which is not applicable here,

16 indisputably.  It was not elected to be -- the owner never

17 elected to be a total destruction.  So I will attend your

18 attention to paragraph 18.6.  That's on the next page.

19         MR. TUVIA: I'm sorry.  This is the lease?

20         MR. VOLKOV: Yes, Exhibit D.

21         MR. TUVIA: Exhibit D.

22         MR. VOLKOV: I am going on page 17.

23         MR. TUVIA: Okay, thank you.

24         MR. VOLKOV: So 18.6 is a provision called

25 "Abatement of Rent and damages."  And it says in (a):

1      "In the event of damage described in paragraphs

2      18.2 and 18.3, lessor will not restore or receive

3      payments or restore the premises, then real

4      property taxes, insurance premiums and other

5      charges, if any, payable by lessee hereunder, for

6      the period during which such damage, repair,

7      restoration continues..."

8   And then it defines what this period is, not to exceed the

9   period for which is defined under paragraph 10(f), shall be

10  abated unless such damage was caused by willful act of the

11  lessee.  There is absolutely no evidence, Your Honor, that

12  lessee had caused this damage.  It was obviously incurred

13  after the fire.  There is no dispute.  There could be

14  dispute as to the cause of it, or whether the fire caused

15  it, but there is no dispute that it happened in April of

16  2013 and the fire happened in March of 2013.  So because of

17  that, it shall be abated, and this provision is so

18  important, Your Honor, that this same lease copies it on

19  page 8 under paragraph 5(g), and it also talks about

20  abatement and because I'm not going back over it, I can't

21  point to the line, but it talks in a different context; it

22  talks also of the lessor.  In that case the lessor has the

23  applicable (unintelligible) rent, taxes, insurance and

24  other charges payable to owner shall be abated commensurate

25  with the degree of such interruption.

1          So for that reason, we argue that these charges

2    have to be abated, that notwithstanding that in the entire

3    universe of evidence, we never established that this was a

4    written demand made for this payment, the same argument

5    which would apply for tax and insurance.  So we argue that

6    this item has to be stricken.

7          Finally, we understand that some portion of the

8    tax of the last installment will be considered by the

9    Court.  We ask the Court to consider the following offsets,

10   and the Debtor has a right to raise offsets.  There are

11   several –- there are four offsets applicable to this case.

12   First, the Plaintiffs' Exhibit 15 shows a payment on the

13   third page made by the tenants and cashed by the landlord

14   for $5,488.34.  On the page immediately preceding it, it

15   has the calculation of how that $5,488 was arrived to, and

16   you can see, Your Honor, that it was calculated from April

17   29, 2013 through December 31, 2013.  Now in consideration

18   of the tax year which starts on July 1st, 2013, and that's

19   by the way is not my invention or even testimony; it's the

20   California Revenue Tax Code Section 75.6, saying fiscal

21   year means –- the fiscal year beginning July 1st and ending

22   June and the same is confirmed in California Government

23   Court 13290, the fiscal year shall commence on the 1st day

24   of July.

25          So at least two months of that payment prorated

for insurance and tax of that payment of $5,488.34 should
be going towards the 2012-2013 period of the property
insurance. That's offset No. 1. Offset No. 2, the
acknowledged $5,000 payments as it says on the face of
Exhibit 4 and supported by testimony by all parties, that
five $1,000 payments in total of 5,000 made by the tenants
assert an unaccounted offset by the tax relief deduction on
the property tax received by the owner. The testimony
established that no discounts yet has been applied
anywhere. They acknowledged and admitted Exhibit I believe
37 –- 37 shows that the landlord received for fiscal year
2013, that's FY 2013 secured real estate, $3,125.48 on one
check and the interest, because the estate pays interest in
that they consider they are holding someone else's tax,
that's $69.74.

We not only argue that FY 2013 means financial
year 2013, we cite *Black's Dictionary* Edition 2014, it says
first, for the definition of financial year, it says see
fiscal year under year, and under fiscal year, it says
abbreviation FY. So that's how we arrive to the conclusion
that this was the credit back for the period of 2012-2013
period, and there was no credit in any year as we asked at
the testimony, given back to the tenants, who even if they
should be properly noticed, supposed to pay one third of
the taxes due. That's setoff item No. 3.

1    And finally for the setoff item No. 4, tenants do

2  perform under their Plan.  They make timely payments under

3  their Plan.  They did set their objections in the Plan, but

4  not withstanding the objections, they do perform and make

5  payments, and as far as I understand, for the Debtor --

6  sorry, for the creditor, Ms. Annie Sun -- how much was

7  paid? -- roughly 20,000.  We have -- and it's verifiable

8  information --

9    THE COURT: But there's no evidence of that amount

10 in the record, other than her testimony that it's

11 approximately $20,000.  But, I mean, what you're reading

12 from is not admitted.

13   MR. VOLKOV: I know, but at least approximately

14 20,000 and it's $20,082, but this is a verifiable claim in

15 the instance that whatever the Court finds not allowed --

16 whatever the Court disallows, they already made payments in

17 any event, and before I conclude my closing argument, I

18 have to say that first of all, I'm glad to have this

19 opportunity to argue, but the burden of persuasion on this

20 claim always remains with the claimant.  That's In re

21 Wells, 463 B.R. 323-326 (2011) and because they did not

22 file as the Exhibit 4 observes, any supporting exhibits to

23 their claim, as they did not in their original claim, the

24 burden of proof also shifts to it.  As the case says,

25 failing to (unintelligible) required by Federal Rule of

1  Bankruptcy Rule 3001(c), does not automatically invalidate

2  the claim.  It does, however, deprive the claim of prima

3  facie validity under Rule 3001(f) and without this

4  presumption of validity, the burden of proving the

5  existence and the amount of claims falls to the claimant

6  with the burden of proof by presentation and waiving

7  (unintelligible) to the claim.  That's <u>In re Cameron</u>

8  (Phonetic) 2004, 315 B.R. 706.

9         In conclusion, Your Honor, I ask the Court that

10  the Court strike items as presented on Exhibit 4 for

11  property tax and insurance in the amounts of property tax

12  23,482.80, insurance 7,202.33 and property tax and

13  insurance cumulative for $2,598.36, attorney's fees

14  provision for $2,000 for the unsuccessful attempt to sell

15  the business as a sale, and the plumbing charge for $895.

16         THE COURT: Thank you.

17         MR. VOLKOV: Thank you, Your Honor.

18         MR. TUKIA: Your Honor, may I --

19         THE COURT: Please be seated.  Don't worry about

20  it.

21         MR. TUKIA: I'll be quick or at least not as long

22  as my honored opposing counsel.  I thank him for his time.

23                    CLOSING ARGUMENT

24  BY MR. TUKIA:

25         The $2,000 attorney's fee.  Annie Sun testified

1   she hired Cindy Lee to do a background search on a

2   potential buyer of the lease from the Gereviches.  Ms. Lee

3   performed that work, and she charged $2,000.  That $2,000

4   was forwarded to the Gereviches.  It wasn't forwarded to

5   the potential buyer; it wasn't a condition to the lease

6   that the potential buyer was accepted.  So whether counsel

7   at Civil Code Section 1950.8(b) applies in this case as the

8   Plaintiffs suggest it does, it does not because that

9   particular portion pertains to a buyer, not a seller of

10  the rental property.

11          Regardless, 1950.8(e) applies here because Ms.

12  Lee was hired to perform -- to verify the creditworthiness

13  and the background of that buyer, and that she charged

14  $2,000.  There's nothing -- there's no evidence here that

15  says that $2,000 was improper, and the irony is that it was

16  the Plaintiffs who excluded Ms. Lee from testifying today

17  who could have elaborated on that.  But she's not here, so

18  what we have is the direct evidence from Annie Sun and in

19  that regard, that $2,000 claim is valid.  It should not be

20  excluded.

21          In regard to the $895 Faultline Plumbing, the

22  invoice has been admitted into evidence.  Inside the

23  invoice on paragraph 2 of page 2 of that invoice, and I'll

24  just read it for the record:

25          "The technician determined the back flow

1          preventer was in fact -- (I'm sorry -- The

2          technician reported that neither of the problems

3          that he was hired to look at was the direct

4          result of the fire."

5  That's the fire of March 13, 2013 (sic), and then

6  Plaintiffs brought up David Myers to testify, and in his

7  testimony, he said all those issues were not part of the

8  fire.  So again, that is a valid claim of $895 by Ms. Sun

9  in the bankruptcy claim, because it was not -- it is not

10 related to the fire.  It was --

11          THE COURT: I understand.

12          MR. TUKIA: Sorry.  It's late afternoon, and I

13 thank you for your patience in that regard, Your Honor.

14          THE COURT: It's okay.

15          MR. TUKIA: The taxes and insurance Plaintiffs

16 paid in 2006 -- Plaintiffs paid in 2007.  They did not

17 dispute or object to the accounting or the amounts charged

18 them and then they paid.  Before I move on, the argument

19 set forth by Plaintiffs' counsel in his closing argument

20 regarding taxes, the fiscal year versus the calendar year,

21 that should be -- I move to strike in that regard because

22 that's expert testimony, and they provided no expert here.

23 The only witness they had who could discuss the lease was

24 Mrs. Gerevich, and, you know, in answer to questions from

25 her attorney, she admitted she wasn't an accountant or not

1  an expert in that regard.  There is no expert testimony --

2  there is no evidence that suggests that fiscal year amounts

3  should be accounted for instead of calendar year amounts.

4       Having said that, all the parties were still

5  acting under the acceptance of the numbers and the

6  accounting provided to them.  They just failed to pay.

7  2008, they failed to pay, but Ms. Sun, in light of the

8  economic hardship around that time, waived those

9  outstanding payments.  2009, Plaintiffs failed to pay.

10  2010, Plaintiffs failed to pay. 2011, Plaintiffs failed to

11  pay.  2012, they failed to pay, but then they started

12  making payment at that time, and you saw in the

13  correspondence and communications between John Casey and

14  sima Gerevich as well as Cindy Lee, the Defendants sent the

15  Plaintiffs proper notice that these outstanding taxes and

16  insurance were due.  Plaintiffs acknowledged them and

17  offered to work out some plan to repay.  They started

18  paying, in fact, as much as $1,000 a month up to $5,000

19  total.  After that, they stopped.

20       So by late 2012, they're already in breach of

21  this -- or by April of 2013 or March 2013, when this fire

22  broke out, they were in breach of this lease, and --

23       MR. VOLKOV: Your Honor, objection.

24       THE COURT: We're not objecting to closing

25  arguments.  He's going to say what he's going to say, and I

1  will review the evidence.

2        MR. TUKIA: And the evidence will show that —- you

3  know, there's a letter there from Mrs. Gerevich admitting

4  that they owe the taxes and they owe the outstanding

5  insurance, and by the way, here's a check for $1,000, and

6  that she continued to pay in an effort to alleviate that

7  debt.

8        THE COURT: I'd appreciate it if you would address

9  Mr. Volkov's argument as to the method of delivery for the

10  demands for those payments and the timeliness of them and

11  his allegation that the lease requires documentation to be

12  attached.

13        MR. TUKIA: Well, there were documentations, at

14  least reference to documentations attached.  Unfortunately

15  in Plaintiffs' own exhibits, they weren't attached.  The

16  delivery, arguably, what's concerning legal notice for

17  legal papers, aside from regular correspondence, I think,

18  you know, this is —- regular correspondence to the

19  Plaintiffs, to an address that's undisputed, is their

20  address that they received mail.  With all due respect to

21  them, there's a sense of selective receipts of mail.  They

22  received some mail; they don't receive other mail.  But

23  they don't complain about it.  They never told my clients

24  that they're having difficulty receiving mail.  My clients

25  never received any notice that —- or never received any

1  return mail that was sent to the Gereviches as testified to
2  by John Casey.

3      That is added language to the assignment and the
4  language says it's concerning a legal notice.  Having said
5  that, Your Honor, they've waived that argument because of
6  the fact that they've acknowledged the debt for outstanding
7  insurance and property taxes.  They started making payments
8  in that regard.  So as far as lack of notice, they knew
9  about it.  And they didn't object to the numbers, and for
10  them to –- at least for their attorney to argue all these
11  accounting and fiscal year versus calendar year principles,
12  at this late stage of the case without an expert is
13  disingenuous and improper, and we would move to strike in
14  that regard.

15      Moving on to the five-year option, Your Honor,
16  again, by December 2013 when they decided to exercise the
17  five-year option, they had already been in bankruptcy for,
18  you know, starting from April to December, that's almost
19  eight months.  They're in bankruptcy by December 2013.
20  They exercise that part of the lease that says they want a
21  five-year option.  They were already in breach of the lease
22  at that time.  As Mr. Casey testified, they were late on
23  rental payments a number of times, and the most important
24  thing is they had failed to pay their outstanding taxes and
25  insurance payments.  But unfortunately because of the

1  pending bankruptcy case, any efforts to evict them were
2  frozen until this bankruptcy is resolved.  So yet the lease
3  ran into the end of the ten-year term by July 1, 2014.
4  According to the lease, their rent increases to ninety-five
5  hundred dollars by then.  Ms. Sun testified that there was
6  some agreement to a ninety-five hundred dollar hike in rent
7  that was never paid.  That was not paid until ten months
8  later, two months ago in 2015.

9          So Defendants did not waive that argument that
10 they breached the lease and therefore they should be
11 evicted from the premises, but they were precluded from
12 performing that because of the pending bankruptcy.  There's
13 a paragraph 22 of the lease that preserves their right to
14 accept payment without waiving any rights.  That was –- I
15 believe we brought that up in our trail brief, and again,
16 it's at paragraph 22 of the lease.

17         Otherwise, again, I'm just –- I'm disappointed in
18 some of these new arguments being posed, even this
19 afternoon, not this morning, but this afternoon about the
20 statute of limitations.  And again, this fiscal versus
21 calendar year issue has never been part of the case.  It
22 wasn't alleged in their complaint.  It hasn't been
23 established as to the amounts, how they were made, whether
24 it was based out of a fiscal year or a calendar year.

25         Having said that, it was already accepted.  So

1  their argument is not -- it's a red herring and irrelevant

2  because the parties had already started acting on the

3  actual amounts that were presented to the Plaintiffs.  In

4  fact, the trustee, the bankruptcy trustee has acted on it

5  and has paid approximately 20,000 out of the $33,000 claim

6  already, without any objections to the accounting.  In that

7  regard, that makes it all the more reasonable the claims

8  that were made here by Ms. Annie Sun in her capacity as an

9  individual and as a trustee.

10           Thank you, Your Honor.

11           THE COURT: Okay. Thank you.  All right.  I'm

12  going to take the matter under submission.  I have not

13  decided yet whether additional post-trial briefing would be

14  helpful.  Frankly, I'm exhausted, and so I want to give you

15  as much clarity and guidance as I possibly can in

16  requesting additional briefing, so what I'd like to do is

17  collect my thoughts over the next several days, issue a

18  further order requiring additional briefing if that's

19  necessary.  If you hear nothing in that regard, just assume

20  that I don't need it.  Okay?

21           But thank you for a well-tried case, both

22  parties.  I'm pleased with the way the evidence came in,

23  and I appreciate your professionalism.

24           ALL COUNSEL: Thank you, Your Honor.

25  (Whereupon, the proceedings are concluded at 5:29 p.m.)

1
2
3
4              CERTIFICATE OF TRANSCRIBER
5
6        I certify that the foregoing is a correct
7  transcript from the digital sound recording of the
8  proceedings in the above-entitled matter.
9
10 DATED: August 8, 2015
11
12                       By:___/s/ Jo McCall_____
13
14
15
16
17
18
19
20
21
22
23
24
25